**2014-1148**

In The

# United States Court of Appeals
For The Federal Circuit

## MASTEROBJECTS, INC.,

*Plaintiff – Appellant*,

**v.**

## GOOGLE, INC.,

*Defendant – Appellee.*

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA IN CASE NO. 4:11-CV-01054-PJH, UNITED STATES DISTRICT JUDGE PHYLLIS J. HAMILTON.**

_____

## BRIEF OF APPELLANT

_____

Spencer Hosie
Diane Sue Rice
HOSIE RICE LLP
600 Montgomery Street, 34th Floor
San Francisco, California 94111
(415) 247-6000 (Telephone)
(415) 247-6001 (Facsimile)
shosie@hosielaw.com
drice@hosielaw.com

*Counsel for Appellant*

Leslie V. Payne
Nathan J. Davis
Alden G. Harris
HEIM, PAYNE & CHORUSH, LLP
600 Travis Street, Suite 6710
Houston, Texas 77002
(713) 221-2000 (Telephone)
(713) 221-2021 (Facsimile)
ndavis@hpcllp.com
lpayne@hpcllp.com
aharris@hpcllp.com

*Counsel for Appellant*

# CERTIFICATE OF INTEREST

Counsel for MasterObjects, Inc. certifies the following:

I.    The full name of every party or *amicus* represented by us is:

MasterObjects, Inc.

II.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

[not applicable]

III.    All parent corporations and any publicly held companies that own 10% or more of the stock of the party represented by us are:

None.

IV.    The names of all law firms and the partners or associates who appeared for the party now represented by us in the trial court or are expected to appear in this Court are:

Hosie Rice, LLP, Spencer Hosie, Diane Rice, George Bishop, Darrell Atkinson, William Nelson

Heim, Payne & Chorush, LLP, Leslie Payne, Nathan Davis, Alden Harris

Dated: February 24, 2014

*/s/ Spencer Hosie*_____
Spencer Hosie
Counsel for Appellant

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ...................................................1

JURISDICTIONAL STATEMENT ......................................................2

STATEMENT OF THE ISSUES ..........................................................3

INTRODUCTION ..................................................................................4

I. STATEMENT OF THE CASE ......................................................7

   A. MasterObjects, Inc. and Its Invention .................................7

   B. MasterObjects' Patents .......................................................9

   C. Google's Infringing Product/Service ................................11

   D. Procedural History and Related Cases .............................13

II.  SUMMARY OF THE ARGUMENT .........................................17

III.   ARGUMENT ..............................................................................20

   A.   Legal Standards ..............................................................20

   B.   The Claims Are Not Limited to Sending "Only the Changes" ............21

   C.   The Specification Does Not Limit the Claims to Sending "Only the Changes" ............33

      *a. The Legal Requirements For Finding a Disavowal in the Specification Are Exacting* ............34

      *b. The Structure of the Patents: General Description of the Invention and In-the-Weeds Technical Detail For One Enabling Embodiment* ............36

      *c. The Specification Teaches that the Client May Send the Query Without Sending "Only the Changes"* ............38

      *d. The Portions of the Specification Relied Upon by Google and the District Court Describe Permissible Implementation Details; They Do Not Clearly Disavow Claim Scope* ............39

   D.   The Prosecution History Demonstrates That the Claims Are Not Limited to Sending "Only the Changes" ............48

IV.  CONCLUSION AND STATEMENT OF RELIEF SOUGHT ............52

# TABLE OF AUTHORITIES

## Cases

*Abbott Laboratories v. Sandoz*
   566 F.3d 1282 (Fed. Cir. 2009) ...........................................................35

*Absolute Software, Inc. v. Stealth Signal, Inc.*
   659 F.3d at 1136 Fed. Cir. 2011) ................................................. 43, 46

*Allen Eng'g Corp. v. Bartell Indus.*
   299 F.3d 1336 (Fed. Cir. 2002) ...........................................................23

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*
   512 F.3d 1338 (Fed. Cir. 2008) ...........................................................32

*Cybor Corp. v. FAS Techs., Inc.*
   138 F.3d 1448 (Fed. Cir. 1998) ...........................................................20

*Free Motion Fitness, Inc. v. Cybex International, Inc.*
   423 F.3d 1343 (Fed. Cir. 2005) ...........................................................32

*Gillette Co. v. Energizer Holdings, Inc.*
   405 F.3d 1367 (Fed. Cir. 2005) .................................................... 32, 33

*Helmsderfer v. Bobrick Washroom Equip., Inc.*
   527 F.3d 1379 (Fed. Cir. 2008) ...........................................................34

*Honeywell Int'l, Inc. v. ITT Indus.*
   452 F.3d 1312 (Fed. Cir. 2006) ...........................................................46

*i4i Ltd. P'ship v. Microsoft Corp.*
   598 F.3d 831 (Fed. Cir. 2010) ...................................................... 21, 44

*Liebel-Flarsheim Co. v. Medrad, Inc.*
   358 F.3d 898 (Fed. Cir. 2004) ...................................................... 36, 43

*Lighting Ballast v. Philips Elecs.*
   No. 2012-1014 (Fed. Cir. Feb. 21, 2014) ...........................................20

*Mars, Inc. v. H.J. Heinz Co., L.P.*
337 F.3d 1369 (Fed. Cir. 2004) ..........................................................30

*MasterObjects, Inc. v. eBay, Inc.*
2013 U.S. Dist. LEXIS 47001 (N.D. Cal. Mar. 28, 2013) ...........................*passim*

*MasterObjects, Inc. v. Yahoo!, Inc.*
2013 U.S. Dist. LEXIS 168296 (N.D. Cal. Nov. 26, 2013) .........................*passim*

*Phillips v. AWH Corp.*
415 F.3d 1303 (Fed. Cir. 2005) ....................................................*passim*

*Rambus Inc. v. Infineon Techs. Ag*
318 F.3d 1081 (Fed. Cir. 2003) ................................................. 21, 43

*Renishaw PLC v. Marposs Societa' per Azioni*
158 F.3d 1243 (Fed. Cir. 1998) .........................................................21

*Teleflex, Inc. v. Ficosa N. Am. Corp.*
299 F.3d 1313 (Fed. Cir. 2002) ........................................................35

*Thorner v. Sony Computer Entm't Am. LLC*
669 F.3d 1362 (Fed. Cir. 2012) ................................... 20, 21, 22, 34

*Trading Technologies Int'l, Inc. v. ESpeed, Inc.*
595 F.3d 1340 (Fed. Cir. 2010) ............................................. 36, 46

*Voda v. Cordis Corp.*
536 F.3d 1311 (Fed. Cir. 2008) ........................................................43

**Statutes**

28 U.S.C. § 1295(a)(1) ...................................................................2

28 U.S.C. § 1338(a) .......................................................................2

## STATEMENT OF RELATED CASES

There have been no other previous appeals in or from this civil action before this or any other appellate court.

There are two cases pending in the United States District Court for the Northern District of California that involve the same asserted patents.  The first is *MasterObjects, Inc. v. eBay, Inc.*, Case No. 3:12-cv-680, which is before Judge Corley.  The second is *MasterObjects, Inc. v. Yahoo! Inc.*, Case No. 3:11-cv-2539, which is before Judge White.  The fundamental question regarding claim scope presented in this appeal was also raised in the *eBay* and *Yahoo!* cases, where the respective courts each reached the opposite conclusion as the district court in the present case.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1338(a).  This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).  The district court entered a stipulated final judgment order on November 26, 2013.  A46.  MasterObjects filed a timely notice of appeal on December 3, 2013.  A1903.

## STATEMENT OF THE ISSUES

Whether the district court erred by construing various lengthy phrases in the asserted claims to each require that the client send "only the changes to the input string that were not sent in any previous query," thereby (i) rejecting the full scope of the ordinary meaning of the claims that two other district courts embraced, (ii) importing—as a claim requirement—a permissive feature from a preferred embodiment in the specification, and (iii) foreclosing the addition of unclaimed elements in the context of open-ended "comprising" claims.

## INTRODUCTION

In 2001, Mark Smit of MasterObjects invented a new way to search online. Instead of waiting for a user to finish typing a search request and hit "submit," Mr. Smit's invention returned increasingly relevant results in real time as the user entered a query. Nine years later, Google unveiled Google Instant, a "game changer" that enabled the software giant's eponymous search engine to provide its users with immediate results. A471. MasterObjects' patents claim precisely the technology that Google Instant uses—a communication protocol that sends a lengthening search string in real time and a server system that returns results as the user types.

To make an instant search paradigm work, the search box in the user's web browser (the "client") needs to synchronize its contents with a remote system (the "server") that processes the query and returns results. In other words, the client "send[s] ... a lengthening string" to the server that conveys the user's input. '529 patent at 31:52-54 (A99). One way to do this, the patents say, is to send the entire search string whenever the user types additional characters. *See infra* § III.C; '529 patent at 12:3-8 (A86). Another way is to send "just the changes" that the user entered since the last time the string was sent. '529 patent at 20:13 (A93). The specification, the prosecution history, and the claims themselves contemplate that either of these approaches is acceptable.

In a creative bid to escape infringement liability, Google convinced the district court to construe the claims in a way that excludes sending the user's entire search string. Citing Google's cropped quotes from a description of the preferred embodiment, the district court held that the claims were limited to sending "only the changes to the input string …" and nothing more. A40.

The court's construction transgresses fundamental principles of claim construction. *First*, though claims are presumptively entitled to their full, ordinary meaning, the court's construction restricts the claims to a much narrower meaning inconsistent with their plain terms. *Second*, the construction imports as a limitation a relatively minor implementation detail of a preferred embodiment, heedless to broader disclosures elsewhere in the specification and prosecution history that contradict this embodiment-specific language. *Third*, the construction's use of the word "only" closes off the otherwise open "comprising" transition, thereby precluding the addition of unclaimed elements. *Fourth*, two other judges in the same district have construed the claims to allow sending the entire lengthening string, further establishing that the plain meaning of these claims does not somehow prohibit sending exactly that string.

The district court's unduly narrow construction carved Google Instant from the scope of MasterObjects' patent claims, leading to a stipulated final judgment of non-infringement. MasterObjects respectfully requests that this Court reverse the

district court's erroneous claim construction and vacate the stipulated judgment of non-infringement that followed.

# I. STATEMENT OF THE CASE

## A. MasterObjects, Inc. and Its Invention

MasterObjects, Inc. is a software company founded by Mark Smit, one of the inventors on the patents-at-issue in this appeal. In 1999 and 2000, Mr. Smit was a young computer scientist working on relational databases and complex document search and retrieval issues for a technology company near Amsterdam. He found the technology frustrating and slow, and thought he could do better. Accordingly, he left his job and put his life savings in a new company founded to develop better search technology. He called the company MasterObjects, and it still exists today.

By the summer of 2001, Mr. Smit had fully conceived of a new search paradigm. He created a way to have instant search results provided as the user typed in characters in a search request. There are several key features to Mr. Smit's new approach to search.

First, Mr. Smit's technique uses asynchronous communications between the user's computer and the server performing the search. In the old search model, the communication was "synchronous," *i.e.*, the server would sit idle until the user hit submit, whereupon the server would do its work, and then return the information to the client. As the client worked, the server waited; as the server communicated, the client waited. To break this "request-response" loop, Mr. Smit understood that

he needed a new communication protocol that was asynchronous, *i.e.*, the client and the server could talk to each other within a session in a non-blocking way. In other words, the server and the client could communicate at the same time rather than the server waiting until the client finished and vice versa. It is the difference between a walkie-talkie ("roger, over") and a telephone (where the parties can speak at any time, even simultaneously, within a conversation). This "asynchronous communications protocol" let the client and the server exchange information even as the user typed characters in the search request.

Second, the invention stores ("caches") prior search queries and corresponding results. Critical to making instant search possible is the notion of storing the most common prior queries and the search results for those queries. With these stores, known as "caches," the system had the speed to associate a few characters of a new request with a pre-existing model of the same request and results thereto, and provide the correct results right away.

Third, search in accordance with the invention is "session-based." A "session" refers to the time period where a user sits down and types in a search request. During a session, as each character (*e.g.*, a letter) is entered, the search becomes increasingly focused, and the results returned increasingly accurate. For example, as a user searching for information about an indoor arena in Manhattan types, "mad" becomes "madi," then later "madison sq," and then out pops search

results—the content—for "madison square garden." The lengthening query produces increasingly relevant and responsive information as the user types (*e.g.*, information relating to Mad Magazine, then James Madison, then Madison Square Garden).

Along with others at MasterObjects, Mr. Smit developed a commercial embodiment of this invention called "QuestObjects," which went on the market in 2004. MasterObjects has had significant sales to clients including Hewlett-Packard, Siemens, and Princeton University. It remains in business today.

### B. MasterObjects' Patents

In August 2001, Mr. Smit filed MasterObjects' first patent application, which issued as U.S. Patent No. 8,112,529 ("the '529 patent"), entitled "System and Method For Asynchronous Client Server Session Communication." The specification describes all of the above aspects and fully enables the instant search invention. This application was followed by others, and now MasterObjects owns four patents with other applications pending. Two patents are asserted here: the '529 patent and U.S. Patent No. 8,060,639 ("the '639 patent"), which is a continuation-in-part of the '529 patent. A65; A106.

The common portions of the '529 patent and '639 patent specifications describe MasterObjects' invention in general terms, and also provide a highly detailed technical description of the QuestObjects implementation (with references

9

to specific software components referred to as "Questlets," "Questors," and the like).

