## 2014-1148

# United States Court of Appeals
# for the Federal Circuit

MASTEROBJECTS, INC.,

*Plaintiff-Appellant*,

v.

GOOGLE INC.,

*Defendant-Appellee*.

*Appeal from the United States District Court for the Northern District of California in case no. 4:11-cv-1054, Judge Phyllis J. Hamilton.*

## BRIEF OF APPELLEE GOOGLE INC.

Jeffrey J. Toney
Jonathan K. Waldrop
Darcy L. Jones
KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
1349 West Peachtree Street, Suite 1500
Atlanta, GA  30309
Telephone:  (404) 260-6080
Facsimile:  (404) 260-6081

Dan L. Bagatell
PERKINS COIE LLP
2901 N. Central Avenue, Suite 2000
Phoenix, AZ  85012
Telephone:  (602) 351-8250
Facsimile:  (602) 648-7150

Steven C. Carlson
Robert P. Watkins III
KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
333 Twin Dolphin Drive
Suite 200
Redwood Shores, CA  94065
Telephone: (650) 453-5170
Facsimile: (650) 453-5171

*Attorneys for Defendant-Appellee Google Inc.*

May 23, 2014

# CERTIFICATE OF INTEREST

Counsel for the Appellee, Google Inc., certifies the following:

1.      The full name of every party represented by me is:  Google Inc.

2.      The name of the real party in interest represented by me is:  Google Inc.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:  Google Inc. has no parent corporation and no publicly held company owns more than 10% of Google Inc.'s stock.

4.      The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or are expected to appear in this court are:
Kasowitz, Benson, Torres & Friedman LLP: Jeffrey J. Toney, Jonathan K Waldrop, Steven C. Carlson, Darcy L. Jones, Keith J. Mitro, Robert P. Watkins, III, Joseph B. Shear;
Perkins Coie LLP:  Dan L. Bagatell;
Latham & Watkins LLP: Douglas E. Lumish, Jeffrey G. Homrig, Joseph H. Lee, Linfong Tzeng;
McDermott Will Emery LLP: Jeremiah Aaron Armstrong, Daniel Raymond Foster, Vanessa I. LeFort, Vinod Jos Mapranath, Terrence Patrick McMahon;
Sidley Austin: Vera M. Elson.

May 23, 2014                              Respectfully submitted,

                                          /s/ Jonathan K. Waldrop
                                          Jonathan K. Waldrop
                                          KASOWITZ, BENSON, TORRES &
                                          FRIEDMAN LLP
                                          1349 West Peachtree Street
                                          Suite 1500
                                          Atlanta, GA 30309
                                          Telephone:  (404) 260-6080
                                          Facsimile:  (404) 260-6081
                                          *Attorney for Defendant-Appellee
                                          Google Inc.*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ...................................................................i

STATEMENT OF RELATED CASES ....................................................vi

INTRODUCTION ........................................................................................1

STATEMENT OF THE ISSUE.................................................................4

STATEMENT OF THE CASE...................................................................5

    A.    MasterObjects' QuestObjects System and the Claimed Invention Based on That System...........................................5

    B.    Google's Accused Instant Search Feature..........................16

    C.    The District Court's Claim Construction and the Resulting Stipulated Judgment of Noninfringement ........................17

    D.    The Parallel Cases Against eBay and Yahoo!....................20

SUMMARY OF ARGUMENT ...............................................................22

ARGUMENT .............................................................................................24

I.    THE CLAIM LANGUAGE ITSELF DICTATES THAT THE CLIENT MAY SEND THE SERVER ONLY THE CHANGES TO THE PREVIOUS QUERY ...................................................................26

    A.    The District Court's Construction Reflects Both the Plain Meaning of "Additional Characters" and the Claims' Discussion of How Those "Additional Characters" Are Used ..........26

    B.    MasterObjects' Construction Defies the Claim Language ...............31

    C.    The Claim Language on Which MasterObjects Relies Does Not Support Its Construction......................................................35

II.    THE WRITTEN DESCRIPTION SUPPORTS THE DISTRICT COURT'S CONSTRUCTION ...................................................40

    A.    The Written Description Only Describes Transmitting Just The Changes to the Server and Expressly Calls This an Aspect of "the Invention".....................................................40

    B.    MasterObjects Improperly Downplays the Inventors' Description of "the Invention" and Distorts the Portions of the Specification on Which It Affirmatively Relies ...............45

# TABLE OF CONTENTS
(continued)

III. THE PROSECUTION HISTORY SUPPORTS, AND CERTAINLY
DOES NOT UNDERMINE, THE DISTRICT COURT'S
CONSTRUCTION ........................................................................51

    A. MasterObjects Distinguished Prior Art on Grounds that the
Client Sends Only the Changes to the Server, and It Stressed
that the Invention Involves Sending Characters from the Client
to the Server in Order to Modify the String at the Server .................51

    B. MasterObjects' Prosecution History Arguments Are Mistaken ........53

IV. THE *EBAY* AND *YAHOO!* CLAIM CONSTRUCTION ORDERS
ARE IRRELEVANT BECAUSE THEY FOCUSED ON A
DIFFERENT CLAIM LIMITATION ...........................................56

CONCLUSION ......................................................................................57

# TABLE OF AUTHORITIES

**Cases**                                                         **Page(s)**

*Apple Inc. v. Samsung Elecs. Co.*,
  695 F.3d 1370 (Fed. Cir. 2012) ........................................................40

*Biogen, Inc. v. Berlex Labs.*,
  318 F.3d 1132 (Fed. Cir. 2003) ........................................................51

*Dippin' Dots, Inc. v. Mosey*,
  476 F.3d 1337 (Fed. Cir. 2007) ........................................................40

*Edwards Lifesciences LLC v. Cook Inc.*,
  582 F.3d 1322 (Fed. Cir. 2009) ........................................................46

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*,
  452 F.3d 1312 (Fed. Cir. 2006) ...................................................47, 51

*K–2 Corp. v. Salomon S.A.*,
  191 F.3d 1356 (Fed. Cir. 1999) ........................................................35

*MasterObjects, Inc. v. eBay, Inc.*,
  Case No. 3:12-cv-680 JSC, 2013 WL 1287428 (N.D. Cal. Mar. 28, 2013)
  .................................................................................... 21, 56

*MasterObjects, Inc. v. Yahoo!, Inc.*,
  Case No. C 11-02539 JSW, 2013 WL 6185475 (N.D. Cal. Nov. 26, 2013)
  .................................................................................3, 21, 56

*Netcraft Corp. v. eBay, Inc.*,
  549 F.3d 1394 (Fed. Cir. 2008) ........................................................46

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) ...................................*passim*

*Power MOSFET Techs., LLC v. Siemens AG*,
  378 F.3d 1396 (Fed. Cir. 2004) ........................................................40

*Spectrum Int'l, Inc. v. Sterilite Corp.*,
  164 F.3d 1372 (Fed. Cir. 1998) ........................................................40

**TABLE OF AUTHORITIES**

(continued)

Page

*Tex. Instruments Inc. v. U.S.I.T.C.*,
988 F.2d 1165 (Fed. Cir. 1993) .......................................................... 33

*Thorner v. Sony Computer Entm't Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ..................................................... 3, 24

*TiVo, Inc. v. EchoStar Commc'ns Corp.*,
516 F.3d 1290 (Fed. Cir. 2008) .......................................................... 46

*Trading Techs. Int'l, Inc. v. eSpeed, Inc.*,
595 F.3d 1340 (Fed. Cir. 2010) ..................................................... 40, 46

*Verizon Services Corp. v. Vonage Holdings Corp.*,
503 F.3d 1295 (Fed. Cir. 2007) ..................................................... 46, 47

**Other Authorities**

Fed. R. App. P. 10 .................................................................................. 19

## STATEMENT OF RELATED CASES

There have been no other previous appeals in or from this civil action before this or any other appellate court.

MasterObjects' Statement of Related Cases includes two cases pending in the Northern District of California that involve the same asserted patents: *MasterObjects, Inc. v. eBay, Inc.*, Case No. 3:12-cv-680 (before Judge Corley); *MasterObjects, Inc. v. Yahoo!, Inc.*, Case No. 3:11-cv-2539 (before Judge White). MasterObjects incorrectly asserts that "[t]he fundamental question regarding claim scope presented in this appeal was also raised in the *eBay* and *Yahoo!* cases, where the respective courts each reached the opposite conclusion as the district court in the present case."  As discussed in the body of this brief, this is an incorrect characterization of the *eBay* and *Yahoo!* cases.  Although the district courts in *eBay*, *Yahoo!*, and this case were consistent in their constructions of a separate claim term, "communication protocol," neither the *eBay* court nor the *Yahoo!* court construed the "additional characters" terms at issue in this appeal.

# INTRODUCTION

The claims of MasterObjects' patents require that the client computer send to the server only the changes made to the query string that the user enters into the client software, as opposed to retransmitting already-sent characters. The claims, the written description, and the prosecution history all make this clear, and the district court accordingly construed a set of claim terms, referred to in shorthand as the "additional characters" terms, to require that each query sent from the client to the server "consists only of the changes to the input string that were not sent in any previous consecutive query."

