2014-1148

In The
# United States Court of Appeals
## For The Federal Circuit

## MASTEROBJECTS, INC.,

*Plaintiff – Appellant*,

**v.**

## GOOGLE, INC.,

*Defendant – Appellee.*

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA IN CASE NO. 4:11-CV-01054-PJH, UNITED STATES DISTRICT JUDGE PHYLLIS J. HAMILTON.**

_____

## REPLY BRIEF OF APPELLANT

_____

Spencer Hosie
Diane Sue Rice
George F. Bishop
HOSIE RICE LLP
600 Montgomery Street, 34th Floor
San Francisco, California 94111
(415) 247-6000 (Telephone)
(415) 247-6001 (Facsimile)
shosie@hosielaw.com
drice@hosielaw.com
gbishop@hosielaw.com

*Counsel for Appellant*

Leslie V. Payne
Nathan J. Davis
Alden G. Harris
HEIM, PAYNE & CHORUSH, LLP
600 Travis Street, Suite 6710
Houston, Texas 77002
(713) 221-2000 (Telephone)
(713) 221-2021 (Facsimile)
ndavis@hpcllp.com
lpayne@hpcllp.com
aharris@hpcllp.com

*Counsel for Appellant*

# TABLE OF CONTENTS

I.    Introduction ..................................................................................................1

II.   The Ordinary Meaning of the Claim Terms Allows the Client to Send the
Entire String ................................................................................................4

    A.    The Claim Language Encompasses Sending the Lengthening String,
and Certainly Does Not Require Sending Only the Changes ..............6

    B.    Google's Not-So-Plain Meaning .........................................................8

        1.    *Google Artificially Narrows Four Unconstrued Words* ............9

        2.    *Google Incorrectly Assumes That the Lengthening String Must
Be Built on the Server* ...............................................................13

        3.    *Google's Surreptitious Construction of "Query" Contradicts
the Plain Language* ....................................................................16

        4.    *Google Also Redefines "Modify"* ............................................16

        5.    *'639 Claims 3 and 4 Do Not Help Google* ...............................17

        6.    *MasterObjects Does Not Read Limitations Out of the Claims* .18

    C.    Many of Google's Redefined Terms Only Appear in One Asserted
Claim, Contrary to Google's Across-the-Board Construction............19

    D.    Google's Construction Is Inconsistent With "Comprising"................19

III.  Google's Specification Citations Do Not Support Its Construction .............21

    A.    Google's "Present Invention" Argument Does Not Demonstrate
"Clear" Intent to Disavow Claim Scope ............................................21

    B.    The QuestObjects System is Just an Embodiment..............................22

    C.    Google's Passages Describe the "Communication Protocol," Not the
"Additional Characters" Terms.........................................................26

i

IV.   Google Misinterprets the Prosecution History ...............................................27

    A.   Google Relies On An Obvious Typographical Error..........................27

    B.   Google Ignores the Prosecution History that Contradicts its
        Construction ........................................................................................28

V.   The *eBay* and *Yahoo!* Courts Rejected Google's Arguments .......................29

    A.   The Other Courts Rejected Google's "Present Invention" Theory.....29

    B.   The *eBay* Court Held That the Server is Not Required to "Glue"
        Queries Together ..................................................................................30

    C.   Neither eBay nor Yahoo! Believed that the Ordinary Meaning of
        "Additional Characters" Is Limited to "Only the Changes"...............31

VI.   Conclusion ..................................................................................................32

# TABLE OF AUTHORITIES

## Cases

*Apple Inc. v. Samsung Elecs. Co.*,
   695 F.3d 1370 (Fed. Cir. 2012) ...................................................................20

*Dippin' Dots, Inc. v. Mosey*,
   476 F.3d 1337 (Fed. Cir. 2007) .................................................................20

*Edwards Lifesciences LLC v. Cook Inc.*,
   582 F.3d 1322 (Fed. Cir. 2009) .................................................................22

*Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*,
   423 F.3d 1343 (Fed. Cir. 2005) ........................................................... 19, 20

*Gillette Co. v. Energizer Holdings, Inc.*,
   405 F.3d 1367 (Fed. Cir. 2005) ........................................................... 19, 20

*Honeywell Int'l, Inc. v. ITT Indus.*,
   452 F.3d 1312 (Fed. Cir. 2006) .................................................................26

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010) ...................................................................25

*Intervet Am., Inc. v. Kee-Vet Labs., Inc.*,
   887 F.2d 1050 (Fed. Cir. 1989) .................................................................28

*MasterObjects, Inc. v. Ebay, Inc.*,
   No. 3:12-cv-680-JSC, 2013 U.S. Dist. LEXIS 47001
    (N.D. Cal. Mar. 28, 2013)........................................................................30

*MasterObjects, Inc. v. Yahoo!, Inc.*,
   3:11-cv-02539-JSW, 2013 U.S. Dist. LEXIS 168296,
   (N.D. Cal. Nov. 26, 2013)........................................................................30

*Power MOSFET Techs., LLC v. Siemens AG*,
   378 F.3d 1396 (Fed. Cir. 2004) .................................................................20

*Rambus Inc. v. Infineon Techs. Ag*,
  318 F.3d 1081 (Fed. Cir. 2003) ...........................................................21

*SciMed Life Sys. v. Advanced Cardiovascular Sys.*,
  242 F.3d 1337 (Fed. Cir. 2001) ...........................................................22

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
  299 F.3d 1313 (Fed. Cir. 2002) ...........................................................23

*TiVo, Inc. v. Echostar Communs. Corp.*,
  516 F.3d 1290 (Fed. Cir. 2008) ...........................................................26

*Trading Techs. Int'l, Inc. v. eSpeed, Inc.*,
  595 F.3d 1340 (Fed. Cir. 2010) ................................................... 20, 22

## I.    Introduction

Google insists that the diverse phrases containing the words "additional characters" all have a simple, unmistakable plain meaning.  As Google puts it:

> the parties' dispute centers on the limitation requiring that "each of the corresponding consecutive queries [sent to the server] lengthens the string by the additional characters, to form a lengthening string."  **On its face, that limitation requires that each consecutive query sent from the client to the server contain only the additional characters entered since the last transmission.**

Google Br. at 1 (emphasis added).