Claim 1 of the '529 patent is representative.  It recites elements that track the key features of MasterObjects' invention described above, including session-based, asynchronous communication of search requests and search results between the client and the server as the user types, and caching of queries and results at the server:

1. A system for retrieval at a client system of content from a server system, comprising:

a communication protocol that enables an asynchronous connection over a network between a client system and a server system, and allows the client system to send via the network, and within a session between the client system and the server system, a lengthening string composed of a plurality of consecutively input characters, to query the server system for string-based content, while asynchronously receiving consecutive responses from the server system as the characters are being input;

a content-based cache, at the server system, which stores previous queries and corresponding result sets previously executed by the system, and which includes within its result sets content or other information previously retrieved from the server system or one or more content sources in response to the previous queries;

a client object, in communication with a client software at the client system and with the communication protocol, wherein the client object

receives, as input, consecutive additional characters from the client software, and

10

while each of the consecutive additional characters are being received as input, transmits via the network to a server object at the server system one or more corresponding consecutive queries, within the session between the client system and the server system, to retrieve content from the server system,

wherein each of the corresponding consecutive queries lengthens the string by the additional characters, to form a lengthening string for retrieving matching content from the server system; and

a server object, in communication with the server system, and with the client object via the communication protocol, wherein the server object

in response to receiving each of the corresponding consecutive queries that modify the lengthening string,

automatically uses the lengthening string to query and retrieve content information from the content-based cache at the server system or from the one or more content sources that matches the lengthening string, and

asynchronously returns, while the additional characters are being input and the corresponding consecutive queries are being transmitted and the lengthening string is being modified during the session, consecutive responses containing content information which increasingly matches the lengthening string, to the client object for immediate use by the client system, wherein the server system includes at least one processor.

'529 patent at 31:48-32:31 (A99).

## C. Google's Infringing Product/Service

In late 2010 (over nine years after MasterObjects filed its first patent application), Google released Google Instant, which offered a new (to Google) manner of searching where Google suggests completed queries and provides

instant results for those queries as the user types.  As (then) Google's Marissa
Mayer explained:

> Instant takes what you have typed already, predicts the most likely
> completion and streams results in real-time for those predictions—
> yielding a smarter and faster search that is interactive, predictive and
> powerful.

A473.  In other words, as a user types characters into the Google search box (*e.g.*,
"madi"), Google Instant provides immediate search results for what Google
predicts to be the user's complete search query (*e.g.*, "madison square garden").
Exemplary screenshots showing how Google Instant provides immediate search
results as the user types "foo" when searching for the Food Network are provided
at A58-60.

Ms. Mayer further explained in the same posting that "Google Instant will
become the **core search experience** on Google.com…."  A474 (emphasis added).
She made clear that Google Instant was a "whole new way to search" (for Google).
A471.  This "new way" was called a "game changer."  *Id.*

Google has sought to protect Google Instant with a bevy of patent filings,
including an application filed in 2011—a full decade after MasterObjects.  *See*
"Anticipated Query Generation and Processing in a Search Engine," U.S. Patent
No. 8,271,471 (filed September 26, 2011, issued September 18, 2012) (A630).
These Google Instant patent filings are remarkably similar to the MasterObjects
patents in that they claim sending an incomplete search request, predicting likely

full queries from that partial request, obtaining results for one or more such predicted queries, caching the results, and then sending such instant results to the user, all mid-search request.

### D. Procedural History and Related Cases

The present case is one of three cases filed by MasterObjects to protect its patented search technology. The other two defendants are eBay and Yahoo!, and those cases are in front of different judges in the Northern District of California and remain pending. *MasterObjects, Inc. v. eBay, Inc.*, Case No. 3:12-cv-680 (Corley, J.); *MasterObjects, Inc. v. Yahoo! Inc.*, Case No. 3:11-cv-2539 (White, J.).

In each of the three cases, the defendant sought to import into the claims via claim construction a specific implementation choice that MasterObjects described in the specification's discussion of the QuestObjects embodiment. Specifically, as discussed above, the invention contemplates that the search request is transmitted to the server as the user types. Although the precise nature of this transmission is a relatively minor implementation detail that could be accomplished in several ways, each defendant requested that the respective district courts construe all of the asserted claims to require one specific approach to this transmission, namely, sending each new character individually as the user types *without sending any previously input characters at the same time* (*i.e.*, sending "only the changes"). For example, if the user's search query was "patent," under the defendants'

proposed approach there would only be infringement if the client sent "p" followed by freestanding "a" followed by disassociated "t" followed by "e," *etc*.  According to the defendants, a system would <u>not</u> fall within the scope of MasterObjects' claims if the client sent "p" followed by "pa" followed by "pat" followed by "pate" followed by "paten" followed by "patent."

Each of the defendants argued that various passages of the specification demanded limiting the claims in this manner.  They did not, however, agree on where this supposed narrow limitation on transmission mechanics was found in the claim language.  eBay and Yahoo! argued that this requirement flowed from the "communication protocol" term, which they proposed should be construed to require "optimiz[ation] for sending single characters from a client to a server."  *See MasterObjects, Inc. v. Yahoo!, Inc.*, Case No. 3:11-cv-2539-JSW, Dkt. No. 64, slip op. at 8-9, 2013 U.S. Dist. LEXIS 168296, at *17 (N.D. Cal. Nov. 26, 2013) (A2123-24); *MasterObjects, Inc. v. eBay, Inc.*, Case No. 3:12-cv-680 JSC, Dkt. No. 51, slip op. at 11, 2013 U.S. Dist. LEXIS 47001, at *19-20, (N.D. Cal. Mar. 28, 2013) (A1320).  Google took a different tack, asserting that this requirement attached to various lengthy phrases that it proposed should each be construed "as a whole" (but "without removing other requirements mandated by the claim language").  A757 at n.12 (Google's Responsive Claim Const. Br.).  Under Google's *gestalt* approach, it argued that the claims "as a whole" mean "each

query consists only of the changes to the input string that were not sent in any previous consecutive query."[1] A38-39 (*Google* Claim Const. Order).

The judges in the *eBay* and *Yahoo!* cases rejected the defendants' requests to import into the claims the "only send the changes" implementation choice described in the specification with respect to the QuestObjects embodiment. *See* A2124 ("[T]he Court finds Yahoo! again attempts to read limitations into the claims based on the QuestObjects preferred embodiment."); A1323 ("[T]he Court concludes that the specification does not clearly indicate an intention to limit 'communication protocol' to a protocol that is optimized for sending single characters.'").

In the present case, however, the district court concluded that the claims were so limited by the specification. A40 ("[T]he court construes the 'additional characters' terms as follows: 'only the changes to the input string that were not sent in any previous consecutive query.'"). MasterObjects subsequently filed a motion for reconsideration, which was denied. A42.

It is undisputed that the search requests transmitted to the Google server as a user types during operation of Google Instant include the entirety of thus-far entered text. A51 at ¶¶ 7-8. In other words, as a user types "patent" into the

---

[1] For example, the phrase Google identified for this requirement in claim 1 of the '529 patent was: "wherein each of the corresponding consecutive queries lengthens the string by the additional characters, to form a lengthening string for retrieving matching content from the server system." A38.

Google search box, the consecutive transmissions to Google are "p," "pa," "pat," "pate," "paten," and "patent" (as opposed to "p," "a," "t," "e," "n," and "t"). Because each consecutive transmission by Google Instant does not include "only the changes to the input string that were not sent in any previous consecutive query" as required by this district court's construction, MasterObjects and Google agreed to a stipulated final judgment of non-infringement based on this construction. A47-48.

## II.   SUMMARY OF THE ARGUMENT

Neither the claims, nor the specification, nor the prosecution history of MasterObjects' patents limit the manner in which the client may send the user's search string to the server.   Instead, the intrinsic evidence discloses alternative ways to send the string, such as by "send[ing] the entire string all at once" or "send[ing] just the changes."   '529 patent at 12:7 (A89); '529 patent at 20:13 (A93).   Absent a clearly expressed intent to limit the claims (what the law calls "expressions of manifest exclusion or restriction"), MasterObjects is entitled to the full scope of the claims' ordinary meaning.

The claims themselves contain no particular phrase or term that supports Google's proposed construction, which is presumably why Google asked the district court to construe various limitations amorphously "as a whole."   *See infra* § III.B.   What the patents actually claim is quite straightforward—the client system sends "a lengthening string composed of a plurality of consecutively input characters" to the server.   '529 patent at 31:52-55 (A99).   Two other judges in the Northern District of California agreed that the claims do not limit the manner in which the string may be sent, and have issued claim construction orders rejecting such imported limitations.

Google's position that the claimed invention is restricted to sending "only the changes" in the form of "additional characters" does not find support in the

17

patent's specification either, which speaks directly to this issue: "The system's protocol is not restricted to sending single characters. In fact, Clients can also use the protocol to send a string of characters." '529 patent at 12:3-5 (A89). This is revisionism in the form of construction. Repeatedly, the specification explains that the claimed system can send entire "strings" and emphasizes that the detailed descriptions of the preferred embodiment are not intended to delimit the metes and bounds of the invention.

During prosecution, the patentee actively broadened the originally filed claims to ensure that they include sending more than just the changes. While the original claims were drawn to a system that sent "single string characters," the claims were soon amended to remove this limitation and to expand the ambit of allowable transmission methods. This evolution of the claim language further undermines Google's argument that an "only the changes" limitation, removed by the patentee, should be inserted back into the claims via *gestalt* construction.

Because the claim language at issue has a plain and ordinary meaning and the only dispute between the parties is the propriety of Google's "as a whole" construction limiting the claims to sending "only the changes," no further construction of the phrases at issue is required once Google's proposed construction is properly rejected. MasterObjects respectfully requests that this Court reverse the district court's erroneous claim construction and stipulated

judgment of non-infringement, and find that the terms at issue are entitled to their plain and ordinary meaning.

## III.   ARGUMENT

Google's send "only the changes" construction wars with the plain language of the asserted claims.  Google reads this "only" in from whole cloth, conjuring a restriction that contradicts the plain language of the claims and is equally inconsistent with the specification and prosecution history.  This is construction through expediency, not principle.  The district court's claim construction order should be reversed.

### A.   Legal Standards

The following is a summary of relevant legal standards and claim construction axioms:

1.    This Court reviews claim construction *de novo*.  *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1451 (Fed. Cir. 1998) (en banc); *Lighting Ballast v. Philips Elecs.*, No. 2012-1014, slip op. at 37 (Fed. Cir. Feb. 21, 2014) (en banc).

2.    The words of a claim are generally given their ordinary and customary meaning.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).

3.    "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution."  *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).  Absent clear disavowal in the form of "expressions of manifest

exclusion or restriction," the patentee is entitled to the full scope of the claim language. *Id.* at 1366.

4.    Courts must "avoid the danger of reading limitations from the specification into the claim." *Phillips*, 415 F.3d at 1323. Although the specification often describes very specific embodiments of the invention, this Court has "repeatedly warned against confining the claims to those embodiments." *Id.*

5.    Where the specification describes a feature of "the present invention," this description does not limit the scope of the claims unless it rises to the level of clear disavowal (*i.e.*, it contains expressions of manifest exclusion or restriction). *See Rambus Inc. v. Infineon Techs. Ag*, 318 F.3d 1081, 1094-95 (Fed. Cir. 2003). A description of "the present invention" that uses permissive language does not constitute clear disavowal. *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 844 (Fed. Cir. 2010).

## B.    The Claims Are Not Limited to Sending "Only the Changes"

"The claim construction inquiry … begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). The claims define the "metes and bounds of the patentee's invention." *Thorner*, 669 F.3d at 1367. A patentee is "free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning." *Id.*; *Phillips*, 415 F.3d at 1313.

As a preliminary matter, the "construction" proposed by Google and adopted by the district court should be met with skepticism because it does not actually define any specific words in the claim. Three defendants each sought to read the "only send the changes" restriction into the claims, but could not agree on which claim language states this requirement (and two other judges concluded that this limitation was **not** found in the asserted claims). *See supra* § I.D. Google itself told the district court that its proposed construction on this point should be interpreted as follows:

> Google's proposed construction on the various "additional characters" limitations **is not intended to construe each phrase of the specific language** for each limitation, but **rather to provide a construction that reflects the scope imparted by those limitations as a whole without removing other requirements mandated by the claim language**.

A757 at n.12 (emphasis added).

In other words, even Google is not asking for a construction of the actual words of the claims, and Google further admits that no particular claim "phrase" supports its construction. Instead, Google's position is that the various lengthy phrases mean what they say, but then an additional requirement that "each query consists only of the changes to the input string that were not sent in any previous consecutive query" should be thrown in too. *See id.* This sort of impressionistic, *gestalt* approach is not how the claim construction analysis is supposed to

proceed.[2]  *See Allen Eng'g Corp. v. Bartell Indus.*, 299 F.3d 1336, 1344 (Fed. Cir. 2002) ("The words of the claims themselves define the scope of the invention, and are given their ordinary and customary meaning, unless the patentee has chosen to use terms in some other manner.").

Focusing on the claim language, the words used are broad enough to encompass a system that sends the newly input characters together with any previously typed characters (even if those characters have already been sent to the server as part of a prior query).  The following discussion focuses on representative claim 1 of the '529 patent (reproduced *supra* at 10-11).  The language of the other asserted claims is comparable.[3]

The first portion of claim 1 of the '529 patent addresses the "communication protocol" between the client system and the server system.  This limitation recites that the client system sends "a lengthening string composed of a plurality of consecutively input characters." '529 patent at 31:52-55 (A99).  This language is straightforward:  the client must be allowed to send a lengthening string.  As

---

[2]  Imagine a converse situation in which the patentee argued that the overall impression or *gestalt* of a claim created a limitation establishing novelty—Google would be outraged (and rightly so).