The parties agree that claim 1 of U.S. Patent No. 8,112,529 ("the '529 patent") is representative of all the asserted claims. In that claim, the parties' dispute centers on the limitation requiring that "each of the corresponding consecutive queries [sent to the server] lengthens the string by the additional characters, to form a lengthening string." On its face, that limitation requires that each consecutive query sent from the client to the server contain only the additional characters entered since the last transmission. MasterObjects' contrary construction, which allows retransmission of previously sent characters, cannot be correct because the claim language says that these consecutive queries "form" a lengthening string at the server, and (later) that this string is "modified" and "lengthened," rather than replaced, as the user continues to type. As the district

1

court recognized, "[t]he words 'lengthens' and 'modify' suggest that the server is not wiping its slate clean with each new submitted query, but is instead combining the queries to form the 'lengthening string.'"

The claim language reflects what the inventors set out to do and what they described in their specification. Their goal was to have the server return increasingly relevant results as the user typed additional characters of an input string into the client computer. To accomplish this, the inventors designed an approach that rapidly synchronized the lengthening string input by the user with the lengthening string that the server used to query the database. To accelerate that synchronization, they adopted a streamlined process that minimized each client-to-server transmission by sending only the updates, not the entire string each time. Optimally, the client computer would send a single character at a time, but in any case it transmitted only the additional characters reflecting the incremental changes to the input string. The QuestObjects system that inventors developed and described throughout the patents as the "present invention" specifically called for sending "just the changes" from the client to the server. And nothing in the specification or prosecution history suggests that the claimed invention covers replacing and re-sending the entire string with each update.

Unable to overcome the intrinsic evidence, MasterObjects erects a series of straw men. MasterObjects first argues that Google sought, and the district court

provided, a *gestalt* interpretation untethered to specific claim language. In actuality, however, the parties debated, and the district court decided, a concrete dispute over particular "additional characters" terms in each claim. MasterObjects also argues that the claims are not limited to *single-character* changes to queries. But Google did not argue, and the district court did not rule, that the changes are limited to single characters. A user may update the search string one character at a time, or he or she may update multiple characters at once (*e.g.*, by pasting multiple characters into the search box). Either way, however, only the changes are transmitted because that construction is the only way to adhere to the "additional characters" limitations and the other requirements of the claims such as "forming," "modifying" and "lengthening" the lengthening string at the server.

While MasterObjects attempts to fit this case into the "disclaimer" or "disavowal" paradigm of cases such as *Thorner*, that standard is inapposite here. There is no need to "disclaim" or "disavow" an interpretation that is outside the claims to begin with, as MasterObjects' is. Rather, this case turns on the plain and ordinary meaning of the claims in view of the specification and prosecution history, all of which compelled the district court's construction.

Finally, MasterObjects suggests that the district courts in the parallel *eBay* and *Yahoo!* cases reached different conclusions. But those courts never construed the terms at issue here. Rather, Google, eBay, and Yahoo! each sought to have the

claim term "communication protocol" construed as a "set of rules that enable computers to exchange messages with each other that is optimized for sending single characters from a client to a server and lists of strings from the server to the client." All three district courts rejected the argument that the system had to be optimized for sending single-character updates. But the issue here is not the term "communication protocol," and it is not whether the system must be optimized for single-character updates. It is whether other claim limitations (the "additional characters" limitations found in each asserted independent claim) require that the client transmit to the server only the changes to the queries, regardless of whether those changes are single characters or multiple characters. eBay and Yahoo! did not raise this argument, and their district courts did not rule on it. Google did raise it, the district court in this case correctly adopted it, and MasterObjects concedes that Google does not infringe under the district court's construction.

The judgment of noninfringement should be affirmed.

## STATEMENT OF THE ISSUE

Consistent with the claim language, the written description, and the prosecution history, the district court construed the asserted claims to require that each query sent to the server consist only of the changes to the input string that were not sent in the previous query. MasterObjects' contrary position, which allows retransmission of all characters in every iteration, contradicts the claim

language, the written description, and the prosecution history.  Was the district

court's construction correct?

## STATEMENT OF THE CASE

### A.    MasterObjects' QuestObjects System and the Claimed Invention Based on That System

MasterObjects' approach to enhancing searches involves establishing a

"session" between a client computer and a particular server computer during which

those computers can exchange requests and responses rapidly.  Synchronizing the

information at each location is critical to this session-based approach.  Indeed, the

patents describe "the invention" as a way to "synchronize the data entered or

displayed on a client system with the data on a server system."  ['529(5:58-62)]  In

particular, as MasterObjects observes in the introduction to its brief on appeal

(at 4), "[t]o make an instant search paradigm work, the search box in the user's

web browser (the 'client') needs to synchronize its contents with a remote system

(the 'server') that processes the query and returns results."[1]

---

[1] MasterObjects suggests (at 8) that "[a] 'session' refers to the time period where a user sits down and types in a search request."  But that was essentially the construction of "session" that MasterObjects proposed below and lost.  [A33]  The district court construed "session" to mean "a related set of communications between a client and a single server in which the server recognizes when consecutive requests originate from the same client" [A38], and MasterObjects has not appealed that construction.

To facilitate quick synchronization, the named inventors desired to minimize the amount of communication between the client and the server.  [A815-16 (testimony of first named inventor van den Oord)]  And to do that, they adopted the approach of sending only the user's newly entered updates to the search string, rather than re-sending characters that had already been entered and transmitted to the server.  [A812, A817-18 (van den Oord)]

The inventors based the two patents-in-suit on a system they called QuestObjects.  Throughout the patents, the inventors described that system as based on incremental queries in which the client computer transmits to the server only the changes from what it transmitted previously.  In QuestObjects, the user enters text at a "client object," and that text is eventually sent to a "server object" to query data at the server.  ['529(18:32-42)]  For present purposes, the critical aspect is the way in which the system synchronizes the string of characters entered at the client with the string used at the server.

Figure 4 of the patent illustrates that process:



*FIG. 4*

(Highlighting added.)  The figure shows the development and transmission of a search string "abc."  At step 403, a user types in "character event" "a," and the character "a" is sent from the client to server using the command "inputBufferAppend['a']."  At step 404, the user types in "character event" "b," and only the character "b" is sent from client to server, using the command "inputBufferAppend['b']."  The server thus forms an initial string "ab" on the server at step 405, which it uses to retrieve a set of results at step 406.  When the user types the character "c," the "character event" "c" is generated at step 407, and the client sends just the letter "c" to the server, which then appends that change (using the inputBufferAppend function) to the existing query "ab" to produce the lengthened string "abc."  The server then uses the lengthened string to retrieve a revised set of results.

7

The corresponding written description of this process confirms that only the new character "c" is sent from client to server. ['529(19:13-16) ("At step 407 the user types a third character 'c' into the Questlet. While *this character* is being sent to the Server, a second and possibly third result set from the previous query is on its way to the Client.") (emphasis added)] Thus, only the changes (here "c" and previously "b") are sent from client to server to lengthen the existing string; the string is not entirely replaced and re-sent.

Figure 6 further depicts what happens when a new character is input:



*FIG. 6A*

As shown in steps 605 and 607, when a "character event" occurs, the system performs the step "update input buffer and notify dependent Questers." [*See also* '529(19:66-20:20) ("If the event is a character event, the input buffer is updated accordingly and Client Questers that have dependencies with the input buffer or

the Result Set also are notified (step 607).")]  Then, unless the results for the updated query already appear in the local cache, the client transmits the *change* in the input buffer—not the entire input buffer string—to the server.  This is shown in step 611, labeled "send input buffer *change* message" (emphasis added).  The corresponding written description confirms that "the protocol of the present invention" causes the client computer to "*send just the changes*" to the server:

> To support this, *the protocol of the present invention* provides a number of messages that allow the Client Quester to *send just the changes* to the input buffer, instead of sending the entire input buffer.

['529(20:11-14) (emphasis added)]

Figures 7 and 8 of the other asserted patent, U.S. Patent No. 8,060,639 ("the '639 patent"), similarly indicate that only the changes are sent from the client to the server, using the Δ (change) symbol to depict that only the changes to the search string are transmitted from client to server:



FIG. 7



**FIG. 8**

The patentees' overall description of their invention also consistently refers to sending the server the incremental changes to the string, rather than retransmitting already-sent characters. The abstract of the '529 patent states that "[t]he invention" is a search and retrieval system "for *sending a character-by-character string of data* to an intelligent server that can be configured to immediately analyze the lengthening string character-by-character and return to the client increasingly appropriate database information as the client sends the string." ['529 Abstract] Likewise, the first sentence of the detailed description states:

> Roughly described, *the invention* provides a session-based bi-directional multi-tier client-server asynchronous information database search and retrieval system for *sending a character-by-character string of data to an intelligent server* that can be configured to immediately *analyze the lengthening string character-by-character* and return to the client increasingly appropriate database information as the client sends the string.