On their face, the claims "require" no such thing.  Claim 1 of the '529 patent explicitly states that the system "allows the client system to send ... a lengthening string composed of a plurality of consecutively input characters ...."  '529 patent at 31:52-55 (A99).  The server uses the lengthening string received from the client to query the server system for content.  These claims neither require sending just the changes, nor prohibit sending just the changes.  These claims are agnostic on the mechanics of query transmission, and deliberately so.

How, then, does Google derive its "plain" meaning?  It does so by rewriting four terms, all to make each word mean something other than what it says.  Google argues that "**form**" must mean "combine individual characters on the server."  It insists that "**corresponding**" must mean "identical to just the new characters typed

1

in" since the last query.  It contends that the word "**modify**" must be narrowly read to encompass only the server gluing together disparate characters, as against a query replacing a prior, shorter version of the string.  And it argues that "**lengthen**" must mean tacking on characters at the server.  *See* Google Br. at 27-29.  Google, in short, is artificially narrowing a bevy of terms, while presenting the resulting mélange as a coherent "plain and ordinary meaning" construction.

The plain words of the claims carry none of Google's freight.  Example 1, presented in MasterObjects' opening brief at 24, shows that sending more than just the changes satisfies the claim language.  Simply put, "corresponding consecutive queries" are generated and the lengthening string is "modified" (*i.e.*, it is made different from the lengthening string as it existed prior to each query) and "lengthened" (*i.e.*, it is one character longer than the prior lengthening string).  In this respect, the corresponding consecutive queries "form" the lengthening string.  Examples 1 and 2 in MasterObjects' opening brief show that the "modifying," "lengthening," and "forming" can happen at either the client or the server.  *See* MasterObjects Br. at 24-25.

Google concludes otherwise only by reading a host of simple words— form, lengthen, modify, corresponding— to mean something other than what they say.  How can such a painfully derived "plain" meaning be plain at all?

2

Google was more candid about its true approach in the court below. There, Google admitted that it was construing a bevy of different phrases, all to reach what Google called "**a simple concept**—that only the changes in what the user inputs at the client are sent to the server as a query." A757 at 20:5-6 (emphasis added). As Google acknowledged then, its construction was untethered from the words of the claims themselves, as its construction was "not intended to construe each phrase of the specific language for each limitation, but rather to provide a construction that reflects the scope imparted by those limitations as a whole...." *Id.* at n.12. Rewriting claims so that white becomes black to reach some gestaltian "scope" and free-floating "concept" is the antithesis of plain meaning.

At bottom, Google is doing exactly what it denies: reading limitations into the claims based on its erring interpretation of the specification and prosecution history. Google does this indirectly, as it effectively concedes that it cannot meet the rigorous standard for disavowal. *See* Google Br. at 3 (disavowing disclaimer and disavowal). And, on this, Google is exactly right: it cannot meet the disavowal standard. To put a sharp point on the issue, consider Google's position on an absolutely central issue: whether the QuestObjects system is just an embodiment; **Google never directly addresses this issue**. But its entire construct relies on the (false) supposition that the QuestObjects system is **not** just an embodiment, but rather cabins the claims, all the evidence to the contrary notwithstanding. It is

3

precisely because Google wishes to avoid the unwinnable disavowal/disclaimer dispute that it now cobbles together its Goldbergian plain meaning contraption.

## II.   The Ordinary Meaning of the Claim Terms Allows the Client to Send the Entire String

The construed '529 claim 1 language states: "wherein each of the corresponding consecutive queries lengthens the string by the additional characters, to form a lengthening string for retrieving matching content from the server system." '529 patent at 32:9-13 (A99).  One of ordinary skill would not interpret this limitation to mean "only the changes to the input string that were not sent in any previous consecutive query," as the district court did.  A40.  It certainly does not "[o]n its face" require an "only send the changes" restriction, as Google contends (Google Br. at 1) any more than it prohibits any other form of query, as Google also necessarily contends.

Attempting to defend its erroneous construction, Google redefines a collection of other terms, which it calls "related clauses" (Google Br. at 27-30), to mean something other than what they say.  In this fashion, Google profoundly rewrites, *e.g.*, '529 claim 1 as follows:

> 1. A system for retrieval at a client system of content from a server system, comprising:
>
> a communication protocol that enables an asynchronous connection over a network between a client system and a server system, and allows the client system to send via the network, and within a session

4

between the client system and the server system, a lengthening string composed of a plurality of consecutively input characters *without sending any of the characters more than once*, to query the server system for string-based content, while asynchronously receiving consecutive responses from the server system as the characters are being input;

a content-based cache, at the server system, which stores previous queries and corresponding result sets …;

a client object, in communication with a client software at the client system and with the communication protocol, wherein the client object

receives, as input, consecutive additional characters from the client software, and

while each of the *sets of one or more* consecutive additional characters *not previously transmitted* are being received as input, transmits via the network to a server object at the server system one or more corresponding consecutive queries *that consist only of characters that have not previously been transmitted to the server system*, within the session between the client system and the server system, to retrieve content from the server system,

wherein each of the corresponding consecutive queries lengthens the string *at the server* by *gluing* the additional characters *to the characters previously received by the server*, to form a lengthening string *at the server* for retrieving matching content from the server system; and

a server object, in communication with the server system, and with the client object via the communication protocol, wherein the server object

in response to receiving each of the corresponding consecutive queries *consisting of only characters that have not previously*