[3]  MasterObjects is asserting claims 1, 44, and 45 of the '529 patent and claims 1 and 13 of the '639 patent.  At the district court, Google did not ascribe any significance to the differences in phraseology among the asserted claims. A757 (Google Responsive Claim Const. Br.) ("Each of the remaining asserted independent claims describes the queries that are sent between the client and server in an essentially identical way").

Google noted at the district court, this limitation "must permit a lengthening string to be sent from a client to a server, but the limitation does not establish **how** that lengthening string is sent."   A1478 (emphasis in original).   That is precisely MasterObjects' point. There are at least two ways in which the lengthening string may be transmitted, and both of them fall within the scope of this claim.  This was never the point of patentable novelty.

The following two examples illustrate alternative approaches to the transmission of the lengthening string:



Example 1: Transmit the Complete Lengthening String[4]

---

[4] In Examples 1 and 2, MasterObjects has chosen to illustrate that the additional characters are sent from the **client software** to the **client object** individually (*i.e.*,



Example 2: Transmit Only the Changes

---

"p," "a," "t," "e," "n," "t") rather than along with previously input letters (*i.e.*, "p," "pa," "pat," "pate," "paten," "patent") to simplify the issue for resolution in this appeal. Nevertheless, MasterObjects' view is that the latter approach is equally within the scope of the claims because the claims are "comprising" claims that simply require that the client object "receives, as input, consecutive additional characters from the client software." '529 patent at 32:1-2 (A99). *See infra* at 32-33. As discussed below, Google posits that the client object **receives** the additional characters individually and in isolation. *Infra* at 29. Even if one assumes that is true, as MasterObjects does for purposes of simplification in these examples, it does not support Google's extrapolation that the **client object** must then **transmit** "only the changes" to the **server object**. *Infra* at 30-31.

25

The district court's construction includes only Example 2 while wholly (and incorrectly) excluding Example 1.[5]  But there is nothing in the claim language that justifies that result.

After describing the communication protocol, claim 1 of the '529 patent goes on to describe what the "client object" is and what it does.  '529 patent at 31:65-32:13 (A99).  Under the "client object" heading, it is specified that the client object interacts with client software and "receives, as input, consecutive additional characters from the client software."  As the user types, the client object receives the increasingly lengthy typed query.  In Example 1 above, the client object receives the additional characters from the client software.

As it receives input from the client software, the client object transmits "corresponding consecutive queries" to the server for "retriev[ing] content from the server system."  So long as the consecutive queries "correspond" to the input, this language in no way qualifies or limits what is sent by the client object or (to use Google's own word) "how" it is sent.  Fundamentally, this claim is agnostic on the mechanics of query transmission, including as to whether what is sent includes the entire string that has been entered so far (as in Example 1).  A transmission that includes the entire string that has been entered so far necessarily "corresponds" to the input.

---

[5] The parties agree that Example 2 is properly within the scope of the claims.

The final "wherein" clause of the "client object" portion of the claim states that the "consecutive queries" "lengthen[] the string by the additional characters, to form a lengthening string for retrieving matching content from the server system." This is also shown in Example 1.  Each consecutive query is longer than the previous query by the "additional character."  The lengthening string formed by the consecutive queries is used for retrieving matching content from the server system.

The paragraph that immediately follows in claim 1 addresses what the "server object" is and what it does.  That language states that, in response to receiving each of the "corresponding consecutive queries that modify the lengthening string," the server object "automatically uses the lengthening string to query and retrieve content information" and asynchronously returns results.  Again, nothing in this paragraph excludes the query transmission technique of Example 1.

Simply put, there is nothing in the language of claim 1 that says that the client is required to send "**only** the changes," as Google contends and the district court held as a matter of claim construction.  As written, claim 1 is satisfied regardless of whether the complete string as input at that time is sent (Example 1) or whether only the changes are sent (Example 2).  As set forth below, this was no accident: the patentee intended that these claims encompass various modes of

transmission, and narrowing the claims to a particular method was unnecessary because the patentable points of novelty lay elsewhere. *See supra* § III.D.

Moreover, when the patentee decided to pursue claims that **were** aimed at particular transmission methods, it used clear language to that effect. *See Phillips*, 415 F.3d at 1314 ("Differences among claims can also be a useful guide in understanding the meaning of particular claim terms."). For example, claim 40 of the '529 patent expressly requires transmission of the complete string (*i.e.*, the Example 1 approach). '529 patent at 37:13-16 (A102) ("…wherein each consecutive query matches the characters of the search string as it is being entered…"). And claim 3 of the '639 patent—which depends on asserted claim 1, which is subject to the district court's "only the changes" construction—expressly recites the "only the changes" requirement (*i.e.*, the Example 2 approach). '639 patent at 41:44-46 (A158) ("…wherein each of the plurality of queries are a single additional character to be added to the increasingly lengthening query string…"); *see also Phillips*, 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.").

Given the broad language of claim 1 of the '529 patent, what, then, does Google say? Google's approach to the claim language is one of inference and stacked supposition. Conveniently, Google simply by-passes the "communication

28

protocol" section of claim 1 that expressly states the client system sends "a lengthening string composed of a plurality of consecutively input characters." Ignoring that this claim language broadly captures both transmission methods shown in Examples 1 and 2 above, Google myopically focuses on the client object section of claim 1 and says that this section sets forth a sequential process that somehow dictates that "only the changes" are sent. According to Google:

> "[T]he first step is that the client object receives only the changes (the 'consecutive additional characters') from the client software." A1476.

> Second, "[t]he client sends 'one or more corresponding consecutive queries. … The most natural reading is that each query corresponds because it contains the 'consecutive additional characters' that were received from the client software in the earlier step." *Id.*

> Third, "[e]ach query, together, must also 'form' the lengthening string. If the queries were the lengthening string, they would not together 'form a lengthening string'—'a' plus 'am' plus 'ama' is 'aamama' not 'ama.'" *Id.*[6]

Neither the premises built into Google's characterization of the claim language nor the inferences it draws from them withstand scrutiny. Google first incorrectly presumes that the client object necessarily "receives **only** the changes (the 'consecutive additional characters') from the client software." A1476 (emphasis added). To set the stage for its ultimate conclusion that the client object must transmit "only the changes," Google begins by improperly assuming that the client object has "only the changes." But even if it were true that the claims

---

[6] The hypothetical search request in Google's example is "amazon."

require that the client object receives "only the changes" (it is not—*see supra* at 24, n.4), nothing in the claim language precludes the client object from retaining the previously received characters while it continues to receive the "additional characters" (*e.g.*, as shown in Example 1 above).

Google then incorrectly assumes that the "corresponding consecutive queries" must be no more and no less than exactly the "additional characters" that were received. The claim says no such thing. Instead, all that is required is a series of "consecutive queries" that "correspond" to the user's input. The queries of Example 1 (complete string input so far) and Example 2 (only the additional characters) equally "correspond" to the input. Google itself told the district court that "[t]he most natural reading is that each query corresponds because it **contains** the 'consecutive additional characters' ….'" A1476 (emphasis added). There can be no doubt that the "consecutive corresponding queries" in Example 1 above "contain" each of the newly entered "additional characters"—look at the last character. They are not **limited to** the last character, of course, but that is not required by the word "contains." *See Mars, Inc. v. H.J. Heinz Co., L.P.*, 377 F.3d 1369, 1375 (Fed. Cir. 2004) ("[L]ike the term 'comprising,' the term[] 'containing' [is] open-ended.").

Google justifies the contortion of the word "corresponds" (and its own synonym, "contains") by spinning the word "form" in the phrase "wherein each of

the corresponding consecutive queries lengthens the string by the additional characters, to form a lengthening string for retrieving matching content from the server system." As Google sees it, this phrase means that the server must blindly glue together the consecutive "only the changes" queries received from the client, and that process would go awry if the complete string were transmitted (*e.g.,* the consecutive queries transmitted in Example 1 would be "glued together" at the server to yield ppapatpatepatenpatent). *See* A1476.

Google is packing all sorts of unwarranted limitations into the single (and unconstrued) word "form." The approach shown in Example 1 above is consistent with the ordinary meaning of the word "form" as used in the claim. As can be seen in Example 1, each consecutive query lengthens the string at the server (and at the client) by the additional characters—"p" becomes "pa" becomes "pat" becomes "pate" becomes "paten" becomes "patent." This lengthening string is then used by the server for retrieving matching content. In other words, "each corresponding consecutive query lengthens the string by the additional characters, to form a lengthening string for retrieving matching content from the server system"— exactly what the claim requires.

Google's "server glues the queries together" theory is also incorrectly premised on its admitted "process"-based analysis of the claims. Google posits that claim 1 of the '529 patent describes a step-by-step chronology that requires the

server to "form" and "lengthen" the string by gluing together consecutive queries only after the client sends them to the server.  A1476.  In reality, the claim does not say that the **server** "form[s]" or "lengthen[s]" the string, nor does it say that this forming or lengthening takes place **after** the client sends the query and **after** the server receives the query.  To the contrary, the "form" language appears in the "client object" section of claim 1.  Google imports a temporal order into the claims based on the order in which the limitations are written, but apparatus claims are not limited to any particular sequence or order in which the limitations must be satisfied.  *See Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1344 (Fed. Cir. 2008) ("Claim 1 and its dependent claims…are pure apparatus claims. They have no process limitations. Claims 1, 7, 9, and 12 are therefore not limited to…any particular sequence of air content reduction relative to winding.").

Finally, the district court's construction is incorrect for the additional reason that it contradicts the open-ended nature of the "comprising" transition phrase, which is used in each of the asserted claims.  It is well-settled that claims with the open "comprising" transition do not exclude additional, unclaimed elements. *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1372 (Fed. Cir. 2005); *Free Motion Fitness, Inc. v. Cybex International, Inc.*, 423 F.3d 1343, 1347, 1353 (Fed. Cir. 2005).  It is also well-settled that a court may not construe "comprising" claims to exclude the addition of unclaimed elements absent "manifest" or

"explicit" disavowal of those elements. *See Gillette*, 405 F.3d at 1372-74 (holding that a "comprising" claim directed to a three-blade razor encompassed four-blade razors and reversing a construction that limited the claims to only three-blade razors). As can be seen in Example 1, "the changes to the input string" (*i.e.*, the final character in each of the consecutive queries) are sent from the client object to the server object. The only difference as compared to Example 2 is that additional characters are sent as well. Such additional elements cannot negate infringement of a "comprising" claim. *See id.* By using the word "only" in its construction, the district court erroneously closed off the otherwise open "comprising" claims.

### C. The Specification Does Not Limit the Claims to Sending "Only the Changes"

The district court concluded that a single sentence in the specification supported its holding that the claims must be limited to sending "only the changes." A40. In doing so, the district court failed to apply this Court's law that limitations (especially, those that are merely permissive features) must not be read into the claims from the specification unless such intent is clearly expressed in the specification. That exacting standard is not satisfied here because (1) the specification expressly contemplates embodiments that do **not** send "only the changes"; and (2) the alleged disavowal is buried deep in a highly technical description of the QuestObjects embodiment, and even then is cast in permissive ("allows") rather than mandatory ("requires") language. If there were any

remaining doubt about whether the purported disavowal is sufficiently clear, it is readily resolved by the fact that two other judges have considered the exact same portions of the specification relied upon by Google and the district court here and concluded that they do **not** disclaim anything.

### a. The Legal Requirements For Finding a Disavowal in the Specification Are Exacting

There are only two exceptions to the rule that the words of a claim are generally "given their ordinary and customary meaning as understood by a person of ordinary skill in the art." *Thorner*, 669 F.3d at 1365. They are: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Id.*

To act as a lexicographer (not at issue here), a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning. *Id.* If the patentee meant "white" to mean "black," he has to say "white here means black!" "It is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments, the patentee must 'clearly express an intent' to redefine the term." *Id.* (citing *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008)).

The standard for specification disavowal (at issue here) is no less exacting: "Where the specification makes clear that the invention does not include a

particular feature, that feature is deemed to be outside the reach of the claims of the patent." *Id.* at 1366 (quoting *Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001)).  Such disavowal must be clear, unmistakable, unambiguous, and manifestly **said**:

> The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by **including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim slope**.

*Id.* (emphasis added), citing with approval *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).  Disavowal through the specification is not the stuff of argument, innuendo, supposition, or inference.

Unless one of the above rigorous standards is satisfied, features of an embodiment described in the specification must not be imported into the claims. *See, e.g., Abbott Laboratories v. Sandoz*, 566 F.3d 1282, 1288 (Fed. Cir. 2009) ("When consulting the specification to clarify the meaning of claim terms, courts must take care not to import limitations into the claims from the specification."); *see also Phillips*, 415 F.3d at 1323 ("For instance, although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.").

### b. The Structure of the Patents: General Description of the Invention and In-the-Weeds Technical Detail For One Enabling Embodiment

One threshold issue turns on the QuestObjects system and the role it plays relative to the claims. MasterObjects contends that the QuestObjects system— described in sometimes excruciating technical detail in the specification—is an enabling embodiment. Google, conversely, insists that the QuestObjects system confines the claims. For Google to prevail, it must show that MasterObjects demonstrated a "clear intention" to so limit the claims using "words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004); *Trading Techs. Int'l, Inc. v. ESpeed, Inc.*, 595 F.3d 1340, 1352 (Fed. Cir. 2010). It cannot make this showing here.

The QuestObjects system is **exemplary**—an illustration of one implementation covered by the claims. The patentee in no way intended to limit the claims to this embodiment, and the patentee made this point as bluntly as possible. To quote the actual text, which uses the word "embodiment" no fewer than forty-six times:

- "In the detailed description below, the present invention is described with reference to a particular embodiment named QuestObjects." '529 patent at 7:6-8 (A87).