['529(8:26-33) (emphasis added)]

11

The specification emphasizes that "the invention" is "optimized for sending single characters."  ['529(11:55-58) ("The invention includes … a communication protocol that is optimized for sending single characters from a Client to the Server …..")][2]  The specification also makes clear that such a "character-by-character" transmission does *not* involve sending the whole string each time.  ['529(12:5-6) (distinguishing "send[ing] the entire string all at once" from transmitting it "character by character")]  The specification does note that the client is "not restricted to sending single characters."  ['529(12:3-4)]  In particular, it may send the server a string of characters in unusual circumstances, such as "when a user replaces the contents of an entry field with a new string."  ['529(4-8)]  But even in that case, the transmission contains no more than the changes to the string.  The specification never describes re-sending characters that have already been sent.

The claims are consistent with the written description.  MasterObjects has asserted multiple claims from two patents, but the parties agree that claim 1 of the '529 patent is representative of all the claims for present purposes.  It reads:

---

[2] In the '639 patent, the inventors changed the specification slightly, but they still emphasized that the optimized solution involved sending "characters," not the complete string:  "The invention includes … a communication protocol that is optimized for sending characters from a Client to the Server …."  ['639(13:58-61)]

1. A system for retrieval at a client system of content from a server system, comprising:

a communication protocol that enables an asynchronous connection over a network between a client system and a server system, and allows the client system to send via the network, and within a session between the client system and the server system, *a lengthening string composed of a plurality of consecutively input characters*, to query the server system for string-based content, while asynchronously receiving consecutive responses from the server system as the characters are being input;

a content-based cache, at the server system, which stores previous queries and corresponding result sets previously executed by the system, and which includes within its result sets content or other information previously retrieved from the server system or one or more content sources in response to the previous queries;

a client object, in communication with a client software at the client system and with the communication protocol, wherein the client object

receives, as input, *consecutive additional characters* from the client software, and

*while each of the consecutive additional characters are being received as input, transmits via the network to a server object at the server system one or more corresponding consecutive queries*, within the session between the client system and the server system, to retrieve content from the server system,

wherein each of the corresponding consecutive queries *lengthens the string by the additional*

> *characters, to form a lengthening string* for
> retrieving matching content from the server
> system; and
>
> a server object, in communication with the server
> system, and with the client object via the commu-
> nication protocol, wherein the server object
>
> in response to *receiving each of the corresponding
> consecutive queries that modify the lengthening
> string*,
>
> automatically *uses the lengthening string to query*
> and retrieve content information from the
> content-based cache at the server system or
> from the one or more content sources that
> matches the lengthening string, and
>
> asynchronously returns, while the additional
> characters are being input and the corre-
> sponding consecutive queries are being
> transmitted and the *lengthening string is being
> modified* during the session, consecutive
> responses containing content information which
> increasingly matches the lengthening string, to
> the client object for immediate use by the client
> system, wherein the server system includes at
> least one processor.

(Emphasis added.)

Although claim 1 recites a system and lists certain components, it also

recites certain steps that the "client object" and "server object" components must

perform. The "client system" receives a "lengthening string composed of

consecutively-input characters." In particular, the client system includes a client

object that receives these "consecutive additional characters" from the client

software as the user types. Next, the client object sends "one or more corresponding consecutive queries" over the network to the server object. Each query sent over the network "corresponds" to the "consecutive additional characters" that were just received from the client software.

The claim continues by requiring that "each of the corresponding consecutive queries lengthens the string by the additional characters, to form a lengthening string for retrieving matching content from the server system." Notably, this limitation mandates that each of the "corresponding consecutive queries" must "lengthen[ ] the string by the additional characters"—acting upon the existing string as opposed to replacing it. It also requires that the "each" of these queries "form" the lengthening string on the server.

In this same vein, the claim next states that the server object "receiv[es] each of the corresponding consecutive queries that modify the lengthening string," confirming the distinction between the multiple consecutive queries and the single lengthening string they "modify." Finally, the server must use the single lengthening string to retrieve matching content from the server and produce increasingly relevant results.

**B.**   **Google's Accused Instant Search Feature**

In 2010, Google released Google Instant, a search feature that provides search results for a predicted query as users type in a partial search query.  [A1338] Google Instant is the sole accused feature remaining in the case.[3]

Google Instant differs from MasterObjects' claimed invention and QuestObjects in many significant ways.  Most important for present purposes, Google Instant operates on a world-wide scale supporting a huge number of concurrent users.  To accommodate this scale, Google opted to use an architecture that, unlike MasterObjects' system, does not require synchronization between a client and any particular server.  Rather, with each request, Google simply sends the entire input string to a server.  [A51]

For example, a user seeking information about the Federal Circuit may type "f" then "e" then "d."   Under Google Instant, the user's computer would transmit "f" then "fe" and then "fed"—not "f" then "e" and then "d."[4]  This approach allows each updated request to be routed to a different server, which provides

---

[3] MasterObjects also accused another feature, Google Suggest, of infringement. [A50, A253-54 (complaint, Joint Stipulation)]  The district court entered judgment of noninfringement as to both Google Suggest and Google Instant. [A46-48] Because MasterObjects has limited its appeal to Google Instant, it has waived any claim against Google Suggest, and this brief thus does not address that feature.

[4] Actually, depending on a variety of factors, Google Instant may or may not send requests every time a letter is typed, deleted, or changed.  But every time it does transmit, it always transmits the entire string.

advantages such as better load balancing and greater resilience to transmission errors at the cost of using additional bandwidth.

MasterObjects concedes that Google Instant does not send to any server only the changes to a previously transmitted query. [A52 (stipulating that Google's system "sends the entire input string in each accused consecutive query and not 'only the changes to the input string that were not sent in any previous consecutive query'")] And that difference ultimately led to the judgment of noninfringement.

### C.    The District Court's Claim Construction and the Resulting Stipulated Judgment of Noninfringement

The district court held a *Markman* hearing and construed five sets of claim terms. Two of those rulings are pertinent to this appeal.

First, the district court rejected Google's contention that the "communication protocol" recited at the outset of claim 1 (and the other asserted independent claims) was not only "a set of rules that enable computers to exchange messages with each other," as MasterObjects proposed, but also "optimized for sending single characters from a client to a server and lists of strings from the server to the client." [A31-33] Google based its proposed construction on the specification's statement that said just that: "The invention includes … a communication protocol that is optimized for sending single characters from a Client to a Server, and lists of strings from the Server to the client." ['529(11:55-59)] The district court observed, however, that the specification did not restrict the invention to sending

single characters, and in its view "[a]dding the 'optimized for' language would not add anything to or take anything away from the scope of the claims." [A32-33 (also expressing "hesitan[ce] to add extra verbiage … [that] would not have a practical effect on claim scope")] The court also noted that MasterObjects had amended the specification of the later-filed '639 patent to omit the word "single," making it difficult to apply a "single characters" limitation to that patent. [A33]

Second, the district court construed a set of terms referred to by the parties and the district court as "additional characters" terms. In representative claim 1, for example, this term was

> wherein each of the corresponding consecutive queries
> lengthens the string by the additional characters, to form
> a lengthening string for retrieving matching content from
> the server system.

The district court agreed that each of these terms required that "each query consists only of the changes to the input string that were not sent in any previous consecutive query." [A39-40] In the district court's example, if the user begins to type "madison square garden," the client may send "m" then "a" then "d" or it may send "m" then "ad," but in any event it will not re-send "m" after transmitting it the first time. [*See* A39]

In so holding, the court first looked to the plain meaning of the claim language. It recognized that "the claim language itself suggests that the 'lengthening string' is formed by piercing together multiple smaller queries, rather

than by receiving iteratively longer versions of the string." [A39-40] Claim 1 of the '529 patent, it pointed out, "describes how 'consecutive additional characters' are input at the client and sent as 'consecutive queries' to the server, 'wherein each of the corresponding consecutive queries lengthens the string by the additional characters, to form a lengthening string.' The server then 'receiv[es] each of the corresponding consecutive queries that modify the lengthening string.'" [A40] "The words 'lengthens' and 'modify,'" the court observed, "suggest that the server is not wiping its slate clean with each new submitted query, but is instead combining the queries to form the lengthening string.'" [*Id.*] The court also found that the specification confirmed this construction by describing "the protocol of the current invention" as one that "send[s] just the changes to the input buffer, instead of sending the entire input buffer." [*Id.* (citing '529(20:11-14))] Although the court agreed with MasterObjects (and Google) that each "change" could be more than a single character, nothing in the patents supported MasterObjects' contention that the entire character string could be re-sent as the user types in a query. [*Id.*]

MasterObjects moved for reconsideration of the claim construction, but the district court denied the motion. [A42-45] In so doing, it observed that claim 1 referred to inputting "consecutive additional characters" at the client computer and sending "corresponding consecutive queries" to the server, and then reasoned that "[t]he natural reading of the claim is that the word 'corresponding' means that the

19

'consecutive queries' sent to the server correspond to the 'consecutive additional characters' entered by the user." [A45]  The court further recognized that claim 1 recited that "each of the corresponding consecutive queries *lengthens* the string" and that the lengthening string is "modified" at the server, yet re-sending the full string every time would result in *replacing* rather than *lengthening* or *modifying* the string.  [*Id.*]

Because everyone agreed that in Google Instant, the client computer re-sends all characters with each request to a server, MasterObjects stipulated to judgment of noninfringement based on the district court's claim construction. [A52]

### D.    The Parallel Cases Against eBay and Yahoo!

MasterObjects also filed parallel cases against eBay and Yahoo!  Those cases were assigned to different judges in the same district.  Google did not make the same claim construction arguments as eBay and Yahoo!, and the district courts' *Markman* rulings differed accordingly.[5]

---

[5] The *eBay* and *Yahoo!* claim construction orders were not entered in this case, and they do not appear in this district court record.  As such, it was improper for MasterObjects to include them in the joint appendix, which by rule is limited to materials in the district court record.  *See* Fed. R. App. P. 10.  Nevertheless, the *eBay* and *Yahoo!* orders are matters of public record, and this Court may take judicial notice of them.