5

been received that modify but do not replace characters in the lengthening string stored and formed at the server,

automatically uses the lengthening string to query and retrieve content information from the content-based cache at the server system or from the one or more content sources that matches the lengthening string, and

asynchronously returns, while the additional characters are being input and the corresponding consecutive queries that consist only of characters that have not previously been transmitted to the server system are being transmitted and the lengthening string formed at the server is being modified without replacing any of the characters stored therein during the session, consecutive responses containing content information which increasingly matches the lengthening string, to the client object for immediate use by the client system, wherein the server system includes at least one processor.

More, Google asks the Court to rewrite the other asserted claims ('529 claims 44 and 44, and '639 claims 1 and 13) in a similar manner even though two terms central to Google's argument—"modified" and "corresponding consecutive queries"—do not even appear in those claims. How possibly can this be right?

## A. The Claim Language Encompasses Sending the Lengthening String, and Certainly Does Not Require Sending Only the Changes

The threshold question here is whether the plain meaning of the claims, as read in conjunction with the specification and prosecution history, requires that each new query "consists only of the changes to the input string that were not sent

in any previous query." If otherwise, then Google must show a disclaimer or disavowal of claim scope, which Google effectively concedes it cannot.

The plain language of the claims covers sending the lengthening string. This was shown in MasterObjects' opening brief's discussion of Example 1. *See* Br. at 24-27. To illustrate the same concept differently:

| Consecutive Query # | Content of Consecutive Query | String Prior to Consecutive Query | String After Consecutive Query | Additional Character by Which the Prior String was Lengthened |
|---|---|---|---|---|
| 1 | p | -- | p | p |
| 2 | pa | p | pa | a |
| 3 | pat | pa | pat | t |
| 4 | pate | pat | pate | e |
| 5 | paten | pate | paten | n |
| 6 | patent | paten | patent | t |

The first corresponding query consists of the letter "p," and the second consists of "pa." The second query ("pa") "**lengthens**" (*as claimed*) the string (previously "p") by the additional character ("a"), and "**forms**" (*as claimed*) a lengthening string ("pa") that is used to retrieve matching content from the server system. The second query also modifies the string (previously "p"), just as it corresponds to adding the new character, "a," relative to the prior "p" alone. As the user continues typing, adding new characters, a third query ("pat") again "lengthens" the string ("pa") by the additional character ("t"), and "forms" a

7

lengthening string ("pat") that is used to retrieve matching server content all as claimed. And so on.

MasterObjects' reading also squares with the "communication protocol" section of '529 claim 1, which describes the protocol as allowing the client system to send "a lengthening string composed of a plurality of consecutively input characters."[1] '529 patent at 31:52-55 (A99).

To use a quotidian example: assume an author sent in a revised draft manuscript to his publisher, with the new draft containing several additional chapters and a new ending. Does this new draft "modify" the existing draft, by replacing the existing draft with a revised draft? Does the new draft "lengthen" its predecessor? Does the new draft "correspond" to the changes made following the first draft? The plain meaning answer is yes to all.

## B.    Google's Not-So-Plain Meaning

Google's brief repeatedly relies on the same faulty premises that lie at the heart of the district court's erroneous construction.[2] Google begins by proclaiming

---

[1] Google never quite explains how its plain meaning squares with this sentence, which says that the client is "allowed…to send a lengthening string," as Judge Corley held in the parallel eBay case. *See infra* § V.B.

[2] The district court stated:

> Plaintiff challenges the idea that the characters are sent piecemeal for the server to "glue" together. **Defendant, on the other hand, argues**

8

that "[t]he claim language **makes clear** that only the 'additional characters' entered by the user are sent from the client computer to the server, where they are added to the characters previously sent." *See* Google Br. at 26 (emphasis added). Google reads the claim language as requiring that, as the user types in additional characters, the client object sends only the new characters (characters not previously sent) to the server. Upon receipt, the server then would blindly[3] glue together the individual characters received. *See id.* at 26-35.

### 1. *Google Artificially Narrows Four Unconstrued Words*

Google gets to this server side glue together conclusion by construing what it characterizes as several "**related clauses**," *i.e.*, what it says are clauses somehow related to the actual term construed, "additional characters." *See* Google Br. at 27-30; *see also id.* at 1 (saying the court below "construed a **set** of claim terms…."

---

**that the server does indeed "glue" the characters together as they are received.**

**\*\*\***

The court agrees with defendant here.

A39 (emphasis added).

[3] "Blindly," as Google argues that the server must mechanistically glue together "p" then "pa" then "pat" to get "ppapat". Google nowhere explains why this is required by the language.

The court did not construe "a set" of claim terms, whatever that may mean; it construed one term here—"additional characters").[4]

Google's first such "related clause" is "**corresponding**." The language reads as follows:

> while each of the consecutive additional characters are being received as input, [the client object] transmits via the network to a server object at the server system one or more **corresponding** consecutive queries….

'529 patent at 32:3-6 (A99) (emphasis added).