- "In the detailed description below, an embodiment of the present invention is referred to as QuestObjects, and provides a system of managing client input, server queries, server responses and client output…. Other terms used to describe the QuestObjects system in detail can be found in the glossary below." '529 patent at 9:49-56 (A88).

- "It will be evident to one skilled in the art that the model shown [QuestObjects] **is purely an illustrative example** of the embodiment of the invention, and that other models and implementations may be developed to practice the invention while remaining within the spirit and scope of this disclosure." '529 patent at 21:36-41 (A94) (emphasis added).

- The Figures are described as relating to "an embodiment." '529 patent at 7:52-8:19 (A87).

The QuestObjects system is just an embodiment, neither more nor less.

After making clear that the detailed description sets forth an enabling embodiment, the specification reinforces the point that this embodiment is **not** designed to cabin the claims:

> The foregoing description of preferred embodiments of the present invention has been provided for the purposes of illustration and description. **It is not intended to be exhaustive or to limit the invention to the precise forms disclosed.…** The embodiments were chosen and described in order to best explain the principles of the invention and its practical application, thereby enabling others skilled in the art to understand the invention for various embodiments… that are suited to the particular use contemplated. **It is intended that the scope of the invention be defined by the following: claims and their equivalence.**

'529 patent at 31:33-45 (A99) (emphasis added).

Because it is just one detailed example, the patents' description of the QuestObjects system is replete with highly specific defined terms **not** found in the claims, *e.g.*, "Quester," "Questlet," "Query Manager," "Persistent Quester Store,"

*etc*. *See* '529 patent at 10:1-37 (A88). These are **embodiment** terms, not **claim** terms.

> *c. The Specification Teaches that the Client May Send the Query Without Sending "Only the Changes"*

The specification is clear that the invention is capable of sending entire strings and is not restricted to sending "only the changes." For example:

> The system's protocol is not restricted to sending single characters. In fact, Clients can also use the protocol to send a string of characters.

'529 patent at 12:3-8 (A89). The very first paragraph of the Detailed Description also describes the client sending a string:

> Roughly described, the invention provides a session-based bi-directional multi-tier client-server asynchronous information database search and retrieval system for sending a character-by-character string of data to an intelligent server that can be configured to immediately analyze the lengthening string character-by-character and return to the client increasingly appropriate database information **as the client sends the string**.

'529 patent at 8:26-33 (A87) (emphasis added).

Further, the specification defines the embodiment specific "QuestObjects" client as follows:

> **QuestObjects** – Client components to communicate to the application server or web server directly. Uses the AppHost Synchronizer and QuestObjects server to **send selected strings and metadata to the application server or web server.**

38

'529 patent at 10:1-4 (A88) (emphasis added).  Here, the embodiment "client" definition allows the client to send the strings.  Along the same lines, the specification defines the QuestObjects "Query Filter" and "Query Pattern" as receiving "strings" from the client:

> Query Filter – A filter specified by a Query Manager in a specific Service used to tell the Server Quester **to interpret incoming strings**….

***

> Query Pattern – A string-matching pattern (such as a unix-style grep pattern) specified by a Query Manager in a specific Service used to tell the Server Quester **to interpret incoming strings**….

'529 patent at 10:27-29 and 39-43 (A88) (emphasis added).  The strings are "incoming" from the client, not formed (as Google uses the word) on the server.  If the QuestObjects embodiment itself is not confined to sending just the changes, how possibly can the claims be so limited?

> d. *The Portions of the Specification Relied Upon by Google and the District Court Describe Permissible Implementation Details; They Do Not Clearly Disavow Claim Scope*

Against all of these transmission agnostic descriptions, Google relies primarily on a single sentence in the specification discussing Figure 6, which the patent identifies as a "flow chart illustrating the client side of **an embodiment** of the invention"—*i.e.*, the QuestObjects embodiment.  *See* '529 patent at 8:4-7 (A87) (emphasis added).  This sentence says that the embodiment illustrated in Figure 6

39

has a protocol "that **allow[s]** the Client Quester to send just the changes to the input buffer, instead of sending the entire buffer." '529 patent at 20:11-14 (A93) (emphasis added). Google also cited Figure 4's embodiment as corollary support, as illustrating how a string is "sent character by character." *See* A758.

Google errs. The cited portions of the specification make clear that the client **may**—the word "allow" is permissive—send "just the changes" or it may not: this is an embodiment-specific variable that can be tweaked at will. Specifically, Figure 4 is described as a "sequence diagram illustrating the use of a system in **accordance with an embodiment of the invention**." '529 patent at 7:63-64 (A87) (emphasis added); *see also* 18:16-18 (A92) ("Fig. 4 shows a simplified event life cycle illustrating what happens in a QuestObjects system using an auto-complete Service."). This is an embodiment, and there is no intent to import the details of this embodiment into the claims, much less "clear" or "manifest" intent to do so.

In the preceding and following sentences and paragraphs, the specification walks through the details of the teaching embodiment discussed in Figures 6A and 6B. *See* '529 patent at 19:53-20:38 (A93). These Figures are described as setting forth a "flow chart illustrating the client side **of an embodiment** of the invention." '529 patent at 8:4-7 (A87) (emphasis added). In this highly specialized embodiment, the "Client Quester" registers with the "Client Controller." The

client then handles activity from the "Active Component," a defined term in the QuestObjects embodiment glossary ("Part of a software program that accesses the QuestObjects system through one or more Questers."). '529 patent at 9:58-61 (A88). As the specification describes:

> First, it waits for an event and receives it (step 604). Then the type of the event is checked (step 605). If it is not a character event, it is handled depending on the type and content of the event (step 606). An example of a non-character event is a double-click on the input string, the click of a button that clears the input buffer, the addition of characters to the input buffer by a paste-action etc. If the event is a character event, the input buffer is updated accordingly and Client Questers that have dependencies with the input buffer or the Result Set also are notified (step 607).

'529 patent at 19:60-20:2 (A93).

With this, the QuestObjects Client Quester updates the "input buffer" on the client side. *Id.* The specification explains that the client may then send the **entire** new input buffer, which would be the string, **or** the protocol may "**allow** the Client Questor to send just the changes to the input buffer" instead of sending the entire input buffer:

> The next step is to get results based on the new input buffer. First, the Client Quester checks if the results are present in the client-side cache, which usually is a fast short-term in-memory buffer (step 608); if so, they are retrieved from the cache (step 609) and the Active Component is notified of the results (step 610). **If the results are not found in the cache, the Client Quester uses the Client Controller to send the new input**

> **buffer to the Server Quester, so that a new query can be executed** (step 611). **To support this, the protocol of the present invention provides a number of messages that allow the Client Quester to send just the changes to the input buffer, instead of sending the entire input buffer.** These messages include but are not limited to: inputBufferAppend, inputBufferDeleteCharAt, inputBufferinsertCharAt, inputBufferSetCharAt, inputBufferSetLength, and inputBufferDelete.

'529 patent at 20:3-17 (A93).

This is the language that Google contends proves that the patentee manifestly and unambiguously intended to limit the claims to the details of the embodiment described. As the district court put it:

> Consistent with *Trading Techs.*, and *Honeywell*, the Court finds that the use of the "current invention" here indicates the description is intended to apply to the invention as a whole, and not just a single embodiment. While Plaintiff does provide support for its argument that each "change" can be more than just a single character, it does not provide adequate support for its argument that the entire character string is re-sent as the user types in a query. Accordingly, the court construes the "additional characters" terms as follows: "Only the changes to the input string that were not sent in any previous consecutive query."

A40 (Claim Const. Order).

This is incorrect. The specification says no such thing. First, the system described in this sentence is, by its terms, just an embodiment, and the specification repeatedly disclaims any intent to confine the claims to the enabling embodiment. *See supra* at 36-37.

42

Second, the use of the phrase "the present invention" does not, in this context, limit the scope of the claims. This Court has consistently refused to restrict claims based on a description of the "present invention" except in the case of clear disavowal. *See, e.g.*, *Rambus*, 318 F.3d at 1094 (citations omitted) ("While clear language characterizing 'the present invention' may limit the ordinary meaning of claim terms, such language must be read in context of the entire specification and the prosecution history…. The remainder of the specification and prosecution history shows that Rambus did not clearly disclaim or disavow such claim scope in this case."); *Voda v. Cordis Corp.*, 536 F.3d 1311, 1320 (Fed. Cir. 2008); *Liebel-Flarsheim*, 358 F.3d at 908-909.

For example, this Court has held that a statement about the "present invention" does not limit the claims where the intrinsic evidence includes disclosures that are inconsistent with such a limitation. *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1136 (Fed. Cir. 2011) ("[W]e have found that use of the phrase 'present invention' or 'this invention' is not always so limiting, such as where the references to a certain limitation as being the 'invention' are not uniform, or where other portions of the intrinsic evidence do not support applying the limitation to the entire patent."). As discussed above, such "inconsistent disclosures" are present in the patents-in-suit, namely, the various teachings that

43

the client may send and the server may receive the entire string. *See supra* at 38-39.

This Court has also held that where the "present invention" description uses "permissive language," such as "could be edited," "can be created," and "ability to work," this does not clearly disclaim systems lacking these benefits. *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 844 (Fed. Cir. 2010). In the present case, even within the QuestObjects embodiment itself, the client is not **required** to send "just the changes." To the contrary, the QuestObjects "protocol" provides "messages" to "**allow** the Client Quester to send just the changes to the input buffer…." '529 patent at 20:11-13 (A93) (emphasis added). **Allowed** is not **required**. Nor does the word "allow" rise to the level of manifest exclusion or restriction.

Third, reading the "only the changes" limitation into the claims based on Google's favorite sentence is inconsistent with the purpose of claim construction, namely, determining how a person of ordinary skill in the art would understand the claims. *See Phillips*, 415 F.3d at 1312-13. As described above, the preceding and following sentences and paragraphs (including myriad references to the Client Quester, Client Controller, Active Component, and Server Quester) make clear that what is being described is the QuestObjects embodiment. '529 patent at 19:53-20:38 (A93). Even Google does not contend that the sentence would actually be

interpreted by one of skill in the art as defining universal features of all embodiments of MasterObjects' invention. For example, the sentence that forms the basis of the district court's "only the changes" construction also refers to a "Client Quester," yet Google has not taken the position that each and every claim must be construed to require a "Client Quester." *See id.* at 20:11-14 (A93). Similarly, the following sentence elaborates that the specified "messages" include QuestObjects-specific messages such as "inputBufferSetLength" and "inputBufferAppend." *Id.* at 20:14-20 (A93). And again, Google does not argue that a system cannot fall within the scope of any of MasterObjects' claims unless it includes these very inputBufferSetLength and inputBufferAppend messages. Reading the "just the changes" language from this sentence into the claims is as improper as it would be to construe the claims to require a "Client Quester," "inputBufferSetLength" messages, and "inputBufferAppend" messages.

The final nails in the coffin of any alleged "clear disavowal" are the two opinions of other judges addressing precisely the same specification language in the context of defendants seeking to add a similar "only the changes" requirement to the claims. When considering whether the QuestObjects embodiment limits the claims, these two judges ruled, with conviction, that it did not. In *MasterObjects v. eBay*, Judge Corley rejected eBay's attempt "to import a limitation from a specific embodiment into the claims." Specifically:

While the inventor's use of "the invention" in the specification often evidences an intent to limit the claims to the description of the invention," *see Trading Technologies Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1353 (Fed. Cir. 201); *Honeywell Int'l, Inc. v. ITT Indus.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006), it is not always dispositive. The Federal Circuit has found that the use of "this invention" is not so limiting "where the references to a certain limitation as being the 'invention' are not uniform, or where other portions of the intrinsic evidence do not support applying the limitation to the entire patent." *See Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1136 (Fed. Cir. 2011) (citing cases). It is not so limiting here.

First, as the Court discussed with respect to asynchronous connection, the inventor expressly explained that the "detailed description" that follows the specification is "an embodiment of the present invention" referred to as QuestObjects. *See* '529 Patent Col. 9:49-56, '639 Patent Col. 6:18-21. Further, at the end of the detailed description the inventor disclaimed that "[t]he foregoing description of the present invention has been provided for purposes of illustration and description. It is not intended to be exhaustive or to limit the invention to the precise forms disclosed." '639 Patent Col. 40:56-59, '529 Patent Col. 31:33-45. **This expressed disclaimer indicates that the inventor's use of "present invention" was, in fact, referring to embodiment of the present invention (the QuestObjects embodiment) rather than what is claimed.**

*MasterObjects, Inc. v. eBay, Inc.*, Case No. 3:12-cv-680 JSC, Dkt. No. 51, slip op.

at 12-13, 2013 U.S. Dist. LEXIS 47001, at *22-23 (N.D. Cal. Mar. 28, 2013)

(A1321-22) (emphasis added).

Along the same lines, Judge White found in the parallel *MasterObjects v. Yahoo!* case, that the QuestObjects system was just an enabling embodiment, and did not and should not limit the claims:

> The Court agrees that Yahoo!'s analysis attempts to read limitations into the claim based on a preferred embodiment. The paragraph that Yahoo! relies on clearly refers to the QuestObjects embodiment. The section describing the embodiment provides:
>
>> In the detailed description below, an embodiment of the present invention is referred to as QuestObjects, and provides a system of managing client input, server queries, server responses and client output. One specific type of data made available through the system from a single source (or syndicate of sources) is referred to as a QuestObjects Service.
>
> ('529 Patent at 9:49-54; *see also id.* at 9:6-8 ("In the detailed description below, the present invention is described with reference to a particular embodiment named QuestObjects"); *see also id.* at 31:33-36 ("The foregoing description of preferred embodiments of the present invention has been provided for the purpose of illustration and description. It is not intended to be exhaustive or to limit the invention to the precise forms disclosed.").) **Accordingly, the Court finds the language cited by Yahoo! only to refer to a limitation of a specific embodiment, the QuestObjects system.**

*MasterObjects, Inc. v. Yahoo!, Inc.*, Case No. C 11-02539 JSW, Dkt. No. 64, slip op. at 7, 2013 U.S. Dist. LEXIS 168296, at *12-13 (N.D. Cal. Nov. 26, 2013) (A2122) (emphasis added). Specification disavowal must be explicit, unambiguous, and clear. On disavowal, Judges White (Yahoo!) and Corley (eBay)

are white versus Judge Hamilton's (Google) black.  Black and white, at minimum, equal grey, and grey does not establish clear disavowal.