In all three cases, the defendants argued that the claimed "communication protocol" had to be optimized for sending single characters.  In all three cases, the district courts refused to include this as a claim limitation.  [A31-32; *MasterObjects, Inc. v. eBay, Inc.*, Case No. 3:12-cv-680 JSC, 2013 WL 1287428, at *9 (N.D. Cal. Mar. 28, 2013); *MasterObjects, Inc. v. Yahoo!, Inc.*, Case No. C 11-02539 JSW, 2013 WL 6185475, at *5 (N.D. Cal. Nov. 26, 2013)]

But only Google asked the court to construe the "additional characters" terms.  In this case, as discussed above, Google separately argued, and the district court held, that these terms require the client to send only the changes in the input string to the server, without re-sending previously sent characters.  Neither eBay nor Yahoo! asked the district courts to construe these terms, and as a result neither of the other two district courts addressed the issue.  Once the district court in this case agreed with Google and entered judgment of noninfringement, however, both the *eBay* and *Yahoo!* courts decided to stay those cases pending the result on this appeal.  *eBay*, Dkt. 119 (Dec. 05, 2013); *Yahoo!*, Dkt. 82 (Apr. 8, 2014).

Although Google is not privy to the inner workings of the eBay and Yahoo! systems, Google understands that those modern systems, like Google Instant, re-send the entire search term whenever the query is updated, rather than sending only the changes.  As a practical matter, then, an affirmance here may also dispose of those cases.

21

## SUMMARY OF ARGUMENT

The claim language, the inventors' written description of their invention, and the prosecution history all support the district court's construction requiring each updated query sent from the client to the server to include only the changes to the existing string—*i.e.*, only the additional characters each time, not the entire string.

1. The language of the "additional characters" terms themselves, related language in the same claims, and language in other, related claims all confirm that the client sends only the changes in each consecutive query and does not re-send already-sent characters. On their face, the "additional characters" terms make clear that the consecutive queries sent from the client to the server must consist of additional characters that form a lengthening string used to retrieve matching content. Related claim language explains that the consecutive queries correspond to the additional characters input to the client computer and modify rather than replace the existing string. The dependent claims make clear that each query may consist of a single additional character or multiple additional characters, but in either case the update queries consist of only the additional characters. MasterObjects' construction allowing the client to re-send previously sent characters must be rejected because it would require reading multiple limitations out of the claims and rewriting others. In arguing that the claim language is

22

"agnostic" or actually supports its construction, MasterObjects mischaracterizes the claims and ignores settled law.

2. The written description fully supports the district court's construction. Consistent with the inventors' goal of reducing communications from the client to the server, the specification consistently describes transmitting just the changes to the existing string and it never describes retransmitting previously sent characters along with the new ones. It explains that "the invention" is optimized for sending single characters, not entire strings, and it expressly states that under the "protocol of the present invention," the client "send[s] just the changes to the input buffer, instead of sending the entire input buffer." Figures 4, 6A, 7, and 8 all confirm this requirement. The only time the specification describes sending an entire string is when the entire string has changed from the previous query, and even in that case the client only sends the changes and does not re-send previously sent characters. MasterObjects cannot escape the inventors' consistent description of their invention, and its own citations to portions of the specification further undermine its argument.

3. The prosecution history likewise confirms the district court's construction. MasterObjects distinguished prior art on grounds that the client sends only the changes to the server, and it repeatedly described its invention as having the client transmit portions of the query string in pieces. The amendments

23

that MasterObjects cites may confirm that the claims are not limited to single-character changes, but they in no way suggest that the claims cover retransmitting already-sent characters.

4.  Contrary to MasterObjects' suggestion, the district courts in the two parallel cases did not reach a different conclusion. They addressed the "communication protocol" limitation and did not consider the "additional characters" limitations because eBay and Yahoo! did not raise them. The district court in this case correctly recognized that the issues were distinct and that the "additional characters" limitations require sending only the changes to the string, regardless of whether those changes consist of one character or more than one.

## ARGUMENT

MasterObjects tries to shoehorn this case into the *Thorner* paradigm in which the Court first identifies a recognized plain and ordinary meaning of a claim term and then looks to see whether the patentee used special lexicography or otherwise disavowed or disclaimed that plain and ordinary meaning in the specification or prosecution history. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365-66 (Fed. Cir. 2012). That paradigm does not fit this case because MasterObjects' proposed construction of the "additional characters" terms does not reflect any accepted meaning of those claim terms.

Instead, this case is governed by the approach adopted *en banc* in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005), under which claim terms are read in context and in view of the specification and any relevant prosecution history. As shown below, the claim language, the patentees' written description of the invention, and the prosecution history all make clear that the claims require that the client computer send the server only the newly input changes to the string.

Contrary to MasterObjects' assertion (at 22), Google has not sought a *gestalt* construction untethered to the claim language. As explained above, Google sought the construction of specific claim terms from each of the independent claims. With respect to claim 1 of the '529 patent, Google asked the district court to construe

> wherein each of the corresponding consecutive queries lengthens the string by the *additional characters*, to form a lengthening string for retrieving matching content from the server system.

(Emphasis added.) The other asserted claims include similarly worded "additional characters" limitations. [*See* '529 claims 44, 45; '639 claims 1, 13] The footnote from Google's district court briefing that MasterObjects now cites (at 22) simply pointed out that, although Google was focusing on the "additional characters" language, it was not seeking to nullify the other, related phrases of those terms (*e.g.*, "corresponding consecutive queries" and "form a lengthening string") and that those other phrases informed the proper construction of the terms as a whole.

The parties agreed below that all these "additional characters" terms should receive a common construction [A38], and MasterObjects continues to agree on appeal that claim 1 of the '529 patent is representative.  Consistent with *Phillips*, Google asked the district court to construe these terms in context and in view of other claims, the written description, and the prosecution history.  The district court did so and, as shown below, it did so correctly.

## I.    THE CLAIM LANGUAGE ITSELF DICTATES THAT THE CLIENT MAY SEND THE SERVER ONLY THE CHANGES TO THE PREVIOUS QUERY

The claim language makes clear that only the "additional characters" entered by the user are sent from the client computer to the server, where they are added to the characters previously sent.  MasterObjects' contrary construction would distort the claim language.

### A.    The District Court's Construction Reflects Both the Plain Meaning of "Additional Characters" and the Claims' Discussion of How Those "Additional Characters" Are Used

The district court's construction was rooted in the plain meaning of "additional characters" and the immediately surrounding claim language. Representative claim 1 of the '529 patent recites:

> each of the corresponding consecutive queries lengthens the string by the *additional characters*, to form a lengthening string for retrieving matching content from the server system.

(Emphasis added.)  This means what it says:  each query from the client computer provides *additional characters* that lengthen the string used to match content on the server.  And the district court's construction required exactly that:  "each query consists only of the changes to the input string that were not sent in any previous consecutive query."

Related clauses describing the "additional characters" and the "corresponding consecutive queries" confirm that this construction is correct.  For example, claim 1 requires that the "client object"

> receives, as input, *consecutive additional characters* from the client software.

(Emphasis added.)  The client computer thus receives additional characters from a user as the user enters an input string.  The claim goes on to explain that these same additional characters correspond to "consecutive queries" that are then sent from the client object to the server object:

> while each of the consecutive additional characters are being received as input, [the client object] transmits via the network to a server object at the server system one or more *corresponding consecutive queries* … to retrieve content from the server system.

(Emphasis added.)  The language directly at issue here then makes clear that when each corresponding consecutive query reaches the server, the "additional characters" are used to form a lengthening string at the server:

> each of the corresponding consecutive queries lengthens
> the string by the additional characters, to *form a
> lengthening string* for retrieving matching content from
> the server system.

(Emphasis added.)[6]  This clause also makes it clear that each consecutive query

must "lengthen" the string by the "additional characters."  The claim language then

goes on to confirm that each time the server object receives a corresponding

consecutive query from the client object, it *modifies* the existing string and

retrieves content based on the content of the lengthened string:

> in response to receiving each of the corresponding
> consecutive queries that *modify* the lengthening string,
> [the server object] automatically uses the lengthening
> string to query and retrieve content information ….