Google says that the word "corresponding," as used here, mandates that only the "additional new characters" just typed in be sent and sent alone, as against being sent as part of a larger string. In this way, Google argues (without as admitting as much) that "**corresponding**" must mean "**identical to**": the new characters are input and the new query will "correspond" to these new characters only if identical to the new characters, with nothing added nor subtracted. But the word "corresponding" is not so limited. Surely a new query containing the new characters and triggered by those new characters "corresponds" with those changes, as against the prior query not containing the new characters.

---

[4] This illustrates the problem with Google's "scope" and "simple concept" construction: it is not even clear what is and is not being construed.

Even were Google correct that "corresponding" means "identical to," its construction fails. The language Google relies upon states that the "corresponding consecutive queries" correspond to the "**input**," not the "additional characters." *See* '529 patent at 32:3-7 (A99). Google acknowledges this by recognizing that this language would cover a system that generates one "corresponding consecutive query" that contains multiple "additional characters." *See* Google Br. at 31. In other words, if there is only one query for multiple "additional characters," as would be the case if a plurality of new characters were sent together, "**each** of the consecutive additional characters" would not have its own identical "corresponding consecutive query." The consecutive queries, therefore, correspond to the "input" (which may contain **all** of the entered characters), not "each of the consecutive additional characters" individually. So even were identicality required, it is present in Example 1—the "input" (stored in the "client object") and the "corresponding consecutive queries" are identical. *See* MasterObjects Br. at 24.

The next "related clause" is "**modify**." Here is the claim language:

> in response to receiving each of the corresponding consecutive queries that **modify** the lengthening string,

'529 patent at 32:17-18 (A99) (emphasis added). Google reads the word "modify" to mean that new characters must be glued to the end of a preexisting string at the server side, as against a new longer query "modifying" the lengthening string by

11

replacing the prior and shorter iteration of it. As with "corresponding," Google so reads into the word a substantial narrowing not congruent with the plain meaning of the word. As the lengthening string of Example 1 grows in length, it is "modified"—it is one character longer at each step. *See* MasterObjects Br. at 24.

The third "related clause" is "**lengthen**." Google argues that there is only one way to lengthen a string, and that is by appending new characters to the end of an existing string sitting on the server. As with the other two clauses, Google therefore reads into the straightforward word "lengthen" a particular process and mechanism not mandated by the language of the word itself.

Google's fourth "related clause" is "**form**." Google argues that "form" requires that the server, and only the server, combine individually received characters to create a lengthening string in the first instance at the server side. But "form" does not necessarily mean "combine" previously sent disassociated characters on the server; one can form a lengthening string in any number of different ways, including sending a query containing all of the information. As with the other "related clauses," Google is reading into the unconstrued word "form" a narrowing meaning.

### 2. Google Incorrectly Assumes That the Lengthening String Must Be Built on the Server

Both the district court and Google justify the "send only the changes" construction by positing that the lengthening string must be "formed," "modified," and "lengthened" only **at the server** by "gluing together" the disassociated queries as they are received. *See* A39, A45. For example, Google argues:

- "MasterObjects' contrary construction, which allows retransmission of previously sent characters, cannot be correct because the claim language says that these consecutive queries 'form' a lengthening string **at the server** …." Google Br. at 1 (emphasis added).

- "Either way, however, only the changes are transmitted because that construction is the only way to adhere to the 'additional characters' limitations and the other requirements of the claims such as 'forming,' 'modifying' and 'lengthening' the lengthening string **at the server**." *Id.* at 3 (emphasis added).

But the claims require no such thing. It is equally consistent with the claim language to have the lengthening string "formed," "modified," and "lengthened" at the **client** before sending it to the server. Indeed, the first limitation of '529 claim 1, which describes the "communications protocol," "allows the **client system** to send via the network … a **lengthening string** …." '529 patent at 31:52-55 (A99)

13

(emphasis added). As the "lengthening string" can be transmitted **by** the client, it can also be formed, modified, and lengthened **at** the client.

None of the ensuing limitations compel a contrary interpretation. In fact, the first reference in '529 claim 1 to how the string is "lengthen[ed]" and the **only** reference to it being "form[ed]" appears in the **client object** section. *Id.* at 32:9-13 (A99) ("wherein each of the corresponding consecutive queries **lengthens** the string by the additional characters, to **form** a lengthening string for retrieving matching content from the server system") (emphasis added).

The other four asserted claims are equally clear that the forming and lengthening can be at the client. For example, '529 claims 44 and 45 recite that each of the consecutive queries "**extends** the query string **in the user interface** by one or more additional characters." *Id.* at 39:39-41; 40:7-9 (A103) (emphasis added). Similarly, '639 claims 2 and 14, which depend from asserted claims 1 and 13, recite that "the plurality of queries are entered into the **web-based interface by the user** to **form** an increasingly **lengthening** query string for retrieving content from the server." '639 patent at 41:37-42 (emphasis added) (A158). The "user interface" and "web based interface" are perforce on the client.

While the portions of '529 claim 1 describing the server object recognize that "the lengthening string" will be "modif[ied]," they do not dictate that this "modification" must occur at the server. The reference to "receiving each of the

14

corresponding consecutive queries that modify the lengthening string" says no more than that it is the "corresponding consecutive queries" that "modify the lengthening string." '529 patent at 32:17-18 (A99). "Pat" modifies "pa." And both the "corresponding consecutive queries" and the "lengthening string" also exist at the client—indeed, that is where they first appear. *Id.* at 31:52-55; 32:3-13. "Modification" does not necessarily occur at the server because it is equally possible that the "corresponding consecutive queries" "modif[ied]" the lengthening string at the client before it was transmitted.