### D. The Prosecution History Demonstrates That the Claims Are Not Limited to Sending "Only the Changes"

The *Markman* Order does not mention the prosecution history evidence, which directly supports MasterObjects while refuting the court's construction. This conclusion is dictated by the evolution of the claim language—from sending single characters to lengthening strings—and the absence of any prosecution statement that the claims are limited to sending "only the changes."

The logical starting point is the original '529 claims.  The critical "communication protocol" and "client object" limitations of original claim 1 read as follows:

> a communication protocol that provides a session-based connection between a client system and a server system, and **allows said client system to query** said server system for content;

> a client object, in communication with a client software at said client system, said client object capable of transmitting to a server object a **plurality of queries** to retrieve content from said content engine, wherein **each of said plurality of queries comprises a single string character**, and wherein each subsequent of said plurality of queries extends the query; and,

A977 (emphasis added, amendments omitted to show original claim language).

These original claims provide that the client system queries the server system by transmitting a "plurality of queries compris[ing] a single string character."

Importantly, the language regarding a "single [ ] character" transmission was quickly eliminated.

By the second office action response, it was clear that MasterObjects had broadened the claim scope to cover both single character and entire string transmission methods. That response includes the following amended "communication protocol" and "client object" limitations of '529 claim 1 (with deletions struck through and additions underlined):

> a communication protocol that ~~provides a~~ <u>enables an asynchronous</u> session-based connection between a client system and a server system, and allows ~~said~~ <u>the</u> **client system to send** ~~a query string to query said server system for content~~, <u>within a session between the client system and the server system,</u> **a plurality of consecutively input query strings**, <u>to query the server system for content</u> ~~as part of a session~~;

> a client object, in communication with a client software at ~~said~~ <u>the</u> client system <u>and with the communication protocol,</u> ~~said~~ <u>wherein the</u> client object ~~capable of transmitting~~ <u>transmits</u> to a server object <u>at the server system</u> a **plurality of** <u>**consecutive**</u> **queries**, <u>within the same session,</u> to retrieve content from ~~said content engine~~ <u>the server system</u>, **wherein each** ~~of said plurality of~~ <u>**consecutive query one of lengthens or shortens the query string by one or more characters,**</u> ~~queries comprises a single string character~~ <u>**and forms an increasingly focused query string**</u> <u>for retrieving content from the server system</u>~~, and wherein each subsequent of said plurality of queries extends the query string~~; and[[,]]

A719 (emphasis added in bold).

These amended claims underscore two important points. First, in the communication protocol limitation, the amended language covers the client

sending "consecutively input query strings," as opposed to the client simply querying the server as in the original claim. Second, in the client object limitation, the "single [ ] character" language was deleted and the concept of each consecutive query lengthening or shortening the query string to "form[] an increasingly focused query string" was introduced. These amendments represent an evolution from claiming that the client sends "single [ ] character" transmissions to claiming the client's sending query strings that have been lengthened (or shortened).

In the very next filing at the PTO, MasterObjects further clarified in its remarks that the amended claims capture both transmission methods. The pertinent remarks arose in the context of addressing the Zim prior art reference, as follows:

> Unlike Zim, which discloses database objects in a SQL client-server environment, embodiments of the present invention use ***strings of characters* themselves (which grow in size as the user types the characters in the string)**, and more particularly consecutive queries that one of lengthen or shorten the query string by the additional characters, and that form an increasingly focused query string for retrieving matching content from the server system.
> \*\*\*
> [A]s defined by Claim 1, the client object receives additional characters from the client software, and as *each character is being received,* transmits to a server object at the server system a plurality of consecutive queries, within the same session, *to retrieve content from the server system,* and that each consecutive query one of lengthens or shortens the query string by one or more *additional characters….* **Consecutive queries only contain the growing string of characters** (rather than a set of stored procedures with corresponding parameters [as in Zim]. As such, in the embodiment defined by Claim 1, the input string has a direct relationship to the content being matched on the

server—once a client has registered with the server by starting a session (at which time the name of the Content Source to be used is specified to the Server), then **subsequent requests from that client simply pass along the user data (the "growing string of characters")**, rather than names of additional/different stored procedure(s) with parameters to be executed.

Furthermore, as also defined by Claim 1, each consecutive client request or query one of lengthens or shortens the query string by the additional characters, and forms an increasingly focused query string for retrieving matching content from the server system. Thus, **each query contains a different query string that *lengthens or shortens the previous one,*** rather than, as disclose in Zim, an indicator to return part of a previous result set's data. Indeed, as described in Zim, it does not seem possible to modify the system therein to extend a prior query in order to get "narrowed down" results, and the consecutive queries cannot be lengthened or shortened by one or more characters in order to create a focused query string that is matched against the content of the server system.

A1016-17 (emphasis added).

Far from limiting '529 claim 1 to the client sending "only the changes," these remarks make clear that the client sends consecutive queries that include the "growing string of characters," such that "each query contains a different query string that *lengthens or shortens the previous one*."  In the very next response and consistent with the above remarks, MasterObjects further amended '529 claim 1 to expressly provide that the client sends "a lengthening string composed of a plurality of consecutively input ~~query strings~~ characters."  A956.

## IV.    CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the reasons stated herein, MasterObjects respectfully requests that this Court reverse the district court's erroneous holding that the claims are limited to sending "only the changes to the input string that were not sent in any previous consecutive query."   MasterObjects further requests that this Court vacate the stipulated judgment of noninfringement, which was expressly predicated on the erroneous claim construction, and find that the terms at issue are entitled to their plain and ordinary meaning.


February 24, 2014                              Respectfully submitted,


                                              */s/ Spencer Hosie*
                                              Spencer Hosie
                                              HOSIE RICE LLP
                                              600 Montgomery Street, 34th Floor
                                              San Francisco, California  94111
                                              (415) 247-6000 (Telephine)
                                              (415) 247-6001 (Facsimilie)
                                              shosie@hosielaw.com

                                              *Attorneys for Plaintiff-Appellant*
                                              *MASTEROBJECTS, INC.*

**ADDENDUM**

# TABLE OF CONTENTS

**Addendum Page**

Claim Construction Order of
The Honorable Phyllis J. Hamilton
     filed May 28, 2013 ..................................................................Add. 1

Order Denying Motion for Leave to File Motion for Reconsideration of
The Honorable Phyllis J. Hamilton
     filed August 26, 2013 .........................................................Add. 19

Stipulated Final Judgment of
The Honorable Phyllis J. Hamilton
     filed November 26, 2013 ....................................................Add. 23

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MASTEROBJECTS, INC.,

        Plaintiff,

    v.

GOOGLE, INC.,

        Defendant.

_____/

No. C 11-1054 PJH

**CLAIM CONSTRUCTION ORDER**

On January 30, 2013, the parties' claim construction hearing to construe the disputed terms of U.S. Patent Nos. 8,060,639 ("the '639 patent") and 8,112,529 ("the '529 patent) (together, the "patents-in-suit")[1] pursuant to <u>Markman v. Westview Instruments, Inc.</u>, 517 U.S. 370 (1996), came on before this court. Plaintiff MasterObjects, Inc. ("plaintiff" or "MasterObjects") appeared through its counsel, Spencer Hosie and Diane Rice. Defendant Google, Inc. ("defendant" or "Google") appeared through its counsel, Douglas Lumish, Joseph Lee, and Jeffrey Homrig. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, the court hereby rules as follows.

**BACKGROUND**

Plaintiff is the assignee and owner of the patents-in-suit, which are directed at systems and methods for allowing a computer to predict search queries and provide search results while the user is still typing in search terms. Specifically, plaintiff describes its invention as an improvement upon previous Internet search technology, which required a

---

[1]MasterObjects' operative complaint also asserts a third patent, U.S. Patent No. 7,752,326, but at the claim construction hearing, MasterObjects informed the court that it intends to drop the '326 patent from the case.

United States District Court

For the Northern District of California

1    user to type in an entire search query and hit "submit" before the server would start to do

2    anything. Plaintiff claims to have developed a "new search paradigm" which has "instant

3    search results provided, character by character, as the user type[s]." Dkt. 110 at 4. For

4    instance, if a user is interested in searching for "Madison Square Garden," the user would

5    start typing "m-a-d," and the server would predict the full search query based on that partial

6    string (such as "Mad Men" after "m-a-d" was typed). As the user continued to enter the

7    "Madison Square Garden" query (typing in "m-a-d-i"), the prediction would change. Instead

8    of predicting "Mad Men," the server would now predict "Madison." And by the time that the

9    user enters "m-a-d-i-s-o-n s," search results for "Madison Square Garden" would be

10    presented to the user.

11          Defendant is a company that offers Internet-based services, including search

12    technology. Plaintiff alleges that defendant's "Google Instant" product directly infringes the

13    patents-in-suit by "providing, in response to lengthening query strings input by a user and

14    without requiring explicit submission by that user, increasingly relevant content such as

15    search suggestions or search results." See Third Amended Complaint (Dkt. 92), ¶¶ 35, 41.

16          The parties originally sought construction of eight terms (or term groups). However,

17    at the claim construction hearing, the court indicated that it was likely to defer ruling on the

18    two term groups that defendant argues are indefinite (namely, "increasingly focused query

19    string" and "increasingly relevant content/increasingly appropriate content or search

20    criteria."). As a result, the parties no longer seek construction of those terms at this stage

21    of the case. And after the hearing, the parties were directed to meet and confer one more

22    time, in light of the court's guidance and comments at the hearing. The parties then filed a

23    joint statement on February 13, 2013, stating that they have agreed to construe the term

24    "content source(s)" as "a server computer that provides the data accessed by the system."

25    Thus, only five disputed terms or term groups are construed herein.

26

27

28

United States District Court

For the Northern District of California

**DISCUSSION**

A.    Legal Standard

In construing claims, the court must begin with an examination of the claim language itself.  The terms used in the claims are generally given their "ordinary and customary meaning."  See Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005); see also Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("The claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim.").  This ordinary and customary meaning "is the meaning that the terms would have to a person of ordinary skill in the art in question at the time of the invention...".  Phillips, 415 F.3d at 1313.  A patentee is presumed to have intended the ordinary meaning of a claim term in the absence of an express intent to the contrary.  York Products, Inc. v. Central Tractor Farm & Family Ctr., 99 F.3d 1568, 1572 (Fed. Cir. 1996).

Generally speaking, the words in a claim are to be interpreted "in light of the intrinsic evidence of record, including the written description, the drawings, and the prosecution history, if in evidence."  Teleflex, Inc. v. Ficosa North Am. Corp., 299 F.3d 1313, 1324-25 (Fed. Cir. 2002) (citations omitted); see also Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313, 1319 (Fed. Cir. 2005) (court looks at "the ordinary meaning in the context of the written description and the prosecution history").  "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language."  Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).

With regard to the intrinsic evidence, the court's examination begins, first, with the claim language.  See id.  Specifically, "the context in which a claim is used in the asserted claim can be highly instructive."  Phillips, 415 F.3d at 1314.  As part of that context, the court may also consider the other patent claims, both asserted and unasserted.  Id.  For example, as claim terms are normally used consistently throughout a patent, the usage of a term in one claim may illuminate the meaning of the same term in other claims.  Id.  The

3

United States District Court
For the Northern District of California

1  court may also consider differences between claims to guide in understanding the meaning

2  of particular claim terms.

3       Second, the claims "must [also] be read in view of the specification, of which they

4  are a part." Id. at 1315.  When the specification reveals a special definition given to a claim

5  term by the patentee that differs from the meaning it would otherwise possess, the

6  inventor's lexicography governs. Id. at 1316.  Indeed, the specification is to be viewed as

7  the "best source" for understanding a technical term, informed as needed by the

8  prosecution history. Id. at 1315.  As the Federal Circuit stated in Phillips, the specification

9  is "the single best guide to the meaning of a disputed term," and "acts as a dictionary when

10  it expressly defines terms used in the claims or when it defines terms by implication."  415

11  F.3d at 1321.

12       Limitations from the specification, such as from the preferred embodiment, cannot

13  be read into the claims absent an express intention to do so.  Teleflex, 299 F.3d at 1326

14  ("The claims must be read in view of the specification, but limitations from the specification

15  are not to be read into the claims.") (citations omitted); CCS Fitness, 288 F.3d at 1366 ("a

16  patentee need not describe in the specification every conceivable and possible future

17  embodiment of his invention."); Altiris v. Symantec Corp., 318 F.3d 1363, 1372 (Fed. Cir.

18  2003) ("resort to the rest of the specification to define a claim term is only appropriate in

19  limited circumstances").  To protect against this, the court should not consult the intrinsic

20  evidence until after reviewing the claims in light of the ordinary meaning of the words

21  themselves.  Texas Digital, 308 F.3d at 1204-05 (to act otherwise "invites a violation of our

22  precedent counseling against importing limitations into the claims") (citations omitted).