(Emphasis added.)

In short, regardless of whether one, two, or more characters are newly

added, these "additional characters" make up the "consecutive queries" that are

used to "form" the lengthening string used in consecutive searches.  The district

court correctly recognized the plain meaning of this requirement:  "the claim

language itself suggests that the 'lengthening string' is formed by piecing together

---

[6] The other asserted claims of the '529 patent likewise require that the consecutive queries "together form" an increasingly lengthy query string.  [*See,* '529 claims 44, 45]  The asserted claims of the '639 patent also recite that "each of the plurality of queries form an increasingly lengthy query string."  [*See* '639 claims 1, 13]

multiple smaller queries, rather than by receiving iteratively longer versions of the string." [A39-40]

The claims' requirement that the string at the server be *lengthened* and *modified*, rather than *replaced*, also supports the district court's construction requiring that only the additional characters be sent. "[I]n response to receiving each of the corresponding consecutive queries that *modify the lengthening string*," the server object

> asynchronously returns, while the additional characters
> are being input and the corresponding consecutive
> queries are being transmitted and the *lengthening* string
> is being *modified* during the session, consecutive
> responses containing content information which
> increasingly matches the *lengthening* string ….

(Emphasis added.) The claim language does not call for wiping out the existing server-level string when a slightly longer string arrives as the user types. The district court fully appreciated this requirement as well: "The words 'lengthens' and 'modify' suggest that the server is not wiping its slate clean with each new submitted query, but is instead combining the queries to form the 'lengthening string.'" [A40]

The server-level string can be "modified" and "lengthened" as the user types only if the changes are sent to the server without tacking on the previously sent characters. As Example 2 on page 25 of MasterObjects' brief shows, sending just the changes produces the same string at both the server and the client:

29



Example 2: Transmit Only the Changes

In green, the "server object" has a lengthening string that is progressively modified (not replaced) as more characters arrive from the client. After the character "p" is sent from the client to the server, the next transmission is the letter "a," followed by "t" and so forth. The string at the server is incrementally lengthened and modified until the word "patent" is formed. Notably, under this approach, the system does not re-send the already-sent characters—and could not unless the newly-sent characters completely *replaced* the existing string at the server. If the server-level string were "formed," "modified" and "lengthened" with already-transmitted characters, the result would be a garbled, compounded string at the server level (*e.g.*, "ppapatpatepatenpatent").

The dependent claims further demonstrate that only the changes are sent from the client to the server. *See Phillips*, 415 F.3d at 1314-15 ("Other claims of

30

the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term.").  For example, claims 3 and 4 of the '639 patent add the requirement that the plurality of queries sent from client to server consist either of a single additional character (claim 3) or a plurality of additional characters (claim 4) that will be added to the lengthening query string:

> 3.  The system of claim 1, wherein each of the plurality of queries are a single additional character to be added to the increasingly lengthening query string.
>
> 4 .  The system of claim 1, wherein each of the plurality of queries are a plurality of additional characters to be added to the increasingly lengthening query string.

[*See also* '639 claims 15, 16 (similar)]  In both cases, each query that lengthens the string consists of only the additional characters.  Although MasterObjects suggests (at 28) that claim 3 reflects an "only the changes" limitation that is not part of the independent claims, claims 3 and 4 alter only the *quantity* of additional characters sent from client to server:  one additional character or more than one additional character.  In both cases, consistent with claim 1, only the additional character or characters are sent and added to the existing string.

## B.    MasterObjects' Construction Defies the Claim Language

MasterObjects argues that the claims cover re-sending the entire search term each time, as illustrated in Example 1 of its brief:



Example 1: Transmit the Complete Lengthening String[4]

But the claim language cannot be squared with that construction.

MasterObjects' construction would nullify several critical limitations. To begin with, MasterObjects reads the "additional characters" requirement out of the claims. Claim 1, for example, requires that each query corresponding to new input by the user "lengthens the string by the *additional characters*, to form a lengthening string." MasterObjects contends that the client object may re-send all the pre-existing characters as well as the additional characters that the user types. But the claims require using the "*additional characters*" to form a *lengthening* string that is *modified*. MasterObjects would turn the "additional characters" into surplusage, contrary to settled law. *See, e.g.*, *Tex. Instruments Inc. v. U.S.I.T.C.*,

988 F.2d 1165, 1171 (Fed. Cir. 1993) (rejecting construction because "construing the claims not to refer to a specific gate location as argued by TI would render the dispute claim language mere surplusage").

Similarly, MasterObjects' interpretation would violate the requirement that the lengthening string be formed by "*each of the corresponding consecutive queries*." In MasterObjects' Example 1, no plurality of queries is combined to form an increasingly lengthy query string. The string "pat" comes directly from the query "pat," not by forming "pat" from a plurality of incremental queries—*i.e.*, by combining "p" with "a" and "t." Moreover, "pat" does not "correspond" to the additional characters of each consecutive query: it is "pat" as a whole, not an amalgamation of "p" with "a" and "t." Indeed, if each query stood on its own, there would be no need for "consecutive" queries at all: any given query could be lost, ignored, or not transmitted, and the system would continue to work. The "consecutive" nature of the queries is required because the server needs to receive all the queries in order to function properly.[7]

---

[7] MasterObjects argues (at 26) that transmissions from the client would still "correspond" to the "additional characters" even if the transmissions included previously-sent characters. But that is not the natural reading of the claim language, which tightly links the "consecutive additional characters" with the "corresponding consecutive queries" and the result that the "corresponding consecutive queries lengthen[ ] the string by the additional characters."

MasterObjects' construction also disregards the requirement that there be a single "lengthening string" at the server level that is "composed of a plurality of consecutively input characters" on the client side. As MasterObjects recognizes (at 4), the server string must be synchronized with the string input by the user. The claim language reflects this, providing that the consecutive queries sent by the client must correspond to the additional characters input by the user and be used to "modify the lengthening string" at the server. Indeed, the claim language expressly requires that the server object "automatically uses *the* lengthening string to query and retrieve content information" (emphasis added). The claims do not allow using a new and different string to query the database as the user makes changes: it is the same, incrementally lengthening string that continues to be used for querying the data with increasing precision.

Under MasterObjects' interpretation, however, the server would use a different string with every query iteration. For example, in MasterObjects' Example 1, six different strings are used to query and receive matching content: "p," "pa," "pat," "pate," "paten," and finally "patent." Using a different string each time, as it newly arrives, is fundamentally inconsistent with the claim requirement to "use[ ] the lengthening string," not a new string, to query the server. Of course, "[c]ourts do not rewrite claims; instead, [they] give effect to the terms

chosen by the patentee." *K–2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999).

Likewise, reading the claims to encompass re-sending the entire search term would contradict the claim language requiring that consecutive queries corresponding to the additional characters "lengthen" and "modify" the existing string. MasterObjects' Example 1 shows just this: it repeatedly wipes away the server-side string with each iteration. Rather than "modifying" and "lengthening" what has already been established at the server, each newly arriving string *replaces* the existing string at the server. The first character to arrive at the server is "p". After the user types the next character "a," MasterObjects contends that client object may send the string "pa" to the server and supplant the "p" string. Then, after the user types "t," MasterObjects contends that the client object may send "pat" to the server, wipe away the existing "pa" string, and overwrite it with "pat." And so on. But as the district court recognized [A39-40], such *replacement* is inconsistent with the claim requirement that the server-level string must be "lengthened" and "modified." Once again, to accommodate MasterObjects' view, the claims would have to be rewritten extensively, contrary to law.

### C. The Claim Language on Which MasterObjects Relies Does Not Support Its Construction

Although MasterObjects contends that the claim language compels its construction, none of its arguments hold water.

MasterObjects first points to (at 23-24) the claim language reciting a "communication protocol" that allows the client to send a lengthening string to the server:

> a communication protocol that enables an asynchronous connection over a network between a client system and a server system, and *allows the client system to send via the network, and within a session between the client system and the server system, a lengthening string* composed of a plurality of consecutively-input characters, to query the server system for string-based content, while asynchronously receiving consecutive responses from the server system as the characters are being input[.]

(Emphasis added.) But this language does not address the issue here. Google agrees that the client must receive a lengthening string and that the string must be transmitted to the server. But while this language describes some aspects of the communication protocol that allow this transfer to happen, this portion of claim 1 does not specify *how* the string is sent to the server. That does not mean, as MasterObjects suggests, that the claims *as a whole* are "agnostic" on this point. It simply means that one must go on to consult the rest of the claim language. And as shown above, that language makes clear that only the additional characters are sent each time.

MasterObjects' claim differentiation arguments (at 28-29) are equally mistaken. According to MasterObjects, claim 3 of the '639 patent requires the client to send only the changes, claim 40 of the '529 patent requires the client to

36

transmit the entire string at once, and claim 1 of the '529 encompasses both

approaches by not specifying either one.  But that is wrong at every turn.