So too the second reference to "modification" in the server object portion of '529 claim 1, which states that the server object "asynchronously returns" search results "while the additional characters are being input and the corresponding consecutive queries are being transmitted and the lengthening string is being modified during the session …." *Id.* at 32:24-27. The use of passive voice leaves the location of the modification (*i.e.*, whether it occurs at the client or server) unspecified; the mechanics of query transmission were never the point of patentable novelty. If anything, the context suggests that the modification of the lengthening string is occurring at the client rather than the server—the other two asynchronous actions recited in this clause (input of characters and transmission of queries) undoubtedly occur at the client. *Id.*

15

Once one recognizes that the "forming," "modifying" (only in '529 claim 1), and "lengthening" of the string may occur at the client, nothing remains to support Google's server glue construction.

### 3. Google's Surreptitious Construction of "Query" Contradicts the Plain Language

Implicit in Google's plain meaning is a redefinition of the unconstrued term "query." Google's construction dictates that only individual letters (*e.g.,* "p," "a," "t," *etc.*) are "queries" within the meaning of the claims, while the terms actually used to search at the server (*e.g.*, "p," "pa," "pat," "pate," "paten," *etc.*) **cannot** be "queries." This peculiar reading cannot be squared with the ordinary meaning of "query," which covers all characters used in the search. The claims also use the term "query" in exactly this sense. *E.g.,* '529 patent at 31:59-60 (A99) (claim 1 reciting: "content-based cache, at the server system, which stores previous queries and corresponding result sets."); *id.* at 33:30-33 (A100) (claim 15 reciting: "queries are matched against the content").

### 4. Google Also Redefines "Modify"

Google's next error begins with a bare pronouncement that "replacing" cannot be "modifying" or "lengthening." Google Br. at 29-30, 35. Whence this *per se* definitional carve-out? An author could surely "lengthen" and "modify" his publisher's draft copy of his book by *replacing* it with an updated version

16

containing an additional chapter; why should these words mean something different here, absent disavowal or disclaimer?

Additionally, '529 claim 1 says nothing about whether the string is "replaced" ("wiped out" in Google's terminology). It neither requires nor precludes modifying the existing string by replacing its contents with the longer query. Nor does the mere act of sending more than "just the changes" require "replacing" or "wiping [the server's] slate clean." *Id.* at 29. The prior iteration of the lengthening string may or may not be stored at the server. Google's assertion that "the result would be garbled" if more than just the changes were sent is premised entirely on the proposition that the server must blindly glue all of the received consecutive queries together (*id.* at 30)—a proposition Google simply made up.

### 5.  '639 Claims 3 and 4 Do Not Help Google

Google misapplies claim differentiation to '639 claims 3 and 4, which state that each query is "a single additional character" or "a plurality of additional characters." Google Br. at 31. While those claims suggest that independent '639 claim 1 is broad enough to capture sending the changes, it does not mean that claim 1 is required to send only the changes, while precluding sending more than just the changes. Other '639 dependent claims refer to searching for the "query" in the "query and result cache" (claim 5) and "execut[ing] the query on said content

engines" (claim 10), both of which will only be useful if the query contains everything entered so far rather than a single, isolated character. A158.

### 6.    *MasterObjects Does Not Read Limitations Out of the Claims*

Google accuses MasterObjects' of "read[ing] the 'additional characters' requirement out of the claims."  Google Br. at 32.  Not so.  As "consecutive additional characters" are received as input, the string is lengthened, and corresponding consecutive queries transmitted.  That is fully consistent with MasterObjects' inventive way to provide search results even as a user types.

Similarly, Google claims that sending more than just the changes would mean that "there would be no need for 'consecutive queries at all'" and that "[t]he 'consecutive' nature of the queries is required because the server needs to receive all the queries in order to function properly."  *Id.* at 33.  Again, Google mischaracterizes MasterObjects' invention.  Sending consecutive queries permits the server to asynchronously return increasingly relevant results as the user types instead of waiting for a complete search request.

Finally, Google posits that MasterObjects ignores the concept of a "lengthening string" because it requires many separate strings.  This argument fails as the iterative and lengthening string represents the growing query used by the server.  Adding chapters to a book does not mean the author is writing different books.

18

### C. Many of Google's Redefined Terms Only Appear in One Asserted Claim, Contrary to Google's Across-the-Board Construction

Google's favorite four words ("form," "lengthens," "modify," and "corresponding") are **not** used in the same manner in any of the other four asserted claims, and some are not used at all. Specifically:

- '529 claims 44 and 45 and '639 claims 1 and 13 do not use the word "modify" or "modified";

- '639 claims 1 and 13 do not use the word "corresponding";

- '529 claims 44 and 45 do not use the word "corresponding" with reference to "queries" (they do refer to "corresponding result sets," which is unrelated to the dispute).

Even if the words "modify" or "corresponding" dictate that only changes can be sent, that language is only applicable to '529 claim 1. For the other claims, Google's plain meaning reading requires first reading in words not present at all.

### D. Google's Construction Is Inconsistent With "Comprising"

Given the open-ended "comprising" language, it was improper to impose a new limitation via claim construction that excludes embodiments transmitting the additional characters along with the previously sent characters. *See Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1371-72 (Fed. Cir. 2005); *Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1347, 1353 (Fed. Cir. 2005).