23  Finally, as part of the intrinsic evidence analysis, the court "should also consider the

24  patent's prosecution history, if it is in evidence."  Phillips, 415 F.3d at 1317.  The court

25  should take into account, however, that the prosecution history "often lacks the clarity of the

26  specification" and thus is of limited use for claim construction purposes. Id.

27  In most cases, claims can be resolved based on intrinsic evidence.  See Vitronics, 90 F.3d

28  at 1583.  Only if an analysis of the intrinsic evidence fails to resolve any ambiguity in the

4

**Add. 4**

United States District Court

For the Northern District of California

1    claim language may the court then rely on extrinsic evidence, such as expert and inventor

2    testimony, dictionaries, and learned treatises. <u>See Vitronics</u>, 90 F.3d at 1583 ("In those

3    cases where the public record unambiguously describes the scope of the patented

4    invention, reliance on any extrinsic evidence is improper").  However, the court generally

5    views extrinsic evidence as less reliable than the patent and its prosecution history in

6    determining how to read claim terms, and its consideration is within the court's sound

7    discretion.  <u>See Phillips</u>, 415 F.3d at 1318-19.

8          B.     Construction of Disputed Terms and Phrases

9         The parties dispute construction of five different terms and term groups contained

10   within the claims of the patents-in-suit, which are addressed in turn below.

11           1.    "content-based cache" and "query and result cache"

12        The terms "content-based cache" and "query and result cache" are found in claims 1

13   and 13 of the '639 patent and in claims 1, 44, and 45 of the '529 patent.  Plaintiff originally

14   proposed that the terms should be construed to mean "a cache which stores previous

15   queries and content or other information returned in response to the previous queries."

16   Defendant originally proposed that the terms should be construed to mean "a persistent

17   store of queries and corresponding result sets executed by a content engine, for a specific

18   content channel, where a content engine is a third-party application that runs on a content

19   source that is capable of performing string-based queries and returning string-formatted

20   answers to the system, and where a content channel is a configuration on the server that

21   defines a specific method of querying one or more specific content sources, allowing users

22   to perform queries and retrieves corresponding results."

23        After the hearing, both parties revised their proposed constructions in light of the

24   court's comments.  Plaintiff now contends that the terms "content-based cache" and "query

25   and result cache" should be construed as "a store of previous queries and corresponding

26   result sets executed by the system."  Defendant now contends that the terms should be

27   construed to mean "a persistent store of queries and corresponding result sets executed by

28   the system."  Thus, the dispute boils down to the inclusion of the word "persistent."

5

United States District Court

For the Northern District of California

1   For support, defendant points to the '529 patent's glossary of terms, which defines

2   "content-based cache" as "[a] persistent store of Queries and corresponding Result Sets

3   Executed by a Content Engine for a specific Content Channel."  '529 patent, 10:17-19.

4   Plaintiff argues that the glossary definition applies only to a preferred embodiment of the

5   invention, and that the claims themselves are broader than that embodiment.

6   The court finds plaintiff's attempt to distance itself from the QuestObjects glossary

7   definition somewhat inconsistent with its proposed construction, which hews very closely to

8   the glossary definition.  However, including the word "persistent" would likely create more

9   ambiguity, not less, in the fact finder's understanding of the terms "content-based cache"

10  and "query and result cache."  It is for that same reason that the court is hesitant to include

11  the terms "content channel" and "content engine" in the construction, even though they also

12  appear in the glossary definition.  Thus, the court declines to include the word "persistent,"

13  and construes the terms "content-based cache" and "query and result cache" as follows: "**a**

14  **store of previous queries and corresponding result sets executed by the system**."

15  2.   "asynchronous connection"

16  The term "asynchronous connection" is found in claims 1 and 13 of the '639 patent,

17  and in claim 1 of the '529 patent.  Plaintiff originally proposed that the term be construed to

18  mean "a connection that allows one side of the communication to communicate at the same

19  time the other side is also communicating within a session."  Defendant originally proposed

20  that the term be construed to mean "a connection that allows both the client and the server

21  to initiate communications at any moment in time."

22  After the hearing, both parties revised their constructions in light of the court's

23  comments.  Plaintiff now contends that the term "asynchronous connection" should be

24  construed to mean "a connection that allows a client and the server system to

25  communicate at the same time within a session."  Defendant now contends that the term

26  should be construed to mean "a connection that allows both the client and the server to

27  initiate communications at any moment in time within a session."  The two proposals are

28  close, but the key dispute appears to be whether either side of the client/server system can

6

United States District Court
For the Northern District of California

1   actually initiate communications with each other at any time (as advocated by defendant),

2   or whether they are merely able to communicate at any time (i.e., simultaneous, non-

3   blocking communications, as advocated by plaintiff).

4        Defendant points to the specifications of both patents-in-suit for support, which state

5   that "[t]he system is bi-directional and asynchronous, in that both the Client and Server can

6   initiate communications at any moment in time." '639 patent, 14:25-27; '529 patent, 12:22-

7   24. Defendant argues that "in that" is definitional language that signals the patentee's

8   intent to define "asynchronous." Defendant also points to the specifications' examples of

9   how communications can be initiated: "For example, a communication initiated by the

10  Client may be a single character that is sent to the Server, that responds by returning

11  appropriate data. An example of a communication initiated by the Server is updating the

12  information provided to the client." '639 patent, 14:31-35; '529 patent, 12:28-32. Finally,

13  defendant cites a portion of the file history where plaintiff represented to the patent office

14  that "since the system is <u>asynchronous</u>, both the client and the server can initiate

15  communications at any moment in time." '529 file history, 12/21/05 Applicant Remarks

16  (Dkt. 117, Ex. E) at 12 (emphasis in original).

17       Plaintiff's objection to the inclusion of "initiate" stems from a concern that the patent

18  could be improperly read to cover a scenario where the server sends unsolicited, "spam"

19  search results to a user, even when the user has not requested any search results. At the

20  hearing, plaintiff repeatedly brought up this "search spam" scenario, explaining that the

21  preferred embodiment of the invention was one where a user initiates communication with

22  a server in order to get search results, not one where the server would initiate

23  communication with a client to send unsolicited search results. Plaintiff argues that

24  defendant's construction would read the preferred embodiment out of the claims. The court

25  disagrees that defendant's construction would have that effect. Rather, plaintiff's described

26  preferred embodiment would certainly be swept into a construction that allows "<u>both</u> the

27  client and the server to initiate communications at any moment in time within a session."

28  Moreover, defendant has pointed to specific intrinsic evidence to support its position, which

7

1   plaintiff has not rebutted with intrinsic evidence of its own.  Instead, plaintiff expressly

2   acknowledges that the patent describes a scenario where a server initiates

3   communications with a user – even though it describes this scenario as an "exception" that

4   is merely "one detail in a potential embodiment."  Dkt. 119 at 6.

5        Plaintiff may be correct that, in most instances, the claimed invention was intended

6   to involve a client-initiated communication.  However, it has not presented any support from

7   the intrinsic evidence for excluding server-initiated communications from the construction of

8   the claims.  Instead, plaintiff's argument is based on concern over a potential non-

9   infringement position that it believes defendant may pursue down the road.  Those

10   arguments are premature at this stage of the case, as the court does not construe claims

11   with an eye towards the parties' theories of infringement (or non-infringement).  Thus, the

12   court agrees with defendant that the claimed invention covers both client-initiated and

13   server-initiated communications, and construes the term "asynchronous connection" as

14   follows:  "**a connection that allows both the client and the server to initiate**

15   **communications at any moment in time within a session**."

16        3.    "communication protocol"

17        The term "communication protocol" is found in claims 1 and 13 of the '639 patent

18   and in claims 1, 44, and 45 of the '529 patent.  Plaintiff contends that the term should be

19   construed to mean "a set of rules that enable computers to exchange messages with each

20   other."  Defendant contends that it should be construed to mean "a set of rules that enable

21   computers to exchange messages with each other and that is optimized for sending single

22   characters from a client to a server and lists of strings from the server to the client."  Thus,

23   the dispute is over the inclusion of the "optimized for sending characters" language tacked

24   on to the end of defendant's proposal - the proposed constructions are otherwise identical.

25        Defendant points to the specification as supporting the "optimized for" language,

26   while plaintiff argues that defendant's "support comes from one sentence in the

27   embodiment-specific description in the '529 patent."  Plaintiff further argues that the

28   patents-in-suit describe numerous instances of sending strings of multiple characters, and

United States District Court
For the Northern District of California

1   argue that there is no reason to import any "single character" limitations to claims which

2   contain no similar limiting language.  Defendant, in turn, argues that there is reason to

3   place special emphasis on a single sentence in this case, because that sentence starts with

4   the phrase "the invention," indicating that the patentee was referring to the invention as a

5   whole, and not just a specific embodiment.  See Trading Techs. Int'l, Inc. v. eSpeed, Inc.,

6   595 F.3d 1340, 1353 (Fed. Cir. 2010) (a "reference to 'the present invention' strongly

7   suggests" that patentee is not describing a mere embodiment); see also Honeywell Int'l,

8   Inc. v. ITT Indus., Inc., 452 F.3d 1312, 1318 (Fed. Cir. 2006) (finding the terms "this

9   invention" and "the present invention" to limit the claims).  Defendant argues that this

10   sentence is no different from the statements considered in Trading Techs. and Honeywell:

11   "The invention includes a Server, that handles requests for information from clients, and a

12   communication protocol that is optimized for sending single characters from a Client to a

13   Server, and lists of strings from the Server to the client."  '529 patent, 11:55-59.

14        The court agrees with defendant's general proposition that all sentences in a patent

15   specification are not created equal, and that a disclosure that begins with "the invention" is

16   due more weight than a disclosure without that introductory language.  However, the court

17   finds two problems with defendant's proposal here.  First, defendant admits that the

18   invention is not restricted to the sending of single characters, but merely argues that it is

19   optimized for sending single characters.  Thus, it is unclear how (if at all) defendant's

20   construction actually serves to restrict the claim scope.  Both proposals seek to construe

21   "communication protocol" as a set of rules for exchanging messages of either a single

22   character or multiple characters.  Adding the "optimized for" language would not add

23   anything to or take anything away from the scope of claims, and the court is hesitant to add

24   extra verbiage to a construction when the addition would not have a practical effect on

25   claim scope.

26        Second, while the court does recognize the importance of the phrase "the invention,"

27   as it is used in the specification, it also notes a small but significant difference between the

28   '529 patent's description of "the invention," and the '639 patent's description of that same

United States District Court

For the Northern District of California

1  "invention." The '639 patent states that "[t]he invention includes a Server, that handles

2  requests for information from clients, and a communication protocol that is optimized for

3  sending characters from a Client to a Server, and lists of strings from the Server to the

4  client," thereby omitting the word "single" from the '529 patent's otherwise-identical

5  statement. <u>Compare</u> '639 patent, 13:58-62 <u>with</u> '529 patent, 11:55-59. So even if the court

6  were inclined to adopt the "optimized for" language, defendant has not provided any

7  justification for adopting the '529 patent's version of that language (which includes the word

8  "single") over the '639 patent's version (which does not include "single").

9       For both of these reasons, the court opts not to include the additional language

10  proposed by defendant, and construes the term "communications protocol" as follows: "**a**

11  **set of rules that enable computers to exchange messages with each other**."

12       4.   "session"

13       The term "session" is found in claims 1 and 13 of the '639 patent and in claims 1, 44,

14  and 45 of the '529 patent.  Plaintiff originally proposed that the term be construed as "a

15  related set of communications between a client and server as the user enters a particular

16  search query by entering consecutive letters."  Defendant originally proposed that the term

17  be construed as "a state maintained between a client and a single server in which the

18  server recognizes when subsequent requests originate from the same client such that, in

19  responding to a character the server receives from a client, the server can use the history

20  of data that has been sent to and from the current user."

21       After the hearing, both parties revised their constructions in light of the court's

22  comments.  Plaintiff now contends that the term "session" should be construed to mean "a

23  related set of communications between a client and the server system as the user enters a

24  search query by entering consecutive characters."  Defendant now contends that it should

25  be construed to mean "a [state or status or condition or relationship] maintained between a

26  client and a single server in which the server recognizes when consecutive requests

27  originate from the same client, and the server uses the history of requests and responses

28  that have been sent to and from that client in responding to those consecutive requests."

10

United States District Court

For the Northern District of California

1       Defendant relies on language from the specification to support its argument, while

2  plaintiff argues that the cited language refers only to one embodiment of the invention, and

3  not the invention as a whole.  Specifically, defendant points to the following language,

4  found in both patents-in-suit:  "In accordance with one embodiment of the invention the

5  system is session-based, in that the server knows or recognizes when subsequent

6  requests originate at the same Client.  Thus, in responding to a character the Server

7  receives from a Client it can use the history of data that has been sent to and from the

8  current user."  '639 patent, 14:12-17; '529 patent, 12:9-14.  Plaintiff is obviously correct that

9  the passage refers to just "one embodiment of the invention," but that "one embodiment"

10  (i.e., the "session-based" embodiment) covers the very claim term at issue here.  The

11  patents state that, in one embodiment, the system is session-based, then go on to explain

12  what it means to be "session-based."  There may well be other, non-"session-based"

13  embodiments that are also claimed by the patents-in-suit, but the limitations cited by

14  defendant would apply to any claim that uses the word "session."  See Mangosoft, Inc. v.

15  Oracle Corp., 525 F.3d 1327, 1331 (Fed. Cir. 2006) ("even if we assume that this language

16  properly addresses only an 'aspect' of the invention . . . this is precisely the aspect of the

17  invention at issue.").  Thus, the court will consider the cited language from the specification

18  in construing the term "session."