As discussed above, the requirement to send only the additional characters

comes straight out of claim 1 of each patent (and the other asserted independent

claims).  Dependent claim 3 of the '639 patent does not insert a new "additional

characters" requirement:  it merely requires the previously-recited additional

characters to be sent one at a time—in contrast to claim 4, which requires the

additional characters to be sent in multi-character chunks.  In fact, claim 40 does

not call for transmitting the entire string at once.  If anything, it also requires

character-by-character transmission because each consecutive query "matches the

characters of the search string as it is being entered, to form the lengthening search

string for receiving content from the server."  The recited "characters" are the

previously recited "consecutive additional characters of the search string from the

user interface as input while it is being entered by the user," and those consecutive

additional characters must cause the client object to transmit "one or more

corresponding consecutive queries" that correspond to the additional characters.

Every one of these claims requires the client to send only the changes.

MasterObjects further argues (at 31-32) that Google's construction

improperly imposes a "temporal order" on apparatus claims.  MasterObjects

ignores, however, that claim 1 requires not only an apparatus, but an apparatus

with certain components that must perform certain tasks in sequence in order to synchronize the client string with the server string. Claim 1 recites "consecutively input characters" and discusses the return of results "as the characters are being input." The client object must sequentially transmit queries as more characters are input: "while each of the consecutive additional characters are being received as input, [it] transmits via the network to a server object at the server system one or more corresponding consecutive queries .…" Furthermore, the server expressly acts "in response to receiving each of the corresponding consecutive queries that modify the lengthening string…" The claimed retrieval system necessarily requires the components to interoperate in a particular ("consecutive") sequence. Indeed, there are corresponding method claims that explicitly recite these steps (*e.g.*, '529 claim 45 and '639 claim 13), and MasterObjects agrees (at 23) that the language of all the asserted claims is similar for purposes of this appeal.

MasterObjects also notes (at 32) that the language requiring "form[ing] a lengthening string" first appears in the "client object" portion of the claim. That is true but misses the point. As explained above, this portion of the claim language specifically requires that the client object transmit queries from the client to the server. It then states that those queries must "form a lengthening string for retrieving matching content from the server system." The next limitation mandates that the "server object" receive those queries, which must modify the lengthening

string, and the server object then uses the lengthening string to retrieve content information. The fact that part of the description appears in the "client object" portion of the claim does not negate the requirement that the consecutive queries transmitted by the client must form a lengthening string at the server.

Finally, MasterObjects argues (at 32-33) that the claims must be construed to allow transmission of more than just the changes because they include the word "comprising." But the word "comprising" appears at the macro level of the claims: the system must "comprise" a communication protocol, a content-based cache, a client object, and a server object. This may mean, for example, that an infringing system may include another component as well. But it does not mean the word "comprising" reaches inside the "client object" and "server object" elements and nullifies the express limitations that those elements place on the queries transmitted from the client to the server. *See*, *e.g.*, *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1343 (Fed. Cir. 2007) ("The presumption raised by the term 'comprising' does not reach into each of the six steps to render every word and phrase therein open-ended—especially where, as here, the patentee has narrowly defined the claim term it now seeks to have broadened."); *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1354 (Fed. Cir. 2010) ("According to TT, because the claims use the transitional phrase 'comprising,' they also cover un-recited features such as automatic re-centering. To the contrary, automatic re-centering is not an additional

feature, but rather negates a claimed requirement that the price level remains static and does not move."); *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1379 (Fed. Cir. 2012) ("despite the use of 'comprising,' claim 6 is not amenable to the addition of other modules that do not use different heuristic algorithms because such addition would impermissibly wipe out the express limitation that requires every module to have a unique heuristic algorithm"); *Power MOSFET Techs., LLC v. Siemens AG*, 378 F.3d 1396, 1409 (Fed. Cir. 2004) ("'Comprising,' while permitting additional elements not required by a claim, does not remove the limitations that are present."); *Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1380 (Fed. Cir. 1998) ("'Comprising' is not a weasel word with which to abrogate claim limitations.").

## II. THE WRITTEN DESCRIPTION SUPPORTS THE DISTRICT COURT'S CONSTRUCTION

The claim language must always be read in light of the rest of the specification, *Phillips*, 415 F.3d at 1315, and here the written description and figures depicting the invention fully support the district court's construction.

### A. The Written Description Only Describes Transmitting Just The Changes to the Server and Expressly Calls This an Aspect of "the Invention"

The specification consistently teaches transmitting just the changes to the server, never once teaching to retransmit the previously transmitted characters along with the additional character(s).  Indeed, the specification refers to

40

transmitting "just the changes" as part of "the invention," and it makes clear that transmitting only such incremental changes was central to what the applicants regarded as their invention.

The '529 patent begins with an Abstract stating that "the invention" provides

> [a] system for sending a *character-by-character string of data* to an intelligent server that can be configured to immediately analyze the lengthening string character-by-character and return to the client increasingly appropriate database information as the client sends the string.

(Emphasis added.) The Detailed Description of the Invention reiterates this focus on sending strings character-by-character:

> Roughly described, *the invention* provides a session-based bi-directional multi-tier client-server asynchronous information database search and retrieval system for *sending a character-by-character string of data* to an intelligent server that can be configured to immediately analyze the lengthening string character-by-character and return to the client increasingly appropriate database information as the client sends the string.

['529(8:26-34) (emphasis added); *see also* '529(12:12-14) ("[I]n responding to a character the Server receives from a Client it can use the history of data that has been sent to and from the current user.")] The specification specifically distinguishes character-by-character transmission from sending the entire string. [*See* '529(12:5-8) (explaining that when the user replaces the entire entry field with a new string, "the Client may then send the entire string all at once to the Server, instead of character by character")]

The specification further explains that "the invention" is "optimized" for

sending single-character queries from the client to the server:

> *The invention* includes a Server, that handles requests for
> information from clients, and a communication protocol
> that is *optimized for sending single characters from a
> Client to the Server*, and lists of strings from the Server
> to the Client.

['529(11:55-59) (emphasis added)][8]  To be sure, the specification goes on to note

that "[t]he system's protocol is not restricted to sending single characters":  the

client may, for example, send multiple characters at once when a user replaces an

entire existing string with a new string.  ['529(12:3-8); *see also* '529(12:49-53)]

Nevertheless, the patented invention was "optimized" to send single-character

changes because the inventors thought that doing so was more efficient.  [*See*

A814-15 (van den Oord)]

In any case, regardless of whether the changes to the string consist of one

character or multiple characters, the specification explains that under the protocol

of the "*present invention*," the client sends the server "*just the changes*" to the

string in the input buffer "*instead of*" sending the entire input buffer string:

> The next step is to get results based on the new input
> buffer.  …  If the results are not found in the cache, the

---

[8] In the '639 patent the inventors edited this phrase slightly to remove the word
"single," but they still emphasized that the invention is "optimized for sending
characters from a Client to the Server."  ['639(13:58-61)]

> Client Quester uses the Client Controller to send the new
> input buffer to the Server Quester, so that a new query
> can be executed (step 611). To support this, *the protocol
> of the present invention* provides a number of messages
> that allow the Client Quester to *send just the changes to
> the input buffer, instead of sending the entire input
> buffer.* These messages include but are not limited to:
> inputBufferAppend, inputBufferDeleteCharAt,
> inputBufferInsertCharAt, inputBufferSetCharAt,
> inputBufferSetLength, and inputBufferDelete.

['529(20:3-17)] The final sentence lists QuestObjects commands that can be used to send the changes to the input string from the client to the server. The names of these commands (inputBufferAppend, inputBufferDeleteCharAt, inputBufferInsertCharAt, inputBufferSetCharAt, inputBufferSetLength, and inputBufferDelete) make clear that they "append," "insert," or "delete" characters. As such, they *modify* the string at the server instead of *replacing* the string at the server with the entire contents of the input buffer.

The patent figures confirm this. Figure 4, reproduced below, shows what happens when the user enters "a" then "b" then "c":



*FIG. 4*

At step 404, when "b" is entered, the client controller transmits an inputBufferAppend command to the server that appends "b" to "a" to produce "ab," which is then used to retrieve results. Then, in step 407, when "c" is entered, the client controller transmits another inputBufferAppend command that appends "c" to the existing string "ab" on the server to produce "abc." The system does *not* send "abc" to replace "ab"; it sends only the change ("c") and the server appends that change to the existing string. The modified, concatenated string "abc" is used to search the database. [*See also* '529(19:13-31) (describing this process and making clear that only "c," not "abc," is sent to the server)]

Figure 6A of the '529 patent shows the same thing, including a step (611) of sending an "input buffer *change* message" (emphasis added). The corresponding discussion in column 20 again confirms that such a "change message" involves

44

sending "only the changes."  [']529(20:11-14)]  Figures 7 and 8 of the '639 patent

similarly depict the client sending "Δ"s (changes) to the server.

**B.    MasterObjects Improperly Downplays the Inventors' Description of "the Invention" and Distorts the Portions of the Specification on Which It Affirmatively Relies**

MasterObjects' discussion of the specification disregards the applicable law

and mischaracterizes the inventors' description of their invention.