Google's cases involve circumstances where the patentee attempted to use "comprising" as a "weasel word … to abrogate" other plainly stated claim requirements or recapture subject matter clearly disclaimed or disavowed—a concern not present here because the claim language and specification contemplate and permit the transmission of the pre-existing characters. *See Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1343 (Fed. Cir. 2007); *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1353-54 (Fed. Cir. 2010) ("automatic re-centering commands" not covered where another limitation prohibited automatic re-centering, which was expressly disclaimed in the specification and prosecution history); *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1379 (Fed. Cir. 2012); *Power MOSFET Techs., LLC v. Siemens AG*, 378 F.3d 1396, 1408-09 (Fed. Cir. 2004).

Google's related suggestion that the open-ended nature of the "comprising" transition only serves to permit the addition of wholly new components is contrary to precedent. *See Free Motion Fitness*, 423 F.3d at 1350-51 (relying on "comprising" transition to reverse restrictive construction of "a cable linking" limitation); *Gillette*, 405 F.3d at 1371-72 (applying "comprising" to "a group of first, second, and third blades" limitation).

## III.  Google's Specification Citations Do Not Support Its Construction

Given that the plain language of the claims does not "require" sending only

the changes, this is indeed a dispute about disavowal/disclaimer.

### A.  Google's "Present Invention" Argument Does Not Demonstrate "Clear" Intent to Disavow Claim Scope

Google's brief is unequivocal: "[w]hile MasterObjects attempts to fit this

case into the 'disclaimer' or 'disavowal' paradigm of cases such as *Thorner*, that

standard is inapposite here."  Google Br. at 3.  Standing by this position, Google

never asserts nor proves "clear," "unmistakable," or "manifest" intent to

disclaim/disavow claim scope.  *Id.* at 34-36.  Google effectively concedes this

issue by arguing plain meaning alone.  *Id.* at 3, 24, 45.

Yet consistency is not Google's hobgoblin here.  Despite its concession,

Google effectively argues that language in the specification controls claim scope.

*Id*. at 45-47.  This is true only if MasterObjects used the term "present invention"

to disclaim/disavow claim scope, which is what Google suggests without quite

stating.  Google is, at bottom, arguing that the "present invention" language means

that the QuestObjects system is not merely an embodiment.  But it has not and

cannot make this showing. *See Rambus Inc. v. Infineon Techs. Ag*, 318 F.3d 1081,

1094-95 (Fed. Cir. 2003) ("While clear language characterizing 'the present

invention' may limit the ordinary meaning of claim terms…the remainder of the

21

specification and prosecution history shows that Rambus did not clearly disclaim or disavow such claim scope in this case."); *SciMed Life Sys. v. Advanced Cardiovascular Sys.*, 242 F.3d 1337, 1344 (Fed. Cir. 2001) ("The words 'all embodiments of the present invention' are broad and unequivocal.… This is therefore a clear case of disclaimer"); *Trading Techs.*, 595 F.3d at 1354 ("an inventor must evince a 'clear intention' to limit the claim terms to a specification embodiment"); *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1329 (Fed. Cir. 2009) ("[w]here the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims").

## B. The QuestObjects System is Just an Embodiment

Google devotes roughly thirteen pages to discussing the description of the QuestObjects preferred embodiment. Google Br. at 5-12, 41-45. For example, each figure that Google reproduces ('529 Figs. 4 & 6, '639 Figs 7 & 8) is characterized in the specification as illustrating "an embodiment," a point quite absent in Google's brief. '529 patent at 7:63-8:7 (A87); '639 patent at 3:42-47 (A139). Google cites other passages that use embodiment-specific terms like "inputBufferSetLength," "inputBufferDelete," and "Quester." *See, e.g.*, Google Br. at 7, 10, 43.

22

Google ignores binding precedent that "an accused infringer cannot overcome the 'heavy presumption' that a claim term takes on its ordinary meaning simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002). And the specification is clear on this issue as well: "[t]he foregoing description of preferred embodiments of the present invention has been provided for the purposes of illustration and description.  It is not intended to be exhaustive or to limit the invention to the precise forms disclosed." '529 patent at 31:33-36 (A99); *see also* MasterObjects Br. at 36-39.

Google also mischaracterizes '639 Figures 7 and 8, arguing that the "Δ" symbol implies that "only the changes to the search string are transmitted from client to server."  Google Br. at 10. Figures 7 and 8 actually describe how changes to the search **results** are communicated **from server to client**; these figures have nothing to do with the string "transmitted from client to server."  The written description, which Google's brief omits (Google Br. at 10, 45), makes this plain.  *See* '639 patent at 20:37-40 (A147).

On "present invention," rather than manifesting a clear intent to disavow, the passages Google cites ('529 patent at 11:55-58, 20:11-14) describe an **optional** implementation detail of the preferred embodiment.  This Court has repeatedly held that "present invention" language is not limiting where the specification uses

23

permissive language or describes only an embodiment. *See* MasterObjects Br. at 42-47 (collecting cases). There are at least four factors that confirm the "send only the changes" functionality is an optional, non-limiting feature of the preferred embodiment:

*First*, the specification repeatedly teaches that sending only the changes is not the exclusive way to send the lengthening search string. For example: "The system's protocol is not restricted to sending single characters. In fact, Clients can also use the protocol to **send a string of characters**." '529 patent at 12:3-8 (A89) (emphasis added). "If the results are not found in the cache, the Client Quester uses the Client Controller to **send the new input buffer** to the Server Quester…." *Id.* at 20:8-12 (A93) (emphasis added). "Query Filter – A filter specified by a Query Manager in a specific Service used to tell the Server Quester **to interpret incoming strings**…."[5] *Id.* at 10:27-29 (A88) (emphasis added); *see also* MasterObjects Br. at 38-39. Google itself quotes specification language describing a "character-by-character string." Google Br. at 11, 12, 37, 41, 48. A character-by-character string is not limited to "only the changes." For example, "p" followed by "pa" followed by "pat" is an example of a character-by-character string—the string grows by each additional character, yet includes more than just the changes.