19       The next issue is raised by defendant's inclusion of the "single server" limitation in its

20  proposed construction.  Plaintiff argues that the claims themselves refer to a "server

21  system," as opposed to an individual server.  See, e.g., '529 patent, claim 1.  However,

22  while the '529 patent does use the phrase "server system," defendant points out that the

23  '639 patent refers to "a server" and "the server."  The court is thus confronted with a

24  situation where both parties are relying on the words of the claims themselves to reach

25  diametrically opposed conclusions - plaintiff argues that the claims conclusively establish

26  the presence of multiple servers, while defendant argues that the claims conclusively

27  establish that the system contains only a single server.  The court rejects both arguments.

28

Add. 11

United States District Court

For the Northern District of California

1    Plaintiff further argues that the principles of claim differentiation preclude a

2  construction where "server" means a single server, pointing to claim 11 (dependent on

3  claim 1) from the '529 patent as describing a "sticky state" server.  Plaintiff argues that "[i]f

4  sticky state were an inherent part of the independent claims, this dependent claim would be

5  nonsensical."  Dkt. 119 at 11.  However, it appears that plaintiff is conflating the specific

6  requirements of claim 11 (the so-called "sticky state" server) with a more general "single

7  server" requirement.  Claim 11 covers "[t]he system of claim 1 wherein said server system

8  stores the state of query and response of the client software, and restores the state of the

9  client software after any interruption in said communication protocol, including an automatic

10  or manual network interruption or termination of the session."  '529 patent, claim 11.  Thus,

11  claim 11 essentially covers a type of "autosave" system between a client and a server, so

12  that if the connection between the two is interrupted, the client and server can pick up

13  where they left off before the interruption.  This "sticky state" system is not co-extensive

14  with a "single server" based system; in other words, a system can consist of a client and a

15  single server without necessarily having these "sticky state" features.  Thus, plaintiff's claim

16  differentiation argument does not end the analysis.

17    Defendant then cites to one example from the specification and two examples from

18  the prosecution file history where a single server is referenced.  Specifically, defendant first

19  cites to the '639 patent, which states that "[o]nce a session is established, all

20  communications from the client IP address go to and from the same server."  '639 patent,

21  8:63-67.  However, there is some ambiguity as to whether this description was meant to

22  apply to all session-based embodiments, or just a subset of those embodiments, so the

23  court does not find this passage to be dispositive on the "single server" issue.  Instead, the

24  court looks to the two examples from the file history.  First, defendant cites a portion of the

25  patentee's remarks stating that "in the embodiment of the invention defined by Claim 1 [of

26  the '529 patent], a client is capable of transmitting to a single server a plurality of queries,

27  within the same session, i.e. within the session that is maintained between that client and

28

**Add. 12**

United States District Court
For the Northern District of California

1    that single server." '529 file history, 04/13/05 Applicant Remarks (Dkt. 117, Ex. G) at 13.

2    Second, defendant cites the patentee's argument for traversing a prior art rejection:

3    [I]n Purcell, the primary goal is to allow a single query from a client to be
4    simultaneously applied against multiple databases in a network. The system
     disclosed therein provides that any of the multiple databases that cannot
     service the specific client query return an empty result (indicating for example
5    "sorry, I can't fulfill that request"). Indeed, it appears more advantageous to
     have a network-wide dispersal of the queries, so as to maximize the chances
6    that at least one of the servers can provide the desired data, rather than to
     have those queries contained within a single session between a single client
7    and a single server. The system then allows another database in the network
     that can fulfill the request to return the requested data. As such, Applicant
8    respectfully submits that Purcell does not disclose a <u>session-based</u>
     environment, wherein a communication protocol provides an <u>asynchronous</u>
9    <u>session-based connection</u> . . . Instead, Purcell appears to disclose a
     traditional synchronous means of requesting information, and not one that
10   uses a session, as presently defined.

11   '529 file history, 12/21/05 Applicant Remarks (Dkt. 117, Ex. E) at 13 (emphasis in original).

12        As a threshold matter, the court recognizes that any prosecution history disclaimer

13   must be "clear and unmistakable." <u>Omega Eng'g, Inc. v. Raytek Corp.</u>, 334 F.3d 1314,

14   1326 (Fed. Cir. 2003). In the court's view, the first statement cited by defendant does not

15   rise to that level. While the patentee does refer to the embodiment "defined by claim 1"

16   (suggesting that the embodiment covers the entire claim scope), the statement simply says

17   that the client "is capable" of transmitting queries to a single server. As a result, the court

18   does not find this disclaimer to be sufficiently "clear and unmistakable," even though it does

19   suggest a single server system.

20        The stronger argument comes from the patentee's remarks regarding Purcell. The

21   patentee describes Purcell as dispersing client queries to multiple servers, "as to maximize

22   the chances that at least one of the servers can provide the desired data, rather than to

23   have those queries contained in a single session between a single client and a single

24   server." Critically, the patentee then states that "[a]s such . . . Purcell does not disclose a

25   <u>session-based</u> environment." (emphasis in original). The patentee's emphasis on

26   "session-based" (and "asynchronous session-based connection" later in the sentence) is a

27   clear indication that he is differentiating Purcell as not "session-based," because of the

28   inclusion of multiple servers. Moreover, the patentee then expressly states that Purcell's

**Add. 13**

United States District Court

For the Northern District of California

1  system is "not one that uses a session, as presently defined."  The patentee's own

2  statements suggest that he is defining "session" in a certain way for purposes of his

3  invention, and that the definition of a "single session" requires "a single client and a single

4  server."  Thus, the patentee clearly and unmistakably disclaimed a multiple-server system

5  during prosecution of the patents, and that disclaimer shall be incorporated into the court's

6  construction of "session."

7           However, two obstacles prevent the court from adopting defendant's proposal in its

8  entirety.  First, even though defendant relies on the specification's disclosure that "in

9  responding to a character the Server receives from a Client it can use the history of data

10  that has been sent to and from the current user," the court notes that this sentence merely

11  refers to a possible function of the system, rather than a requirement of the system.  <u>See</u>

12  '639 patent, 14:15-17; '529 patent, 12:12-14.  That is, the server "<u>can</u> use the history of

13  data" sent to and from the client in responding to a client request.  (emphasis added).  The

14  heart of the "session" definition is contained in the specification's previous sentence, that

15  "the server knows or recognizes when subsequent requests originate at the same Client."

16  <u>See</u> '639 patent, 14:12-14; '529 patent, 12:9-11.  Adding the "can use the history of data"

17  language would not expand or contract the boundaries of the claims, and thus the court

18  declines to include it.

19           Second, as discussed at the hearing, the court agrees with plaintiff that the word

20  "state" (as used in defendant's proposed construction) is imprecise, and could create more

21  disputes down the road.  In the parties' joint statement, defendant offers some possible

22  alternatives ("status," or "condition," or "relationship") but all suffer from the same problem -

23  they are subject to interpretation as a subjective, mental state (or status, etc.) rather than

24  an objective, technological state.  Defendant argues that "'state' comes directly from the

25  intrinsic evidence," but the court does not agree that "state" is used to describe what a

26  "session" is.  For instance, the patents-in-suit describe a feature where data can be "stored

27  across Client session whereby the <u>state</u> and contents of the Client are automatically

28  restored when <u>a new Client session is started</u>."  '529 patent, 10:44-48.  According to that

United States District Court

For the Northern District of California

passage, when a <u>new</u> <u>session</u> is started, the <u>old</u> <u>state</u> is restored - suggesting that the two

terms are not interchangeable.  Defendant's other citations similarly fail to persuade the

court that the patents-in-suit use the term "state" to describe what a "session" is.  Instead,

the best description of what a "session" is comes from the previous passage cited by

defendant - that a "session" allows "the server [to] know[] or recognize[] when subsequent

requests originate at the same Client."  '639 patent, 14:12-14; '529 patent, 12:9-11.  Based

on that passage, the key aspect of a "session" is the association of related

communications, so that the server can match up certain requests with an individual client.

For that reason, the court prefers the concrete phrasing of plaintiff's proposal ("a related set

of communications") over the more abstract proposals offered by defendant ("state" or

"status" or "condition" or "relationship").  Thus, the court construes the term "session" as

follows:  "**a related set of communications between a client and a single server in**

**which the server recognizes when consecutive requests originate from the same**

**client**."

     5.     The "additional characters" terms

     The parties agree that the following four phrases, all using the term "additional

characters," should be given a common construction:

     - "wherein each of the plurality of queries form an increasingly lengthening query

string for retrieving content from the server; and wherein the server receives the plurality of

queries from the requesting client, and in response to receiving each of one or more

additional characters in the increasingly lengthening query string"

     - wherein each of the plurality of queries form an increasingly lengthening query

string for retrieving content from the server; and wherein the server receives the queries

from one of the clients, and in response to receiving each of one or more additional

characters in the increasingly lengthening query string"

     - "wherein each of the corresponding consecutive queries lengthens the string by the

additional characters, to form a lengthening string for retrieving the matching content from

the server system"

**Add. 15**

United States District Court

For the Northern District of California

1      - "wherein each one of the plurality of queries are consecutive and together form an

2 increasingly focused query string for retrieving content from the server, and wherein each

3 subsequent one of the plurality of queries extends the query string in the user interface by

4 one or more additional characters"

5      The "additional characters" terms are found in claims 1 and 13 of the '639 patent and

6 in claims 1, 44, and 45 of the '529 patent.  Plaintiff originally proposed that the terms should

7 be given their plain meaning.  After the hearing, plaintiff opted to submit a proposed

8 construction, and now contends that the "additional characters" terms should be construed

9 to mean "one or more characters added to the query after being input by a user of the client

10 software."  Defendant contends that the terms should be construed to mean "each query

11 consists only of the changes to the input string that were not sent in any previous

12 consecutive query."

13      Going back to the "Madison Square Garden" example discussed above, the key

14 dispute here is over which characters are sent to the server as the user types in the letters

15 "m-a-d-i."  Plaintiff argues that the claims describe a "lengthening string" that is sent, so that

16 the client would send the letter "m" after the user types it, then would send the letters "m-a,"

17 then "m-a-d," and so on.  Plaintiff challenges the idea that the characters are sent

18 piecemeal for the server to "glue" together.  Defendant, on the other hand, argues that the

19 server does indeed "glue" the characters together as they are received.  In defendant's

20 view, the client would send the letter "m" after the user types it.  Then, when the user

21 continues to type, the client would send the letter "a" without re-sending the letter "m."

22 Defendant concedes that the letters do not need to be sent individually, but maintains that

23 only the changes to the search string are sent - so if the client types "m-a-d," the client

24 might first send the letter "m" followed by the letters "a-d" together.  In defendant's view, the

25 key aspect of the invention is that no character is ever re-sent to the server - so in this

26 example, the letter "m" is sent to the server once and only once.

27      The court agrees with defendant here.  First, the claim language itself suggests that

28 the "lengthening string" is formed by piecing together multiple smaller queries, rather than

United States District Court

For the Northern District of California

1    by receiving iteratively longer versions of the string.  Claim 1 of the '529 patent describes

2    how "consecutive additional characters" are input at the client and sent as "consecutive

3    queries" to the server, "wherein each of the corresponding consecutive queries lengthens

4    the string by the additional characters, to form a lengthening string."  The server then

5    "receiv[es] each of the corresponding consecutive queries that modify the lengthening

6    string."  The words "lengthens" and "modify" suggest that the server is not wiping its slate

7    clean with each new submitted query, but is instead combining the queries to form the

8    "lengthening string."  The specification confirms this understanding, as "the protocol of the

9    current invention" is one that "send[s] just the changes to the input buffer, instead of

10    sending the entire input buffer."  '529 patent, 20:11-14.  Consistent with Trading Techs. and

11    Honeywell, the court finds that the use of "the current invention" here indicates that the

12    description is intended to apply to the invention as a whole, and not just a single

13    embodiment.  While plaintiff does provide support for its argument that each "change" can

14    be more than just a single character, it does not provide adequate support for its argument

15    that the entire character string is re-sent as the user types in a query.  Accordingly, the

16    court construes the "additional characters" terms as follows: "**only the changes to the**

17    **input string that were not sent in any previous consecutive query**."

18          C.    Conclusion

19          In accordance with the foregoing, and for the reasons discussed above, the court

20    construes the parties' disputed terms as follows:

21          1.    "content-based cache" and "query and result cache" mean "a store of

22               previous queries and corresponding result sets executed by the system."

23          2.    "asynchronous connection" means "a connection that allows both the client

24               and the server to initiate communications at any moment in time within a

25               session."

26          3.    "communication protocol" means "a set of rules that enable computers to

27               exchange messages with each other."

28

4.    "session" means "a related set of communications between a client and a single server in which the server recognizes when consecutive requests originate from the same client."

5.    The "additional characters" terms mean "only the changes to the input string that were not sent in any previous consecutive query."

**IT IS SO ORDERED**.

Dated: May 28, 2013

PHYLLIS J. HAMILTON
United States District Judge

United States District Court
For the Northern District of California

1

2

3 UNITED STATES DISTRICT COURT

4 NORTHERN DISTRICT OF CALIFORNIA

5

6

7 MASTEROBJECTS, INC.,

8         Plaintiff,                No. C 11-1054 PJH

9       v.                     **ORDER DENYING MOTION FOR LEAVE TO FILE MOTION FOR**

10 GOOGLE, INC.,                **RECONSIDERATION**

11         Defendant.

12 _____/

13      Before the court is plaintiff's motion for leave to file a motion for reconsideration of

14 the court's claim construction order. Because plaintiff MasterObjects, Inc. ("plaintiff") has

15 not, under Local Rule 7-9(b)(3), shown a "manifest failure by the court to consider material

16 facts or dispositive legal arguments which were presented to the court," the court hereby

17 DENIES plaintiff's motion for leave. However, because the court did request a response

18 from defendant Google Inc. ("defendant"), the court has reviewed plaintiff's proposed

19 motion for reconsideration and defendant's response, and DENIES plaintiff's motion on the

20 merits as follows.