MasterObjects begins (at 33-35) by moving the goalposts, arguing that

Google must show that the inventors acted as their own lexicographers, or that they

clearly disavowed what MasterObjects wants the claims to cover.  But

MasterObjects relies on the mistaken premise that its interpretation of the claims

reflects their plain and ordinary meaning.  As shown above, it does not:  the claims

standing alone show that the invention requires sending only the changes, and the

specification repeatedly and consistently confirms that conclusion.

MasterObjects next urges the Court to ignore the patents' extensive

discussion of QuestObjects, dismissing it (at 13, 36) as "in-the-weeds technical

detail" that merely provides one "exemplary" enabling embodiment.  But while the

claims are not limited to the exact QuestObjects embodiment, the written

description explains what the claimed "*invention*" is.  MasterObjects cannot avoid

the inventors' description and depictions of their invention.  This Court has

repeatedly recognized that it is proper to rely on inventors' descriptions of "the

45

invention" or "the present invention" in determining the scope of the claimed

invention.  *See*, *e.g.*, *Trading Techs.*, 595 F.3d at 1353-54 (specification's reference

to a "one click centering feature" as part of "the present invention" "strongly

suggest[ed] that the claimed re-centering command require[d] a manual input,

specifically, a mouse click"); *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d

1322, 1330 (Fed. Cir. 2009) ("Here, the specification frequently describes an

'intraluminal graft' as 'the present invention' or 'this invention,' indicating an

intent to limit the invention to intraluminal devices."); *TiVo, Inc. v. EchoStar*

*Commc'ns Corp.*, 516 F.3d 1290, 1300 (Fed. Cir. 2008) (holding that where

physical separation functionality was described as an aspect of "the invention," and

embodiments in specification were consistently described with this functionality,

physical separation was a claim limitation); *Netcraft Corp. v. eBay, Inc.*, 549 F.3d

1394, 1398 (Fed. Cir. 2008) ("the common specification's repeated use of the

phrase 'the present invention' describes the invention as a whole [and] the

prosecution history does not warrant a contrary result."); *Verizon Services Corp. v.*

*Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) ("When a patent

thus describes the features of 'the present invention' as a whole, this description

limits the scope of the invention.").  In short, when the patent describes the scope

of "this invention" or "the present invention," "[t]he public is entitled to take the

patentee at his word." *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006).

MasterObjects next purports (at 38-39) to find instances where the specification describes re-sending the entire string each time, but in actuality the specification discloses no such thing. As noted above, the specification notes that "[t]he system's protocol is not restricted to sending single characters" and can also "send a string of characters." ['529(12:3-4)] But that statement does not say or even suggest that the system may re-send already-transmitted characters. Immediately before this statement, the inventors made clear that the protocol of the "invention" is "optimized for sending single characters from a Client to the Server." ['529(11:55-58)] And immediately afterward, the inventors explained an exception to that rule: an "entire string" will be sent "all at once to the Server, instead of character by character," "*when a user replaces the contents of an entry field with a new string*." ['529(12:5-8) (emphasis added)] Simply put, sending an entire string is an exceptional circumstance, not the norm addressed by the claims, which require a lengthening string. In any event, even in that exceptional case, the client still sends only the *changes* to the string, consistent with the district court's construction, because the user has replaced the entire contents of the entry field with a brand new string.

MasterObjects next observes (at 38) that the first paragraph of the Detailed Description refers to the client sending a string. But that paragraph does not suggest that the client may re-send already-sent characters, which is the issue here. In fact, that paragraph expressly describes the client sending the string "character-by-character" and the server then "analyz[ing] the lengthening string character-by-character." ['529(8:26-33)] Sending a string character-by-character is the antithesis of sending the entire string with each update.

MasterObjects next argues (at 38-39) that the specification particularly describes QuestObjects as sending entire strings, not just the changes recently made by the user. Again, however, those passages say no such thing. What MasterObjects refers to as the definition of "QuestObjects" as a whole is actually the second half of the definition of "Application Proxy," which reads as follows:

> Application Proxy – An optional method implemented by the QuestObjects Server allowing the use of the QuestObjects system in client systems that do not allow the QuestObjects–Client components to communicate to the application server or web server directly. Uses the AppHost Synchronizer on the QuestObjects server to *send selected strings* and metadata to the application server or web server.

['529(9:65-10:5)] This is not a definition of QuestObjects at all; rather it refers to "[a]n optional method implemented by the QuestObjects Server" for systems in which the client and server cannot communicate directly. It has nothing to do with the client-to-server transmissions at issue here.

48

The other definitions cited by MasterObjects are likewise inapposite. The

definitions of "Query Filter" and "Query Pattern" concern back-end

communications *at the server*, not the transmissions from client *to* server:

> Query Filter – A filter specified by a Query Manager in a
> specific Service used to tell the Server Quester to
> interpret *incoming strings* before they are sent to the
> Service as a QuestObjects Query.
>
> Query Pattern – A string-matching pattern (such as a
> unix-style grep pattern) specified by a Query Manager in
> a specific Service used to tell the Server Quester to
> interpret *incoming strings* before they are sent to the
> Service as a QuestObjects Query.

['529 (10:27-29, 39-43) (emphasis added)] These functionalities are carried out

within the "Query Manager," which is part of the Content Channel at the server.

[*See* '529(10:31-38 ("Query Manager – An intelligent part of a Content Channel

that interprets QuestObjects Queries and sends them to a Content Engine …. The

Query Manager can also send a list of Query Patterns and Query Filters to the

Server Quester, allowing the Server Quester to match and filter new Queries before

they are sent to the Content Channel.")] Thus, MasterObjects is simply wrong in

stating that the definitions of Query Filter and Query Pattern reflect that strings are

"incoming" from the client. But even putting this aside, none of these examples

suggests that the client ever re-sends previously transmitted characters.

Finally, MasterObjects tries in vain (at 39-45) to distinguish the portions of

the specification relied on by Google and the district court. Although

MasterObjects dismisses these as mere embodiments describing "permissible implementation details," the specification repeatedly refers to the entire "invention" as optimized to send single-character updates to the server, not the entire string each time.  [*See*, *e.g.*, '529(8:26-34, 11:55-59)]  Even more pointedly, the patentees described "the protocol of the present invention" as "provid[ing] a number of messages that allow the ClientQuester to send just the changes to the input buffer, instead of sending the entire input buffer."  ['529(20:11-14)]  Of course, the names of particular messages (*e.g.*, inputBufferAppend) are exemplary, but "the invention" requires the system to send just the changes to the string—not the entire string each time.  MasterObjects points to the word "allow" in this passage, arguing that "allow" is permissive.  But the plain import of the passage is that the messages *enable* sending just the changes to the input buffer rather than the entire input buffer.  Neither this passage nor anything else in the patents suggests that sending just the changes is optional.

In sum, both the patent's affirmative descriptions of the "invention" and its failure to describe any embodiments in which more than just the changes are sent strongly confirm the correctness of the district court's construction.

## III.  THE PROSECUTION HISTORY SUPPORTS, AND CERTAINLY DOES NOT UNDERMINE, THE DISTRICT COURT'S CONSTRUCTION

Prosecution history can limit claim scope, but it cannot expand claim scope beyond what the specification supports.  *See*, *e.g.*, *Honeywell*, 452 F.3d at 1319; *Biogen, Inc. v. Berlex Labs.*, 318 F.3d 1132, 1140 (Fed. Cir. 2003); *see also Phillips*, 415 F.3d at 1317.  Here, the file history confirms the limited claim scope indicated by the claim language and the rest of the specification.

### A.  MasterObjects Distinguished Prior Art on Grounds that the Client Sends Only the Changes to the Server, and It Stressed that the Invention Involves Sending Characters from the Client to the Server in Order to Modify the String at the Server

During prosecution, MasterObjects distinguished its invention from prior art on grounds that its invention sent only the changes from the client to the server.  In particular, MasterObjects distinguished claim 1 of the '529 patent from prior art, explaining that its invention, unlike the Schabes reference, provides increasingly-refined results as the server received individual characters and modifies the query string by those newly received additional characters:

> Schabes is cited for the concept of refining a search, using extended matching techniques, according to the *relative sequence or pattern* of words in a particular input query.  However, Applicant respectfully submits that Schabes does not teach the particular search and retrieval described above and defined by Claim 1, namely that the server object records, during the same session, each of a plurality of queries, and in response to *receiving each single string character*, automatically matches the

51

> changing query string against the content of the server
> system, *as it is being lengthened or shortened by one or
> more characters*, and returns increasingly relevant
> content information to the client object, for immediate
> use by the client system.

[A951-52 (Dec. 21, 2005 Response to Office Action at 13-14) (emphasis altered)]

This statement confirms that under the claimed invention, the server receives "each

single string character," not the entire string each time, and adjusts the query string

by the "one or more characters" it receives with each update.