---

[5] Google asserts that the "incoming strings" are not "incoming" from the client. Google Br. at 49. If not from the client, where?

These broad disclosures show that MasterObjects did not clearly and unmistakably limit its invention to sending "just the changes."

*Second*, the "present invention" language itself is permissive, and explains that the QuestObjects protocol "**allow[s]** the Client Quester to send just the changes to the input buffer." '529 patent at 20:11-14 (A93). "Allow" does not mean require. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 844 (Fed. Cir. 2010) ("The specification's permissive language, 'could be edited,' 'can be created,' and 'ability to work,' does not clearly disclaim systems lacking these benefits.").

*Third*, the specification uses the phrase "present invention" over seventy times. These references often relate to idiosyncratic embodiment details such as: "Every time a Client Quester uses the protocol of the **present invention** to send something to the Server Quester that may result in a new QuestObjects Result Set, it includes a request identifier." '529 patent at 23:27-30 (A95) (emphasis added); *see also id.* at 11:1-5, 25:17-19, 30:2-5, 31:2-4. The specification's liberal use of "present invention" when referencing specific implementation details of the preferred embodiment shows that MasterObjects used the term as a synonym for the non-limiting QuestObjects embodiment rather than as a portal to lard a slew of implementation details into the claims.

25

*Fourth*, Google is wrong that "transmitting only such incremental changes was central to what the applicants regarded as their invention." Google Br. at 41. Google cites no support for this statement. Sending "only the changes" was just one way—not a "central" part of the invention—to transmit the string. The inventive features (*e.g.*, asynchronous communication, consecutive queries, query and results caching, and session-based search to deliver increasingly relevant search results) lie elsewhere. *See* MasterObjects Br. at 7-9.

Finally, Google's cases are inapposite because they involve situations where "the present invention" (or similar language) was used to describe the invention as a whole, not just an embodiment. *See, e.g., TiVo, Inc. v. Echostar Communs. Corp.*, 516 F.3d 1290, 1300 (Fed. Cir. 2008) ("[T]he specification clearly refers to the separation aspect of the 'invention' and not merely one embodiment of a broader invention."); *Honeywell Int'l, Inc. v. ITT Indus.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) ("[T]he invention is a fuel filter…the written description does not indicate that a fuel filter is merely a preferred embodiment of the claimed invention.").

### C.  Google's Passages Describe the "Communication Protocol," Not the "Additional Characters" Terms

The district courts in the *Google*, *eBay*, and *Yahoo!* cases squarely rejected the defendants' arguments that the specification limits the claimed

26

"communication protocol" to sending only "single characters." *See* A31-33; *infra* § V.A. Accordingly, Google concedes: "the issue here is not the term 'communication protocol….'" Google Br. at 4, 56.

Yet the "present invention" language Google repeatedly cites comes from the specification's description of the **communication protocol**. '529 patent at 11:55-59 (A89) (the "invention includes…a communication protocol that is optimized for sending single characters"); *id.* at 20:3-17 (A93) (the "protocol of the present invention…allow[s] the Client Quester to send just the changes").

Google attempts to shoehorn its rejected (and not appealed) "present invention" communication protocol arguments into the "additional characters" terms. These attempts should be rejected, just as all three district courts did in the "communications protocol" context.

## IV. Google Misinterprets the Prosecution History

### A. Google Relies On An Obvious Typographical Error

Google argues that MasterObjects distinguished over the Schabes reference based on a "single string character" limitation. Google Br. at 51-52. But MasterObjects amended its claims to delete the "single string character" limitation in the same response, just a few pages prior. A939-46. Accordingly, references to "single string character" in the argument section of the response are clearly typographical errors. *Cf. Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050,

27

1053-54 (Fed. Cir. 1989) ("When it comes to the question of which should control, an erroneous remark by an attorney…or the claims of the patent as finally worded and issued by the Patent and Trademark Office as an official grant, we think the law allows for no choice.  The claims themselves control.").

Even Google does not genuinely believe that MasterObjects distinguished over Schabes based on the "single string character" limitation.  In fact, Google makes the contrary argument on the next page of its brief (at 53): "MasterObjects explained that this change [deleting the 'single string character' limitation] was made in order to distinguish the invention's 'technique of extending a query string search term' from prior art applying 'extended search-pattern techniques' such as the Schabes prior art discussed above."

Regardless, it is undisputed that MasterObjects removed the "single string character" limitation.  This limitation cannot be read back into the claims via claim construction. *See* MasterObjects Br. at 48-50.

## B.     Google Ignores the Prosecution History that Contradicts its Construction

Google proclaims: "nothing in the specification or prosecution history suggests that the claimed invention covers replacing and re-sending the entire string with each update." Google Br. at 2. But Google ignores the prosecution history that says exactly the opposite.  *See* MasterObjects Br. at 50-51.  For

28

example, MasterObjects explained during prosecution that "[c]onsecutive queries only contain the growing string of characters" when distinguishing the "Zim" reference. A1017. Thus, the claimed "query" can contain the entire "growing string of characters" and is not limited to "just the changes." MasterObjects repeatedly reiterated this point to the PTO: "subsequent requests from that client simply pass along the user data (**the 'growing string of characters'**)" and "each query contains a different **query string** that **lengthens or shortens the previous one**." *Id.* (emphasis added)

Google's brief ignores this language, instead arguing that MasterObjects distinguished Zim on slightly different grounds. Google Br. at 54-55. Google misses the point. The cited passages show that MasterObjects put the PTO and the public on notice that its invention includes sending queries that "contain the entire growing string of characters," not just the changes.