21      Plaintiff argues that the court erred in its constructions of two disputed terms: (1)

22 "session," and (2) the "additional characters" terms. The court construed "session" as "a

23 related set of communications between a client and a single server in which the server

24 recognizes when consecutive requests originate from the same client." Plaintiff's argument

25 is that the claims describe a "server system," which implies more than one server. Plaintiff

26 first argues that defendant "heavily redacted" a portion of the prosecution history, changing

27 its meaning, and that the court cited the same redacted version of the statement in its

28 order. Here is the redacted version:

**Add. 19**

> [I]n Purcell, the primary goal is to allow a single query from a client to be simultaneously applied against multiple databases in a network. The system disclosed therein provides that any of the multiple databases that cannot service the specific client query return an empty result (indicating for example "sorry, I can't fulfill that request"). Indeed, it appears more advantageous to have a network-wide dispersal of the queries, so as to maximize the chances that at least one of the servers can provide the desired data, rather than to have those queries contained within a single session between a single client and a single server. The system then allows another database in the network that can fulfill the request to return the requested data. As such, Applicant respectfully submits that Purcell does not disclose a session-based environment, wherein a communication protocol provides an asynchronous session-based connection . . . Instead, Purcell appears to disclose a traditional synchronous means of requesting information, and not one that uses a session, as presently defined.

And the full version (with changes underlined):

> [I]n Purcell, the primary goal is to allow a single query from a client to be simultaneously applied against multiple databases in a network. The system disclosed therein provides that any of the multiple databases that cannot service the specific client query return an empty result (indicating for example "sorry, I can't fulfill that request"). Indeed, it appears more advantageous to have a network-wide dispersal of the queries, so as to maximize the chances that at least one of the servers can provide the desired data, rather than to have those queries contained within a single session between a single client and a single server. The system then allows another database in the network that can fulfill the request to return the requested data. As such, Applicant respectfully submits that Purcell does not disclose a session-based environment, wherein a communication protocol provides an asynchronous session-based connection <u>between the client system and the server system, and allows the client system to send, as part of a session between that client system and that server system, a plurality of consecutively input strings to query the server system for content</u>. Instead, Purcell appears to disclose a traditional synchronous means of requesting information, and not one that uses a session, as presently defined.

'529 file history, 12/21/05 Applicant Remarks (Dkt. 117, Ex. E) at 13.

Plaintiff argues that the "server system" language shows that the invention is not limited to a single server, and that the patentee was not distinguishing Purcell based on the presence of a single server, but on the presence of an asynchronous connection.

Plaintiff then points to the language of claim 1 of the '529 patent, which also uses the "server system" language. Plaintiff then argues that claim 2 of the '529 patent specifically refers to a single server, and that claim 4 specifically refers to multiple servers. Plaintiff thus argues that the principle of claim differentiation requires finding that claim 1 must

2

Add. 20

1  include both single server and multiple server cases.  Plaintiff then, very briefly, argues that

2  the "single server" limitation effectively imports a "sticky state" server requirement into the

3  construction.

4      There is some merit to the argument that the invention as a whole allows for the

5  possibility of multiple servers.  The cited section of the file history confirms this, as it states

6  that "it appears more advantageous to have a network-wide dispersal of the queries, so as

7  to maximize the chances that at least one of the servers can provide the desired data."

8  However, the key issue is that, to the extent that the invention involves a <u>session</u>, that

9  <u>session</u> must be limited to a single client and a single server.  The full version of the above-

10  quoted sentence states that "it appears more advantageous to have a network-wide

11  dispersal of the queries, so as to maximize the chances that at least one of the servers can

12  provide the desired data, <u>rather than to have those queries contained within a single</u>

13  <u>session between a single client and a single server</u>."  Thus, as defined by the patentee

14  himself, a "session" does refer to the set of communications between one client and one

15  server.  That client may well communicate with other servers, but it would do so outside the

16  bounds of the original "session."  The court's claim construction order says as much, stating

17  that "[t]here may well be other, non-'session-based' embodiments that are also claimed by

18  the patents-in-suit, but the limitations cited by defendant would apply to any claim that uses

19  the word 'session.'"  Dkt. 153 at 11.  The court also notes that its order specifically

20  addressed the "sticky state" argument, and explained how it differed from a "single server"

21  requirement.  <u>Id.</u> at 12.  For these reasons, the court DENIES plaintiff's motion for

22  reconsideration of the construction of "session."

23      The court construed the "additional characters" terms as "only the changes to the

24  input string that were not sent in any previous consecutive query."  Plaintiff's main

25  argument here is that, as the user types in a search query, the client computer re-sends the

26  entire character string (i.e., not "only the changes") as he/she types.  For instance, if the

27  user were searching for "amazon," the computer would send "a," then "a-m," then "a-m-a,"

28  and so on.  Plaintiff concedes that the claims state that "consecutive additional characters"

3

1  are "receive[d] as input," but argues that description applies only to the client computer

2  (and reflects the user's typing actions), but does not describe what the server receives.

3  Plaintiff then argues that, even where the specification is referring to "the invention," it is

4  actually "very plain that the language" is directed at a specific embodiment.  Finally, plaintiff

5  makes the same "sticky state" argument as in the "session" section, arguing that the court's

6  construction imports such a requirement into these terms.

7        Plaintiff's first two arguments were already addressed in the court's order.  Claim 1

8  of the '529 patent describes a process by which "consecutive additional characters" are

9  input at the client computer, and "<u>corresponding</u> consecutive queries" are sent to the

10 server.  The natural reading of the claim is that the word "corresponding" means that the

11 "consecutive queries" sent to the server correspond to the "consecutive additional

12 characters" entered by the user.  The claim goes on to state that "each of the

13 corresponding consecutive queries <u>lengthens</u> the string," and that the lengthening string is

14 "modified" at the server.  If plaintiff were correct, and a new full string was re-sent every

15 time, the string would not be "lengthened" or "modified," it would be <u>replaced</u>.  Next, plaintiff

16 argues that the words "the invention" refer only to one specific embodiment.  But, as noted

17 in the claim construction order, this argument has been expressly rejected by the Federal

18 Circuit.  <u>See</u> <u>Trading Techs. Int'l, Inc. v. eSpeed, Inc.</u>, 595 F.3d 1340, 1353 (Fed. Cir.

19 2010); <u>Honeywell Int'l, Inc. v. ITT Indus., Inc.</u>, 452 F.3d 1312, 1318 (Fed. Cir. 2006).

20 Finally, as mentioned above, plaintiff's "sticky state" argument was addressed in the

21 context of "session," and does not appear to be applicable to this set of terms.  Thus, the

22 court DENIES plaintiff's motion for reconsideration of the construction of the "additional

23 characters" terms.

24        **IT IS SO ORDERED**.

25 Dated: August 26, 2013

26                                          _____
                                           PHYLLIS J. HAMILTON
27                                          United States District Judge

28

United States District Court
For the Northern District of California

SPENCER HOSIE (SBN 101777)
shosie@hosielaw.com
DIANE S. RICE (SBN 118303)
drice@hosielaw.com
DARRELL R. ATKINSON (SBN 280564)
datkinson@hosielaw.com
HOSIE RICE LLP
600 Montgomery Street, 34th Floor
San Francisco, CA 94111
Telephone (415) 247-6000
Facsimile (415) 247-6001

Attorneys for Plaintiff
MASTEROBJECTS, INC.

JOSEPH B. SHEAR (Bar No. 262222)
jshear@kasowitz.com
KEITH J. MITRO (Bar No. 287108)
kmitro@kasowitz.com
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
333 Twin Dolphin Drive, Suite 200
Redwood Shores, CA 94065
Telephone (650) 453-5170
Facsimile (650) 453-5171

JONATHAN K. WALDROP (*pro hac vice*)
jwaldrop@kasowitz.com
DARCY L. JONES (*pro hac vice*)
djones@kasowitz.com
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1349 West Peachtree Street, N.W., Suite 1500
Atlanta, GA 30309
Telephone (404) 260-6080
Facsimile (404) 260-6081

Attorneys for Defendant and Counterclaimant
GOOGLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| MASTEROBJECTS, INC., | CASE NO. CV 11-01054 PJH |
| Plaintiff and Counter-defendant | [~~PROPOSED~~] **STIPULATED FINAL JUDGMENT** |
| v. | |
| GOOGLE INC., | |
| Defendant and Counterclaimant. | |

1   The Court having issued its Claim Construction Order on May 28, 2013 (D.I. 153); and

2   pursuant to the Joint Stipulation for Entry of Stipulated Final Judgment ("Joint Stipulation"),

3   entered into by and among Plaintiff MasterObjects, Inc. ("MasterObjects") and Defendant

4   Google Inc. ("Google"); and

5   Based on the Court's construction of the "additional characters" terms as meaning "only

6   the changes to the input string that were not sent in any previous consecutive query" (Claim

7   Construction Order, pp. 15-17); and based on the parties' Joint Stipulation that the Google

8   accused products do not practice the "additional characters" terms and therefore do not infringe

9   claims 1, 8, 13, 44, and 45 of the '529 patent and claims 1 and 13 of the '639 patent, the claims

10  asserted in this litigation; and

11  Based on the stipulated facts set forth in the Joint Stipulation, which are incorporated

12  herein by reference; and

13  Based upon the parties' stipulation that, subject to the reservation of rights for

14  MasterObjects and Google set forth in the Joint Stipulation, final judgment of non-infringement

15  may properly be entered,

16  IT IS HEREBY ORDERED as follows:

17  1.   Therefore, pursuant to the parties' stipulation, judgment of non-infringement as a

18  matter of law as to all asserted claims in the Complaint (claims 1, 8, 13, 44, and 45 of U.S. Patent

19  8,112,529 and claims 1 and 13 of U.S. Patent No. 8,060,639), against Plaintiff and in favor of

20  Defendant is GRANTED.

21  2.   This Stipulated Final Judgment is without prejudice to the parties' rights to appeal

22  the Court's Claim Construction Order, this Stipulated Final Judgment of non-infringement and/or

23  any prior or future orders issued by the Court, which appeal rights are specifically preserved.  The

24  parties reserve their rights to challenge construction of this disputed claim phrase of the '529

25  patent or the '639 patent on appeal.

26  3.   Nothing in the Claim Construction Order, the Joint Stipulation, or this Stipulated

27  Final Judgment, or any other order in this matter, shall have any collateral estoppel or issue

28  preclusion effect in this matter or in any present or future litigation of MasterObjects with Google

1    or in any present or future litigation of MasterObjects with any other entity, and, specifically (but

2    without limitation) shall have no collateral estoppel or issue preclusion effect in the matters of:

3    MasterObjects, Inc. v. eBay Inc., No. C 12-680 JSC (N.D. Cal.); MasterObjects, Inc. v. Yahoo,

4    Inc., No.  C 11-2539 JSW (N.D. Cal.); or MasterObjects, Inc. v. Google Inc., No. C 13-04304

5    PJH (N.D. Cal.), until this Stipulated Judgment becomes final and unappealable. The foregoing

6    does not waive or limit any of Google's defenses, other than collateral estoppel or issue

7    preclusion before this Stipulated Final Judgment becomes final and unappealable, with respect to

8    the Claim Construction Order, the Joint Stipulation, or the Stipulated Final Judgment, including

9    the persuasive effect of said Claim Construction Order, which may be available to Google in the

10   appeal of this matter or in any other present or future litigation between MasterObjects and

11   Google, including but not limited to the matter MasterObjects, Inc. v. Google Inc., No. C 13-

12   04304 PJH (N.D. Cal.) ("MasterObjects II").

13        4.      Pursuant to the parties' Stipulated Final Judgment, the Court DIRECTS the Clerk

14   to enter final judgment as set forth herein.

15        5.      Pursuant to the parties' Stipulated Final Judgment, the Court ORDERS that

16   Defendant's counterclaims are DISMISSED without prejudice.

17        6.      All claims in this action having now been adjudicated or dismissed by one or more

18   Orders of this Court, this is the Final Judgment of the Court in this matter.

19        The clerk is ordered to provide copies of this order to all counsel.

20        IT IS SO ORDERED.

21

22   Dated:  November 26   , 2013      _____

23                                     Honorable Phyllis J. Hamilton
                                       U.S. District Court Judge for the
24

25

26

27

28



## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 24th day of February, 2014, I caused this Brief of

Appellant to be filed electronically with the Clerk of the Court using the CM/ECF

System, which will send notice of such filing to the following registered CM/ECF

users:

Jeffrey J. Toney
Darcy L. Jones
Jonathan K. Waldrop
KASOWITZ BENSON TORRES & FRIEDMAN, LLP
1349 W. Peachtree Street
Atlanta, Georgia  30309
(404) 260-6133

Keith J. Mitro
Robert P. Watkins, III
KASOWITZ BENSON TORRES & FRIEDMAN, LLP
333 Twin Dolphin Drive, Suite 200
Redwood Shores, California  94065
(650) 453-5170

*Counsel for Appellee*

Upon acceptance by the Clerk of the Court of the electronically filed

document, the required number of copies of the Brief of Appellant will be hand

filed at the Office of the Clerk, United States Court of Appeals for the Federal

Circuit in accordance with the Federal Circuit Rules.

/s/ Spencer Hosie
*Counsel for Appellant*

# CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

    [ X ] this brief contains [*11,121*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

    [   ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

    [   ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: February 24, 2014        /s/ Spencer Hosie
                                  *Counsel for Appellant*