MasterObjects' other statements to the PTO during prosecution confirm that

"only the changes" are sent to the server. Throughout prosecution, MasterObjects

repeatedly explained that the client sends to the server one or more characters in

the form of individual "consecutive queries" that serve to "lengthen," "extend,"

"shorten," or "modify" the lengthening string at the server:

- Furthermore, in the embodiment of the invention defined by Claim 1, a client is capable of *transmitting to a server a plurality of queries*, within the same session, wherein *each of said plurality of queries comprises a single string character*, and wherein each subsequent of said plurality of queries *extends* the query string." [A989 (Apr. 11, 2005 Response to Office Action at 14) (emphasis added)];

- "[T]he server object records, during the session, each of the plurality of queries, and *in response to receiving each single string character, matches the extending query string* and returns increasingly appropriate content information to the client." [*Id.* (emphasis added)];

- "[T]he process wherein *each subsequent one of said plurality of queries lengthens or shortens the query string by one or more characters has been more clearly defined* to distinguish this technique of extending a query string search term from the extended search-

52

pattern techniques described in the cited references." [A948 (Dec. 21, 2005 Response to Office Action at 11) (emphasis added)];

- "As part of a session, the client can send a plurality of consecutively input strings to query the server for content …. Each consecutive query *either lengthens or shortens the query string by one or more characters*, to form *an increasingly focused query string* for retrieving content from the server system. (For example, the query can be lengthened by an additional character)." [A948-49 (emphasis in original)].

The applicants thus repeatedly explained to the PTO that the client of the *invention* (not just QuestObjects) sends portions of the query string in piecemeal fashion in order to "lengthen," "shorten," and "modify" the string at the server.

## B.    MasterObjects' Prosecution History Arguments Are Mistaken

The file history on which MasterObjects relies does not support its position.

MasterObjects first cites (at 48-50) its amendments to the claims of the '529 patent. The claims originally recited that "each of said plurality of queries comprises a single string character," and they were subsequently amended to recite that each consecutive query "lengthens or shortens the query string by one or more characters." [*Compare* A977 *with* A719; A948] But that hardly shows that the client object may retransmit already-sent characters. MasterObjects explained that this change was made in order to distinguish the invention's "technique of extending a query string search term" from prior art applying "extended search-pattern techniques" such as the Schabes prior art discussed above. [A948 ("[T]he process wherein each subsequent one of said plurality of queries lengthens or

53

shortens the query string by one or more characters has been more clearly defined to distinguish this technique of extending a query string search term from the extended search-pattern techniques described in the cited references.")]  In any event, although this amendment may confirm that MasterObjects' invention is not limited to sending single-character changes, Google has never argued that it is and the district court did not rule that it is.  On the relevant issue (sending changes or re-sending the entire string each time), this history *supports* the district court's construction because it recognizes that that each transmission to the server "lengthens or shortens the query string," which shows that the server-level string is modified and not entirely replaced by the incoming characters.  [A948]

MasterObjects also relies (at 50-51) on the applicants' traversal of a rejection based on a patent to Zimowski (referred to as "Zim" in prosecution), but this does not help it either.  During prosecution, MasterObjects explained that Zimowski involved a system and method in which a client application was able to "invoke a stored procedure on the server and to have multiple query result sets returned" to the client.  [A1014]  MasterObjects distinguished Zimowski on the basis that the query sent from the client to the server consisted of a single message:

> Zim discloses a client-server environment in which a plurality of server database objects and result sets are exchanged with a client using a minimal number of network messages. The advantages of such a system are (i) it involves *a single exchange of messages between the client and the server*; (ii) both the client and the server

54

> can constrain the amount of data that will be sent to the
> client; and (iii) once some initial amount of data is
> received, the client can subsequently select, in any order,
> which additional data it may want to retrieve.

[A1015 (emphasis added)]    MasterObjects likewise distinguished Zimowski

because the limited information sent from client to server in that reference could

not be "lengthened or shortened by one or more characters in order to create a

focused query string." [A1017]  MasterObjects disparaged Zimowski as lacking

the ability to "extend a prior query in order to get 'narrowed down' results." [*Id.*]

In so arguing, the applicants were not suggesting that their invention covered

replacing the string at the server with a newer and longer string.  At most, the

discussion cited by MasterObjects (at 50-51) demonstrates that unlike Zimowski's

static query, the invention here involves use of consecutive queries to lengthen or

shorten (and together form) a query string to retrieve results.  [*See* A1016-17

("[E]mbodiments of the present invention use strings of characters themselves

(which grow in size as the user types the characters in the string), and more

particularly consecutive queries that one of lengthen or shorten the query string by

the additional characters, and that form an increasingly focused query string for

retrieving matching content from the server system.")]  This in no way suggests

that the claims cover retransmitting already-sent characters.

## IV.   THE *EBAY* AND *YAHOO!* CLAIM CONSTRUCTION ORDERS ARE IRRELEVANT BECAUSE THEY FOCUSED ON A DIFFERENT CLAIM LIMITATION

Finally, MasterObjects again tries (at 45-48) to cast a shadow over the district court's construction by arguing that two other district courts resolved the same claim construction issue in the opposite way.  No such thing happened. Although MasterObjects asserted the same patents before three different judges of the Northern District of California, only the district court in this case considered the "additional characters" limitations at issue here.

All three district courts construed the claimed "communication protocol" identically.  All three defendants asked the courts to require a protocol "optimized for sending single characters from a client to a server and lists of strings from the server to the client."  And all three courts rejected that construction for similar reasons.  [*See* A31-33; *eBay*, 2013 WL 1287428, at *9 ("eBay does not identify any other language in the patent or anything in the prosecution history that suggests that the written description's one reference to optimizing singly characters is a limitation of the claims."); *Yahoo*, 2013 WL 6185475, at *6 ("[T]he specification does not clearly indicate an intention to limit 'communication protocol' to a protocol that is 'optimized for sending single characters.'").

That reasoning, however, was limited to the "communication protocol" term and the proposed "optimized for sending single characters" constructions.  Only

Google asked for construction of the "additional characters" limitations, and only the district court in this case addressed whether those limitations require the client object to send "only the changes to the input string that were not sent in any previous consecutive query." The district court in this case correctly recognized that the two issues were distinct and that the intrinsic evidence compelled adoption of Google's construction of the "additional characters" limitations.

## CONCLUSION

The judgment of noninfringement should be affirmed.

May 23, 2014                    Respectfully submitted,

                                /s/ Jonathan K. Waldrop

                                Jeffrey J. Toney
                                Jonathan K. Waldrop
                                Darcy L. Jones
                                KASOWITZ, BENSON, TORRES &
                                FRIEDMAN LLP
                                1349 West Peachtree Street
                                Suite 1500
                                Atlanta, GA 30309
                                Telephone:  (404) 260-6080
                                Facsimile:  (404) 260-6081

                                Steven C. Carlson
                                Robert P. Watkins III
                                KASOWITZ, BENSON, TORRES &
                                FRIEDMAN LLP
                                333 Twin Dolphin Drive
                                Suite 200
                                Redwood Shores,  CA 94065
                                Telephone: (650) 453-5170
                                Facsimile: (650) 453-5171

                                Dan L. Bagatell
                                PERKINS COIE LLP
                                2901 N. Central Avenue
                                Suite 2000
                                Phoenix, AZ  85012
                                Telephone:  (602) 351-8250
                                Facsimile:  (602) 648-7150

                                *Attorneys for Defendant-Appellee*
                                *Google Inc.*

# United States Court of Appeals
## for the Federal Circuit
### *MasterObjects, Inc. v Google Inc.,* 2014-1148

## PROOF OF SERVICE

I, John C. Kruesi, Jr., being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by KASOWITZ, BENSON, TORRES & FRIEDMAN LLP, Attorneys for Appellee to print this document. I am an employee of Counsel Press.

On **May 23, 2014,** counsel has authorized me to electronically file the foregoing **Brief for Appellee Google Inc.** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

Spencer Hosie
(*principal counsel*)
Diane Sue Rice
George F. Bishop
HOSIE RICE LLP
600 Montgomery Street, 34th Floor
San Francisco, California 94111
(415) 247-6000 (Telephone)
(415) 247-6001 (Facsimile)
shosie@hosielaw.com
drice@hosielaw.com
gbishop@hosielaw.com

Leslie V. Payne
Nathan J. Davis
Alden G. Harris
HEIM, PAYNE &CHORUSH, LLP
600 Travis Street, Suite 6710
Houston, Texas 77002
(713) 221-2000 (Telephone)
(713) 221-2021 (Facsimile)
lpayne@hpcllp.com
ndavis@hpcllp.com
aharris@hpcllp.com

Paper copies will also be mailed to the above principal counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

May 23, 2014

/s/ John C. Kruesi, Jr.
John C. Kruesi, Jr.
Counsel Press

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  The brief contains <u>12,222</u> words, excluding the sections exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft® Word 2010 and 14-point Times New Roman type.


May 23, 2014                                   /s/ Robert P. Watkins III
                                               Robert P. Watkins III
                                               *Counsel for Defendant-Appellee*
                                               *Google Inc.*