## V.    The *eBay* and *Yahoo!* Courts Rejected Google's Arguments

Contrary to Google's argument that the *eBay* and *Yahoo!* claim constructions are "irrelevant," they are directly relevant.

### A.    The Other Courts Rejected Google's "Present Invention" Theory

The *eBay* and *Yahoo!* claim construction orders correctly held that the "present invention" specification language does not limit the claims because there was no clear intent to disavow. In *eBay*, the defendant argued that the claimed

29

communication protocol must be optimized for sending single characters, based on the following passage: "[t]he invention includes … a communication protocol that is optimized for sending single characters from a Client to the Server." '529 patent at 11:55-58 (A89). As the quoted language on page 46 of MasterObjects' brief shows, the district court strongly disagreed, holding that "the inventor's use of 'present invention' was, in fact, referring to an embodiment of the present invention (the QuestObjects embodiment) rather than what is claimed." *MasterObjects, Inc. v. Ebay, Inc.*, No. 3:12-cv-680-JSC, 2013 U.S. Dist. LEXIS 47001, at *23 (N.D. Cal. Mar. 28, 2013) (A1321-22). The *Yahoo!* court similarly declined to read the "invention" language into the claims, holding that "the language cited by Yahoo! only [ ] refer[s] to a limitation of a specific embodiment, the QuestObjects system." *MasterObjects, Inc. v. Yahoo!, Inc.*, 3:11-cv-02539-JSW, 2013 U.S. Dist. LEXIS 168296, at *18 (N.D. Cal. Nov. 26, 2013) (A2122); *see also* MasterObjects Br. at 47-48.

## B. The *eBay* Court Held That the Server is Not Required to "Glue" Queries Together

The *eBay* court went further and squarely ruled that MasterObjects' claims were not limited to a system in which the server "glue[s]" individual queries together:

> Finally, eBay's construction is **inconsistent with the ordinary meaning** of the claims. At oral argument eBay opined that

30

> 'optimized' means that the **client can send single characters to the server and the server then relates each sent single character to the previously sent single characters** and responds with a list of relevant responses. (Dkt. No. 50 at 55:1- 57:13.) In other words, the communication protocol must be able to **'glue' individually sent characters together at the server**. **The claims, however, require the client system 'to send via the network . . . a lengthening string composed of a plurality of consecutively input characters.' '529 Patent Col. 31:52-54;** [ ].... **Thus, eBay's proposed construction contradicts the claims' language.**

2013 U.S. Dist. LEXIS 47001, at *25-26 (A1322-23) (emphasis added). As shown, the *eBay* court expressly rejected Google's central position on appeal to justify its send only the changes construction, namely, that the claims require gluing together individual queries at the server.

### C. Neither eBay nor Yahoo! Believed that the Ordinary Meaning of "Additional Characters" Is Limited to "Only the Changes"

While defendants eBay and Yahoo did not seek a construction for "additional characters," they had the same incentive as Google to seek an "only the changes" construction. Google Br. at 21. Were such a meaning plain on the face of the claims, then surely eBay and Yahoo! would have sought a limiting construction of "additional characters." They did not, further evidencing that Google's plain meaning is not plain.

## VI.    Conclusion

For the foregoing reasons, MasterObjects respectfully requests that this
Court reverse the construction and judgment of the court below and remand for
further proceedings. [6]

June 23, 2014                                        Respectfully submitted,


                                                    */s/ Spencer Hosie*
                                                    Spencer Hosie
                                                    HOSIE RICE LLP
                                                    600 Montgomery Street, 34th Floor
                                                    San Francisco, CA  94111
                                                    (415) 247-6000 (Telephone)
                                                    (415) 247-6001 (Facsimile)
                                                    shosie@hosielaw.com

                                                    *Attorneys for Plaintiff-Appellant*
                                                    *MASTEROBJECTS, INC.*

---

[6] Google's waiver argument regarding the accused Google Suggest feature is
peculiar.  MasterObjects appealed from the "stipulated final judgment" and argued
reversible error in the "additional characters" construction.  *See* A1904 (Notice of
Appeal); MasterObjects Br. at 3.  MasterObjects argued that this error required that
the stipulated final judgment of non-infringement be vacated; it did not limit its
request to Google Instant.  MasterObjects Br. at 5, 52.  This is a claim construction
dispute, and MasterObjects certainly was not required to describe all accused
products or risk waiver.

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 23rd day of June, 2014, I caused this Reply Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Jeffrey J. Toney
Darcy L. Jones
Jonathan K. Waldrop
KASOWITZ BENSON TORRES & FRIEDMAN, LLP
1349 W. Peachtree Street
Atlanta, Georgia  30309
(404) 260-6133

Keith J. Mitro
Robert P. Watkins, III
KASOWITZ BENSON TORRES & FRIEDMAN, LLP
333 Twin Dolphin Drive, Suite 200
Redwood Shores, California  94065
(650) 453-5170

*Counsel for Appellee*

Upon acceptance by the Clerk of the Court of the electronically filed document, the required number of copies of the Reply Brief of Appellant will be hand filed at the Office of the Clerk, United States Court of Appeals for the Federal Circuit in accordance with the Federal Circuit Rules.

/s/ Spencer Hosie
*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*6,965*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[      ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[      ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: June 23, 2014                         /s/ Spencer Hosie
                                                        *Counsel for Appellant*